Robert G. Abrams
Thomas A. Isaacson
Peter A. Barile III
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 783-0800
Fax: (202) 383-6610
abramsr@howrey.com
isaacsont@howrey.com
barilep@howrey.com

Paul Alexander
HOWREY LLP
1950 University Avenue
East Palo Alto, CA 94303
Tel.: (650) 798-3500
Fax: (650) 798-3600
alexanderp@howrey.com

Emily L. Maxwell
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA 94105
Tel.: (415) 848-4947
Fax: (415) 848-4999
maxwelle@howrey.com

Guido Saveri
R. Alexander Saveri
Melissa Shapiro
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
Fax: (415) 217-6813
guido@saveri.com
rick@saveri.com
melissa@saveri.com
cadio@saveri.com

*Lead Class Counsel*
*Member of the Steering Committee for*
*Plaintiffs in MDL No. 2029*

*Liaison Class Counsel*
*Member of the Steering the Committee for*
*Plaintiffs in MDL No. 2029*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE ONLINE DVD RENTAL ANTITRUST LITIGATION** | **Master File No. M:09-CV-2029 PJH** <br><br> **MDL No. 2029** <br><br> **Hon. Phyllis J. Hamilton** |
| **This document relates to:** <br><br> **ALL ACTIONS** | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1    NOW COME Plaintiffs, ANDREA RESNICK, BRYAN EASTMAN, AMY LATHAM, MELANIE

2  MISCIOSCIA, STAN MAGEE, MICHAEL OROZCO, LIZA SIVEK, and MICHAEL WIENER, for their Complaint

3  brought under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16

4  of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, for treble damages and injunctive relief against

5  Defendants Netflix, Inc. ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Wal-Mart.com

6  USA LLC ("Walmart.com").

7    Based upon personal knowledge, information, and belief, and the investigation of counsel,

8  Plaintiffs allege as follows:

9                          **NATURE OF THE ACTION**

10    1.   This suit is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil

11  Procedure on behalf of a plaintiff Class, defined more fully below, consisting of all persons and entities

12  that paid a subscription fee to Defendant Netflix to rent DVDs between May 19, 2005 and the date of

13  class certification (the "Class Period").

14    2.   On or before May 19, 2005, Defendants completed and entered into an illegal

15  anticompetitive agreement (the "Market Allocation Agreement") to divide the markets for sales and

16  online rentals of DVDs in the United States, with the purpose and effect of monopolizing and

17  unreasonably restraining trade, in at least the market for online DVD rentals (the "Online DVD Rental

18  Market"). The mechanics of the Market Allocation Agreement, as set forth herein, allowed Defendant

19  Netflix to charge supracompetitive prices to Plaintiff and other Class members.

20    3.   At the beginning of 2005, Defendants Netflix and Walmart.com were competing directly in

21  the Online DVD Rental Market. Walmart.com viewed its relatively new online rental program, "Wal-

22  Mart DVD Rentals," as a success, expressing considerable optimism about the future growth of the

23  service. In early January 2005, Walmart.com reduced the price of its most popular online DVD rental

24  program, reflecting its plans to expand in that market, which placed further price pressure on Netflix.

25  Facing growing competition from Walmart.com, in January 2005, Netflix CEO Reed Hastings invited

26  Walmart.com CEO John Fleming to dinner for a meeting to discuss their (then) competing businesses.

27    4.   Fleming accepted the invitation; that meeting and other communications led to Defendants

28

HOWREY LLP

                                        1
                    CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1   entering the Market Allocation Agreement, pursuant to which Walmart.com agreed to exit the Online

2   DVD Rental Market and Netflix agreed not to enter the retail DVD market, but instead to actively

3   promote DVD sales by Wal-Mart Stores and Walmart.com.

4       5.   Since entering into the Market Allocation Agreement, neither Wal-Mart Stores nor

5   Walmart.com has rented DVDs online and Netflix has not sold new DVDs.  The Market Allocation

6   Agreement served to eliminate all competition (including price competition) between Walmart.com

7   and Netflix in the Online DVD Rental Market, entrench and enhance Defendants' dominant market

8   positions, and otherwise cause harm to competition, including enabling Netflix to charge higher

9   subscription prices for online DVD rentals than it would have had they not entered into the Agreement.

10  Plaintiffs and all other similarly situated consumers did in fact pay and continue to pay higher

11  subscription prices to Netflix than they otherwise would have as a result of Defendants' conduct.

12                          **PLAINTIFFS**

13      6.   ANDREA RESNICK is an adult individual who resides in San Francisco, California.  During

14  the Class Period, Ms. Resnick directly subscribed to Netflix for her personal, non-commercial use and

15  paid Netflix fees in connection therewith.  The subscription fees Ms. Resnick paid to Netflix were

16  supracompetitive; they were greater than she would have paid, but for the antitrust violations alleged

17  herein.  Ms. Resnick thereby suffered injury in her property, in the form of overcharges, injury which

18  the antitrust laws are intended to prevent and remedy.

19      7.   BRYAN EASTMAN is an adult individual who resides in Washington, DC.  During the Class

20  Period, Mr. Eastman directly subscribed to Netflix for his personal, non-commercial use and paid

21  Netflix fees in connection therewith.  The subscription fees Mr. Eastman paid to Netflix were

22  supracompetitive; they were greater than he would have paid, but for the antitrust violations alleged

23  herein.  Mr. Eastman thereby suffered injury in his property, in the form of overcharges, injury which

24  the antitrust laws are intended to prevent and remedy.

25      8.   AMY LATHAM is an adult individual who resides in Bristow, Virginia.  During the Class

26  Period, Ms. Latham directly subscribed to Netflix for her personal, non-commercial use and paid

27  Netflix fees in connection therewith.  The subscription fees Ms. Latham paid to Netflix were

28

HOWREY LLP

DM_US:22172748_1

1  supracompetitive; they were greater than she would have paid, but for the antitrust violations alleged

2  herein.  Ms. Latham thereby suffered injury in her property, in the form of overcharges, injury which

3  the antitrust laws are intended to prevent and remedy.

4       9.  STAN MAGEE is an adult individual who resides in Issaquah, Washington.  During the Class

5  Period, Mr. Magee directly subscribed to Netflix for his personal, non-commercial use and paid Netflix

6  fees in connection therewith.  The subscription fees Mr. Magee paid to Netflix were supracompetitive;

7  they were greater than he would have paid, but for the antitrust violations alleged herein.  Mr. Magee

8  thereby suffered injury in his property, in the form of overcharges, injury which the antitrust laws are

9  intended to prevent and remedy.

10       10. MELANIE MISCIOSCIA is an adult individual who resides in Medford, Massachusetts.

11  During the Class Period, Ms. Miscioscia directly subscribed to Netflix for her personal, non-

12  commercial use and paid Netflix fees in connection therewith.  The subscription fees Ms. Miscioscia

13  paid to Netflix were supracompetitive; they were greater than she would have paid, but for the antitrust

14  violations alleged herein.  Ms. Miscioscia thereby suffered injury in her property, in the form of

15  overcharges, injury which the antitrust laws are intended to prevent and remedy.

16       11. MICHAEL OROZCO is an adult individual who resides in San Mateo, California.  During the

17  Class Period, Mr. Orozco directly subscribed to Netflix for his personal, non-commercial use and paid

18  Netflix fees in connection therewith.  The subscription fees Mr. Orozco paid to Netflix were

19  supracompetitive; they were greater than he would have paid, but for the antitrust violations alleged

20  herein.  Mr. Orozco thereby suffered injury in his property, in the form of overcharges, injury which

21  the antitrust laws are intended to prevent and remedy.

22       12. LIZA SIVEK is an adult individual who resides in Milford, Connecticut.  During the Class

23  Period, Ms. Sivek directly subscribed to Netflix for her personal, non-commercial use and paid Netflix

24  fees in connection therewith.  The subscription fees Ms. Sivek paid to Netflix were supracompetitive;

25  they were greater than she would have paid, but for the antitrust violations alleged herein.  Ms. Sivek

26  thereby suffered injury in her property, in the form of overcharges, injury which the antitrust laws are

27  intended to prevent and remedy.

28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1    13. MICHAEL WIENER is an adult individual who resides in Philadelphia, Pennsylvania.  During

2    the Class Period, Mr. Wiener directly subscribed to Netflix for his personal, non-commercial use and

3    paid Netflix fees in connection therewith.  The subscription fees Mr. Wiener paid to Netflix for renting

4    DVDs were supracompetitive; they were greater than he would have paid, but for the antitrust

5    violations alleged herein.  Mr. Wiener thereby suffered injury in his property, in the form of

6    overcharges, injury which the antitrust laws are intended to prevent and remedy.

7                                              **DEFENDANTS**

8                                              **NETFLIX**

9    14. Defendant Netflix is a Delaware corporation headquartered at 100 Winchester Circle, Los

10   Gatos, California, 95032.  Netflix is publicly traded on the NASDAQ under the symbol NFLX.  Its

11   revenues earned from engaging in interstate commerce exceed $1 billion annually.  Through its

12   website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by charging monthly

13   subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans.  Netflix

14   has possessed a market share of at least 75% of the Online DVD Rental Market in the United States, as

15   defined herein, at all times during the Class Period.

16                                             **WAL-MART**

17   15. **Wal-Mart Stores.**  Defendant Wal-Mart Stores is the largest retailer in the United States.

18   Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville,

19   Arkansas, 72716.  Wal-Mart Stores is publicly traded on the New York Stock Exchange under the

20   symbol WMT.  Its revenues earned from engaging in interstate and foreign commerce approach $400

21   Billion annually.  Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells

22   new DVDs directly to consumers nationwide.  Wal-Mart Stores sells far more DVDs than any other

23   retailer in the United States, accounting for about 40% of all new DVDs sold to consumers

24   domestically.  During fiscal years 2005-2008 combined, it and Walmart.com had revenues in excess of

25   $25 billion from selling DVDs to consumers.  Prior to the Market Allocation Agreement, Wal-Mart

26   Stores' wholly-owned subsidiary Walmart.com competed with Netflix in the Online DVD Rental

27   Market through the "Wal-Mart DVD Rentals" service, which was available on www.walmart.com.

28

HOWREY LLP

4

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

16. **Walmart.com.**  Defendant Walmart.com is a California Limited Liability Company with offices at 7000 Marina Boulevard, Brisbane, California, 94005.  Its corporate registration with the California Secretary of State (as of May 18, 2009) lists its address as 702 S.W. 8th St., Bentonville, AR 72716—the same address as Wal-Mart Stores.  It is the online component of Wal-Mart Stores' retail empire that is the leading seller of new DVDs in the United States.

17. Prior to the conspiracy alleged herein, Walmart.com was also a major competitor of Netflix in the Online DVD Rental Market through the "Wal-Mart DVD Rentals" service, which was available on www.walmart.com.  While its financials are not publicly reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United States.  Walmart.com sells new DVDs directly to consumers nationwide.  Consumers who purchase DVDs via www.walmart.com may have them either mailed or otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via Walmart.com's and Wal-Mart Stores' "Site to Store" program.

18. **Wal-Mart Stores and Walmart.com.**  Walmart.com and Wal-Mart Stores are, in essence, operated as a single commercial enterprise and hold themselves out to the public as such, by which Walmart.com is an internet sales channel for Wal-Mart Stores, rather than being an independent business entity.  Wal-Mart Stores is the registrant of the www.walmart.com domain name that is used to sell products and services by Walmart.com.  Likewise, Wal-Mart Stores is the registrant of www.walmartdvdrentals.com.  Wal-Mart Stores' Chief Marketing Officer John Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows:

> Walmart.com was set up as a separate company, with outside investors and with Wal-Mart owning a majority.  The idea was that Walmart.com was going to tap into customers Wal-Mart didn't have and, in doing so, would defend our position as the world's largest retailer.  We saw very quickly that this wasn't how customers viewed the online channel.  Within six months, Wal-Mart bought back the outside interest.

19. **Wal-Mart Stores' Active Participation in the Conspiracy.**  Wal-Mart Stores was actively involved in the conspiracy alleged herein, as alleged more specifically below.  For purposes of these allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and

1   benefiting from, the Market Allocation Agreement.  Moreover, Wal-Mart Stores directed, ratified,

2   approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

3       20. Wal-Mart Stores had a strong motive to conspire with Netflix.  In addition to its interests as

4   the 100% owner of Walmart.com, Wal-Mart Stores had further incentives to enter into the Market

5   Allocation Agreement, since it obtains substantial revenues from sales of new DVDs, as well as store

6   traffic resulting in the sales of other goods, which would have been threatened by Netflix's entry into

7   new DVD sales, and which were enhanced by Netflix's promotion of Wal-Mart Stores and

8   Walmart.com through the Market Allocation Agreement.

9       21. In a letter submitted in connection with a prior antitrust case brought against Netflix by

10   other plaintiffs for other alleged violations of law, an assistant general counsel of Wal-Mart Stores,

11   referring specifically to Wal-Mart Stores, wrote of "Wal-Mart's decision to discontinue renting

12   DVDs."  Moreover, it was Wal-Mart Stores that announced in part the Market Allocation Agreement,

13   which identifies Wal-Mart Stores, in the "About" section of the press release.  The announcement

14   quoted John Fleming, at the time both the Chief Marketing Officer of Wal-Mart Stores and the

15   outgoing CEO of Walmart.com still overseeing Walmart.com operations, regarding the Agreement.  It

16   explained that Walmart.com's DVD sales are in fact Wal-Mart Stores' "online movie sales business,"

17   and that, more generally, Wal-Mart Stores' "[o]nline merchandise sales are available at

18   www.walmart.com."

19       22. Whenever this Complaint refers to a statement or transaction of any corporation or entity,

20   the allegation means that the corporation or entity acted by or through its directors, members, partners,

21   officers, employees, affiliates, or agents, while engaged in the management, direction, control, or

22   conduct of the corporation's or entity's business and acting within its scope of authority.

23                           **JURISDICTION AND VENUE**

24       23. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d) & 1337

25   and 15 U.S.C. §§ 1-2, 15 & 26.

26       24. Venue is proper in this District pursuant to 28 U.S.C. §§ 15, 22 & 26 and pursuant to 28

27   U.S.C. § 1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted

28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1  business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial

2  part of the events at issue in Plaintiffs' claims occurred in this District; and (c) a substantial portion of

3  the affected interstate trade and commerce described below has been carried out in this District.

4      25. This Court has personal jurisdiction over Defendants because, *inter alia*, Netflix and

5  Walmart.com are headquartered in this State and each of the Defendants has transacted business,

6  maintained continuous and systemic contacts, purposefully availed itself of the benefits of doing

7  business, and committed acts in furtherance of the alleged conspiracy in this State.

8                           **INTERSTATE TRADE AND COMMERCE**

9      26. Defendants' conduct has taken place within the flow of, and substantially affected the

10  interstate commerce of, the United States. By way of example, Defendants have sold and/or rented

11  DVDs throughout the United States, involving hundreds of millions or billions of dollars in interstate

12  commerce, and used the instrumentalities of interstate commerce, including interstate wires and the

13  U.S. mail, to sell and/or to rent DVDs throughout the United States.

14                                **RELEVANT MARKET**

15      27. For those claims that may require market definition, the Relevant Market for purposes of

16  these allegations during the Class Period at least is: the rental of DVDs online by subscription for

17  delivery by mail in the United States (the "Online DVD Rental Market"). At all relevant times, Netflix

18  has been a competitor in the Relevant Market. Prior to entering into the Market Allocation Agreement,

19  Defendants Wal-Mart Stores and Walmart.com competed in the Relevant Market.

20      28. The Market Allocation Agreement, however, is *per se* illegal and requires no allegation of

21  market definition.

22      29. Plaintiffs also allege, in the alternative, that the Market Allocation Agreement is

23  anticompetitive and illegal under the Rule of Reason.

24      30. Among other facts alleged herein, the Defendants' conduct ended competition between

25  direct competitors in the Online DVD Rental Market, conferred market and monopoly power upon

26  Netflix in that market and has no pro-competitive benefits.

27

28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

31. "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc containing commercially recorded entertainment programs for personal viewing. DVDs are the primary medium by which movies and other recorded entertainment are distributed in the United States. Revenues on DVDs far exceed those generated from box office receipts. In addition, DVDs have become a particularly lucrative means for the distribution of previously aired television programs, surpassing even television syndication rights as a revenue stream in many instances. As defined herein, "DVD" does not refer to blank Digital Video Discs, which are used to store or record data.

32. At all relevant times, there have been no reasonably interchangeable substitutes for the service of online DVD rentals, which is differentiated, from both the demand and the supply side, from other methods of DVD distribution channels, as well as other methods of entertainment content delivery.

33. In the Online DVD Rental Market, for a monthly subscription fee, a consumer may rent DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to its exit from this market) Wal-Mart DVD Rentals. Within any given plan, the consumer pays the subscription fee regardless of how many DVDs he or she rents per month. Thus, even a consumer who does not rent a DVD for months still is charged the subscription fee; Netflix CEO Reed Hastings has called this the "gym membership effect." To rent DVDs, consumers fill out a rental "queue" in their online profile, listing in order of preference the DVDs they wish to rent. The DVDs are then sent to the consumer's home via U.S. mail. To return the DVD and receive the next DVD in the queue, the consumer inserts the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then mails the next available movie in the queue to the consumer.

34. From the consumer's perspective, online DVD rentals are a differentiated service that is not reasonably interchangeable with in-store video rental. In video rental from stores, consumers drive to or otherwise arrive at the store, find (or do not find) what they are looking for, and, for the most part, pay on a per-DVD basis for their selection(s). After the designated rental period, usually depending upon the release date of the DVD, the consumer returns the selection or potentially incurs late fees. During the Class Period as alleged herein, these late fees have accounted for as much as 20% of the

1    revenues in traditional video rental stores; there are no late fees or due dates in the Online DVD Rental

2    Market.

3        35. There are numerous other practical indicia of the Online DVD Rental Market being a

4    relevant product market, distinct from other forms of video rental, including:

5        **A.    Price Competition.**  No direct price competition exists between online DVD

6    rental and other forms of video rental, whether in-store, kiosk, video-on-demand, or video

7    downloading, which are not reasonably interchangeable with online DVD rental.  For example, online

8    DVD rentals generally are priced on a monthly subscription basis.  Within any given plan, the

9    subscription rate is independent of the number of DVDs the customer actually rents in a month.  In-

10   store DVD rentals, kiosks, and downloading generally are priced on a pay-per-view basis.  Also,

11   changes in the price of online rentals do not closely track changes in the price of in-store rentals.  The

12   pricing of online DVD rentals is generally nationwide in scope and is not affected by local in-store

13   prices and competition.  As a result, the pricing of online DVD rentals would generally be the same to

14   a customer, regardless of whether the nearest rental store is two minutes or two hours away.  Online

15   DVD rentals generally offer additional services, such as movie reviews, customer-specific

16   recommendations based on viewing and preference history, and other metrics of popularity.  The cross-

17   elasticity of demand between these products and services is such that a small but significant non

18   transitory increase in price ("SSNIP") would not cause consumers to switch from online DVD rental to

19   in-store rental or any other arguable method of DVD or video distribution, and *vice versa*.

20       **B.    Functional Differences.**  Online DVD rentals fundamentally differ from in-

21   store rentals in that (1) they do not require travel to a store (including a second trip to return the DVD

22   and potentially multiple trips if the store does not have the DVD in stock at the right time), (2) are

23   available to anyone with a postal address, regardless of proximity to a store, (3) are primarily

24   subscription-based services, and (4) provide a much wider selection of titles than can a bricks-and-

25   mortar store—the library of titles available from online service providers has grown over time, now

26   ranging near 100,000 DVDs—often twenty to one-hundred times the selection of titles stocked (not to

27   mention available) at any single video rental store.  For these reasons, among others, online and in-

28
HOWREY LLP

DM_US:22172748_1

1  store DVD rentals are not reasonably interchangeable.  Likewise, other modes of video distribution,

2  such as kiosk, video-on-demand, and downloading, among other forms, are not reasonably

3  interchangeable with online DVD rentals for a number of reasons, including relative selection and

4  convenience for consumers, pricing, as well as, from the supply perspective, licensing considerations

5  and technological limitations.

6          **C.**    **Public and Industry Perceptions.**  The online rental market is recognized as a

7  distinct market by the public and the industry, including by Defendants.  For example, Defendants

8  have confirmed and recognized the existence of a discrete online rental market.  In September 2008,

9  Netflix spokesman Steve Swasey told the Wall Street Journal that other types of rental services, such

10  as kiosk and in-store rentals, do not present a direct competitive threat to Netflix explaining, "We see

11  kiosks as competing with video stores.  They're very new-release centric—that's all they offer—and

12  that's what the stores offer.  You're still going to a destination to pick it up, you have to return it, and

13  you pay by the day."  Mr. Swasey acknowledged that while video downloads may be a competitive

14  force in the future, "[m]ainstream consumers are still happy with DVDs, and probably will be for five

15  to 10 years."

16          36. With DVD being the dominant medium for years to come, the entry of this technology is

17  not timely enough to be considered a competitive force in the relevant market.  Indeed, Netflix CEO

18  Reed Hastings maintains that DVDs will be the dominant medium for movies for perhaps as long as

19  the gasoline engine. He thus has predicted that the competitive threat of internet downloading to online

20  DVD rental is like that of hydrogen powered cars to gasoline powered cars—inconsequential for many

21  years to come.

22          37. As recently as April 24, 2009, during Netflix's First Quarter conference call with financial

23  analysts, Hastings said that online DVD and Blu-ray rental will "continue to grow for many years,"

24  without regard to any advances in video downloading or other modes of content delivery.  Hastings

25  went to explain that the "key takeaway" is that "there is still a lot of growth in rental by mail.  The

26  studios clearly have a vested interest in extending the life of DVD and Blu-ray and that's good for

27  Netflix as well."  Indeed, Hastings observed video kiosks pose no serious competitive threat to Online

28

HOWREY LLP

DM_US:22172748_1

1    DVD Rental, explaining that "Despite kiosk growth . . . we had a record quarter and we expect to have

2    a record year because our differentiators continue to be our vast selection—over 100,000 titles—the

3    convenience of mail and streaming, that you don't have to drive anywhere to receive or return a Netflix

4    disk, and our unlimited rentals for one flat fee." He also observed that by year's end, in-store rentals,

5    video streaming and DVD sales would be even less of a competitive threat than video kiosks.

6         38. Online DVD rentals are also a separate market from DVD sales. The pricing of DVD sales

7    and online DVD rentals are very different. For example, the price to buy a new DVD depends heavily

8    on how popular it is, including whether it is a new release or how successful the title originally was at

9    the box office or on television. By contrast, online DVD renters generally charge based on a

10   subscription fee, regardless of whether the consumer is renting popular or obscure DVDs. The

11   industry and the public perceive online DVD rentals as separate from DVD sales, whether in-store or

12   online. The factors motivating a consumer to buy a DVD are different from those that lead to renting a

13   DVD. The former generally applies to DVDs that the consumer intends to view (either personally, or

14   their family or friends) numerous times. The latter generally applies to DVDs that the consumer

15   intends to view once and then return. DVDs sold at retail have other distinguishing characteristics,

16   such as packaging and special features not available with rentals, which are delivered unadorned in

17   envelopes. In addition, the fact of whether a DVD is new or used is not an issue in rental, but is a

18   significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts.

19   DVD sales and online rentals also are not reasonably interchangeable for consumers intending to

20   collect physical DVDs or to give a DVD as a gift. The cross-elasticity of demand between these

21   products and services is such that a SSNIP would not cause consumers to switch from online renting to

22   purchasing DVDs, and *vice versa.*

23        39. The Geographic Market for the Online DVD Rental Market is the United States. The

24   United States is the only area of effective competition where buyers can turn for alternative sources of

25   supply of Online DVD Rental services. Among other things, shipping costs and transglobal

26   differences in DVD data encoding make it neither practical nor feasible for entities located in other

27   countries to rent DVDs to U.S. consumers.

28

HOWREY LLP

DM_US:22172748_1

## **MARKET AND MONOPOLY POWER**

40. At all relevant times, Netflix dominated the Online DVD Rental Market. Netflix has had an approximate market share of 75% in the Online DVD Rental Market, and is far and away the market leader in the Online DVD Rental Market. As a result of this market share, Netflix has had, and continues to have, market and monopoly power in the Online DVD Rental Market; it has the power to control prices or exclude competition in this Relevant Market.

41. Netflix also has the power to control prices or exclude competition in the Relevant Market for other reasons. Specifically, Netflix (a) set subscription prices well in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such subscriptions generally in excess of the competitive price, and (d) would not, with a SSNIP for its online DVD rental subscriptions (or not reducing its prices to match Blockbuster's lower prices during the Class Period), lose sufficient sales to make such a price increase unprofitable.

42. Netflix's market and monopoly power is strengthened by the significant barriers to entry in the Relevant Market. There have been no significant market entrants in the nearly four years since the announcement of the Market Allocation Agreement, which increased those barriers. Online DVD rental is highly capital intensive. A firm must operate on a large scale to be successful. It requires the possession of a significant number of shipping facilities strategically located throughout the United States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain the selection of titles that consumers demand. As Netflix CEO Reed Hastings observed, "When you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the barriers to profitability are very large." Hastings further noted that "opening a website that does rental is easy. What's hard is [creating] the scale to be able to do it profitably." These barriers are far greater now that they were when Netflix began. Netflix was able to enter on a much smaller scale but a new entrant today would need a much larger scale of operations.

43. Since the implementation of the Market Allocation Agreement, the Online DVD Rental Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not

1   control.  Blockbuster's presence does not preclude Netflix's monopoly and market power.  Reed

2   Hastings has stated that Blockbuster actually "works very well for us" because it creates "a lot of

3   press" but, from a competitive perspective, it has a "relatively not strong balance sheet and [is] in the

4   business in a small way."  A few minor firms have shares of less than 1-2% of the market.  During

5   fiscal years 2005-2008 combined, Netflix earned more than $5 Billion in revenues and nearly $2

6   Billion in gross profit from renting DVDs to consumers—a margin of nearly 40%.  As a result of

7   Netflix's market and monopoly power alleged herein, its subscription fees have been higher than they

8   otherwise would have been.

9       44. Further evidence of Netflix's market and monopoly power is reflected in the

10   anticompetitive effects alleged herein.

11                   **THE ILLEGAL AGREEMENT**

12       45. **Pre-Agreement Competition in the Online DVD Rental Market.**  In early 2005, Netflix

13   was coming off a year in which competition was growing and its stock price had dropped

14   precipitously.  It faced increasing competition from Wal-Mart DVD Rentals and from Blockbuster

15   Online, the latter of which had just entered the Online DVD Rental Market.

16       46. By mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan.

17   Blockbuster entered the online market in earnest in August, at first charging $19.99 but then reducing

18   its price in November to $17.49 for its similar plan.  After that, the Wal-Mart DVD Rentals rate was

19   reduced from $18.86 to $17.36.  In the wake of these price cuts, Netflix reduced its prices by nearly

20   20% to $17.99 per month.  After that, Blockbuster further decreased its price to $14.99—20% below

21   Netflix's already reduced price and more than 40% below the price Netflix was charging just months

22   earlier.

23       47. Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had

24   established themselves as the leader in new DVD sales, were facing increasing competition from in-

25   store and online channels of distribution in new DVD sales, including competition from Amazon.com.

26   At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of

27   millions of customers who were also known to be prolific DVD buyers, and the sales and profits of

28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1  Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to these

2  customers.  Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional sales

3  and profits and to gain further market share in the sale of new DVDs if these customers were to make

4  their purchases of new DVDs from them instead.

5      48. **Walmart.com's success and plans for the online DVD rental business prior to the**

6  **Agreement**.  From its beginnings in 2003 through the January 2005 dinner, Walmart.com trumpeted

7  the success of its online DVD rental service.  As early as November 2003, Cynthia Lin, a

8  spokeswoman for Walmart.com, observed that "Customers have really been responsive to the

9  convenience of ordering online. . . . There's definitely a large appetite for this."  And, in February

10  2004, Walmart.com said it was "seeing superb growth" in Wal-Mart DVD Rentals.  By April 2004,

11  Walmart.com said its gains in monthly subscribers were "exceeding expectations."  On October 24,

12  2004, only a few months prior to the January dinner, Kevin Swint, Walmart.com's director of

13  entertainment and photo said that Wal-Mart DVD Rentals had "grown beyond our expectations" and

14  that "We're really bullish about this service . . . and our customers are enthusiastic."

15      49. The recognition of the potential of its DVD rental business also was reflected in the

16  dramatic expansion of Wal-Mart DVD Rentals during 2004 by the doubling of its capacity and

17  expressions of plans to continue that expansion in 2005.  During 2004, for instance, Wal-Mart DVD

18  Rentals expanded its DVD selection from 13,000 titles to 20,000 and doubled the number of

19  distribution centers from 7 to 14.  In December 2004, Amy Colella, a spokeswoman for Walmart.com,

20  said that the business was going to add even more distribution centers the following year.  As Colella

21  explained on December 29, 2004: "It's a viable business for us, with growth potential."  During a

22  January 7, 2005 interview, within days of the January dinner of CEOs Hastings and Fleming,

23  Walmart.com CEO John Fleming told CNBC that Wal-Mart DVD Rentals was among its "very good

24  businesses that we're focused on developing over the next year or two."

25      50. **The Wal-Mart DVD Rentals Price Cut.**  On that same day, January 7, 2005, Wal-Mart

26  DVD Rentals dropped the price on its most popular DVD rental plan significantly—to $12.97 per

27  month—creating further price pressure on Netflix to reduce its DVD rental prices.  In order to respond

28

1  to the increased competition, Netflix would have been forced to lower its prices and thereby reduce its

2  profits.  This increased competition was not good news for Netflix.  "Since its core business is online

3  DVD rentals, Netflix might have been the company most threatened by Wal-Mart's push into the

4  sector," as one industry publication then noted.  That publication further explained, "Because of its

5  size, buying power and agreements with movie distributors, Wal-Mart could have put significant

6  pricing pressure on Netflix over time, analysts said."  This growing price disparity plainly was not

7  good news for Netflix, even though it was for consumers.

8      **51. The January Dinner Meeting.**  Faced with this increasing competition, Reed Hastings, the

9  Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to

10  dinner to discuss their companies' (then) competing businesses.  Fleming accepted the invitation; they

11  met in January 2005, "started talking about how we could work together" (according to Hastings), and

12  embarked upon a scheme that would result in the Market Allocation Agreement.

13      **52. Hastings' Subsequent "Prediction."**  On April 21, 2005, in Netflix's First Quarter

14  earnings call with financial analysts, held after the January dinner, but less than one month prior to the

15  public announcement of the Market Allocation Agreement, Hastings made plain the motive for Netflix

16  to conspire with Wal-Mart Stores and Walmart.com:

17          In terms of profitability over the coming years, the key issue is the number of major
           competitors.  If there are only two major players, Blockbuster and Netflix, the
18          profitability may be substantial like other two-firm entertainment markets.  If, on the
           other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in
19          online rental, then the profits would likely be small.

20  Hastings went on to "predict" on that conference call:

21          [T]he likely case is [that] online rental becomes a two-firm market over the coming
           years.
22

23      **53. The Public Announcement.**  On May 19, 2005, shortly after Fleming had been promoted

24  by Wal-Mart Stores from his position at Walmart.com in Brisbane to be the Chief Marketing Officer of

25  Wal-Mart Stores in Bentonville, Defendants issued a joint press release that revealed the existence of

26  the Market Allocation Agreement.  By entering into the Market Allocation Agreement, Defendants

27  unlawfully divided and allocated the markets for DVD sales and rentals, and did, in fact, create the

28

HOWREY LLP

DM_US:22172748_1

1 two-firm market that Hastings sought. Recognizing the tremendous benefits that this improper

2 agreement would bring to them, Hastings admitted that "This agreement bolsters both Netflix's

3 leadership in DVD movie rentals and Wal-Mart's strong movie sales business."

4     54. **The Media's Reaction.** The news of the agreement was featured in a number of

5 newspapers and other publications, in articles with aptly colorful titles, such as:

6         •  "Wal-Mart and Netflix Scratch Each Other's Backs,"

7         •  "Truce in DVD-Rental Wars,"

8         •  "Wal-Mart and Netflix: An Alliance," and

9         •  "Wal-Mart Loves Netflix: And Vice-Versa."

10     55. **The Execution.** Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the

11 Online DVD Rental Market. Walmart.com announced to all of the subscribers to Wal-Mart DVD

12 Rentals that it was exiting the Relevant Market and that those subscribers could be transferred to

13 Netflix. Walmart.com took additional steps to affirmatively implement the Market Allocation

14 Agreement by adding a prominently placed link to the Netflix website to encourage customers to

15 transfer their subscriptions to and otherwise rent from Netflix. Since the date of their joint

16 announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind down its

17 existing online rental business), neither Walmart.com nor Wal-Mart Stores has participated in the

18 Online DVD Rental Market, and Netflix has not sold new DVDs.

19     56. As a result of the Market Allocation Agreement, downward pricing pressure from

20 Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors.

21 Absent the Market Allocation Agreement, Netflix would have lowered its prices no later than May 19,

22 2005. As a result of the elimination of a competitor in this Relevant Market, Netflix was able to hold

23 its subscription rate steady at $17.99 per month and its only competitor left, Blockbuster, was able to

24 raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per

25 month. This was in accord with Hastings' expectation that "[i]f there are only two major players,

26 Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment

27 markets." As one business publication proclaimed: "That's one less competitor for the DVD rental

28

DM_US:22172748_1

1  pioneer . . . . Now it looks like the competitive storm is dying down." In Netflix's next earnings call,

2  on July 25, 2005, Hastings boasted:

3      Last quarter we said online rental was shaping up to be a two-player market, and that is
        indeed what is happening.

4

5      57. The Market Allocation Agreement was not in the independent self-interest of Wal-Mart

6  Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted

7  Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to

8  Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an

9  agreement not to compete for new DVD retail sales. But for the Market Allocation Agreement,

10  Walmart.com would not have exited the Online DVD Rental Market when it did. Likewise, Netflix

11  would not have foreclosed its opportunity to sell DVDs to its millions of subscribers—a base of

12  customers who purchase on average 25 DVDs per year each—and would not have promoted new DVD

13  sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them

14  not to compete against Netflix's online rental business.

15      58. Walmart.com's exit from the Online DVD Rental Market was not a unilateral decision. It

16  was a key element of the Market Allocation Agreement as set forth herein. First, Walmart.com's exit

17  was expressly part of the Market Allocation Agreement with Netflix that directly stemmed from the

18  meeting between the two companies' CEOs. Prior to that Agreement, Walmart.com had not

19  announced anything about exiting this market. Second, as detailed above, shortly prior to the January

20  dinner Walmart.com repeatedly described its success in the online DVD rental business and expressed

21  its intention to continue and expand in that business. Its conduct after the January meeting thus

22  represents a sudden and sharp reversal in its plans. Third, Walmart.com cut its price shortly before the

23  January dinner. It would not have done so had it planned to exit the Online DVD Rental Market. Such

24  a price cut only makes sense if Walmart.com planned to remain a long-term competitor in that market.

25  Fourth, the fact that the dinner was initiated by Reed Hastings right around the time of Walmart.com's

26  price cut and numerous announcements of its intention to continue and expand its online DVD rental

27  business, contradicts any assertion that the dinner stemmed from a unilateral decision by Walmart.com

28

1   to exit the market.

2   59. **Single agreement**.  The conduct alleged herein constitutes a single overarching conspiracy

3   consisting of both the terms that were publicly announced as well as the other aspects of the Market

4   Allocation Agreement.

5   <u>**ANTICOMPETITIVE EFFECTS**</u>

6   60. Defendants' illegal acts and practices have caused anticompetitive effects in the Online

7   DVD Rental Market. The subscription fees charged by Netflix to Plaintiffs, as well as the other

8   members of the Class, were maintained at artificially high and supracompetitive levels.  Plaintiffs and

9   the other members of the Class paid higher subscription prices to Netflix than they otherwise would

10  have paid.  As one industry publication reported at the time of the Agreement, "[b]ecause of its size,

11  buying power and agreements with movie distributors, Wal-Mart could have put significant pricing

12  pressure on Netflix over time, analysts said."

13  61. The Market Allocation Agreement (i) eliminated one of only three significant competitors

14  in the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to

15  acquire market power and also acquire and maintain monopoly power in the Relevant Market.  The

16  Market Allocation Agreement has enabled Netflix to implement monopolistic and supracompetitive

17  pricing in the Relevant Market.

18  62. **The Market Allocation Agreement and Defendants' acts and practices in furtherance**

19  **thereof have no procompetitive benefits.**  The co-promotion aspects of the Agreement do not create

20  information that consumers need, nor do they create new or better products or services.  Rather, they

21  have served to reinforce the true anticompetitive nature of the Market Allocation Agreement by

22  assuring, for example, that Walmart.com not only withdrew from the Online DVD Rental Market, but

23  further enhanced Netflix's position in that market.  Even if there were any such benefits, they would

24  not outweigh any of the anticompetitive effects described herein, and, in any event, could be achieved

25  by less restrictive means.

26  63. Defendants' market allocation scheme is a naked restraint of trade; it was not and is not

27  ancillary to any legitimate business collaboration.  Rather, the market allocation scheme was a core

28
HOWREY LLP

DM_US:22172748_1

1    activity of the Market Allocation Agreement itself.  The co-promotion aspects of the Agreement were a

2    means to reinforce the market allocation.  To the extent that those aspects were portrayed as the sole

3    reason for the Market Allocation Agreement, that portrayal was misleading and pretextual, allowing

4    Defendants' market allocation conspiracy to escape scrutiny and "hide in plain sight."

5                                  **CLASS ACTION ALLEGATIONS**

6            64. Plaintiffs bring this action on their own behalf and as a class action under Rules

7    23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

8    following Class:

9            Any person or entity in the United States that paid a subscription fee to Netflix on or
             after May 19, 2005 up to and including the date of class certification.
10

11           Excluded from the Class are government entities, Defendants, their co-conspirators,
             Reed Hastings, John Fleming, Defendants' subsidiaries, corporate affiliates, and
12           counsel in this action.  Also excluded are persons who subscribed to Wal-Mart DVD
             Rentals as of May 19, 2005.  Also excluded are the Judge presiding over this action, her
13           law clerks, her spouse, or any person within the third degree of relationship to either of
             them, or the spouse of such a person, within the meaning of 28 U.S.C. § 455.
14

15           65. The Class numbers in the millions, the exact number and identities of the members being

16   known by Defendants.

17           66. The Class is so numerous and geographically dispersed that joinder of all members is

18   impracticable.

19           67. There are questions of law and fact common to the Class and the members

20   thereof.  These common questions relate to the existence of the conspiracy alleged, and to the type

21   and common pattern of injuries sustained as a result thereof.  The questions include, but are not

22   limited to:

23           a.    Whether Defendants engaged in a contract, combination, or conspiracy to
                   allocate markets;
24
25           b.    Whether Defendants unreasonably restrained trade in the Online DVD Rental
                   Market;
26           c.    Whether Defendants had the specific intent for Netflix to monopolize the
                   Online DVD Rental Market;
27
28           d.    The nature and character of the acts performed by Defendants in the
                   furtherance of the alleged contract, combination, and conspiracy;

HOWREY LLP

DM_US:22172748_1

e. Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f. Whether the alleged contract, combination, and conspiracy and other conduct violated Section 2 of the Sherman Act;

g. The anticompetitive effects of Defendants' violations of law;

h. Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

i. Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiffs and other members of the Class.

68. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

69. Each Plaintiff is a member of the Class. Plaintiffs' claims are typical of the claims of other members of the Class, and they will fairly and adequately protect the interests of the members of the Class. Their interests are aligned with, and not antagonistic to, those of the other members of the Class.

70. Plaintiffs are represented by counsel who are competent and experienced in class action antitrust litigation.

71. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## ANTITRUST INJURY AND STANDING

72. During the Class Period, Plaintiffs and the members of the Class have directly paid monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

73. Plaintiffs and the members of the Class have suffered, and many continue to suffer, injury

1    of the type that the antitrust laws are designed to punish and prevent.  Plaintiffs and the members of

2    the Class have paid, and many continue to pay, more to subscribe to Netflix than they would

3    have, absent the Market Allocation Agreement.  As a direct and proximate result of the unreasonable

4    restraint of trade and market and monopoly power created by the Market Allocation Agreement, which

5    is continuing to this day, Plaintiffs and the members of the Class were, and many continue to be,

6    injured and financially damaged in their businesses and property, in amounts that are not presently

7    determined.  As the direct victims of Defendants' antitrust violations, Plaintiffs are efficient

8    enforcers of the antitrust claims made herein.

9

**COUNT ONE**

10

**SHERMAN ACT SECTION ONE (15 U.S.C. § 1)**
**Market Allocation of Online DVD Rental Market**
**(Against All Defendants)**

11

12    74. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

13    75. Defendants have entered into a *per se* illegal market division agreement, in violation of

14    Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

15    76. In the alternative, if evaluated under the Rule of Reason, the Market Allocation Agreement

16    is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §

17    1.

18    77. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors

19    in the Online DVD Rental Market.  In addition, Netflix was a potential competitor of Wal-Mart Stores

20    and Walmart.com in new DVD sales.  Wal-Mart Stores and Walmart.com were actual participants and

21    Netflix was a potential participant, with the means and economic incentive to sell new DVDs—in the

22    absence of the Market Allocation Agreement.

23    78. Defendants shared a conscious commitment to a common scheme designed to achieve the

24    unlawful objective of allocating the markets for online DVD rentals and new DVD sales.  The Market

25    Allocation Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and

26    Walmart.com agreeing not to compete in that market.  The agreement also allocated new DVD sales to

27    Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new DVDs in

28    competition with them.

HOWREY LLP

DM_US:22172748_1

79. In addition to explicitly or *de facto* agreeing not to sell new DVDs, Netflix also obtained the Market Allocation Agreement by providing potentially valuable promotion to Wal-Mart Stores and Walmart.com.  In so doing, Netflix provided significant consideration to Wal-Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and both Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

80. The Market Allocation Agreement has created significant anticompetitive effects and no pro-competitive benefits.  It eliminated competition in the Relevant Market, raising prices paid by consumers.  To the extent that there were any procompetitive benefits resulting from the agreement, they would not outweigh the agreement's anticompetitive effects and could have been achieved by less restrictive means.

81. As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

### COUNT TWO

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Monopolization of Online DVD Rental Market**
**(Against Netflix)**

82. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

83. Netflix has monopoly power in the Online DVD Rental Market.

84. Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Allocation Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.  That monopolization was achieved or strengthened through restrictive or exclusionary conduct, rather than by means of superior business acumen.  It was Netflix's conscious object to further its dominance in the relevant market by and through the Market Allocation Agreement.

85. As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1

## COUNT THREE

2
### SHERMAN ACT SECTION TWO (15 U.S.C. § 2)
**Attempt to Monopolize Online DVD Rental Market**
3
**(Against Netflix)**

4    86. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

5    87. If Netflix does not already have monopoly power, then Netflix has a dangerous probability

6 of success in achieving monopoly power in the Online DVD Rental Market.

7    88. With the specific intent to achieve a monopoly, Netflix, by its acts and practices described

8 herein, including by executing, implementing, and otherwise complying with the Market Allocation

9 Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of

10 the Sherman Antitrust Act, 15 U.S.C. § 2. It was Netflix's conscious object to control prices and/or

11 exclude competition in the relevant market.

12    89. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

13 Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

14

## COUNT FOUR

15
### SHERMAN ACT SECTION TWO (15 U.S.C. § 2)
**Conspiracy to Monopolize Online DVD Rental Market**
16
**(Against All Defendants)**

17    90. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

18    91. Defendants shared a conscious commitment to a common scheme designed to achieve the

19 unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time

20 of the Agreement, Netflix and Walmart.com were actual competitors in that market. Defendants

21 conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would

22 result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart

23 Stores and Walmart.com knew that the natural and probable consequence of the Market Allocation

24 Agreement would be the monopolization of the Relevant Market by Netflix. Defendants have

25 committed overt acts in furtherance of their conspiracy, including entering into, complying with, and

26 implementing the Market Allocation Agreement, in violation of Section 2 of the Sherman Antitrust

27 Act, 15 U.S.C. § 2.

28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1     92. As a result of this violation of law, Netflix's subscription prices charged to, and paid by,

2 Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiffs respectfully request that:

3      A.    The Court determine that this action may be maintained as a class action under
             Rule 23 of the Federal Rules of Civil Procedure and that Plaintiffs be appointed
4            class representatives.

5      B.    Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust
             Act, 15 U.S.C. §§ 1-2.
6
       C.    The Court declare the Market Allocation Agreement between Defendants
7            announced May 19, 2005, to be unlawful and null and void.

8      D.    Judgment be entered for Plaintiffs and the members of the Class against
             Defendants, jointly and severally, for three times the amount of damages
9            sustained by Plaintiffs and the Class, under Section 4 of the Clayton Antitrust
             Act, 15 U.S.C. § 15, together with the costs of the action, including reasonable
10           attorneys' fees, and such other relief as is appropriate.

11     E.    Defendants, their affiliates, successors, transferees, assignees, and the officers,
             directors, partners, agents and employees thereof, and all other persons acting or
12           claiming to act on their behalf, be permanently enjoined and restrained from, in
             any manner, continuing, maintaining or renewing the contract, combination or
13           conspiracy alleged herein, or from engaging in any other contract, combination
             or conspiracy having similar purpose or effect, and from adopting or following
14           any practice, plan, program or device having a similar purpose or effect,
             pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.
15
       F.    Plaintiffs and the members of the Class have such other, further, and different
16           relief as the case may require and the Court may deem just and proper under the
             circumstances.

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1

## **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiffs respectfully request that:

3      A.     The Court determine that this action may be maintained as a class action under
              Rule 23 of the Federal Rules of Civil Procedure and that Plaintiffs be appointed
4             class representatives.

5      B.     Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust
              Act, 15 U.S.C. §§ 1-2.
6
       C.     The Court declare the Market Allocation Agreement between Defendants
7             announced May 19, 2005, to be unlawful and null and void.

8      D.     Judgment be entered for Plaintiffs and the members of the Class against
              Defendants, jointly and severally, for three times the amount of damages
9             sustained by Plaintiffs and the Class, under Section 4 of the Clayton Antitrust
              Act, 15 U.S.C. § 15, together with the costs of the action, including reasonable
10            attorneys' fees, and such other relief as is appropriate.

11     E.     Defendants, their affiliates, successors, transferees, assignees, and the officers,
              directors, partners, agents and employees thereof, and all other persons acting or
12            claiming to act on their behalf, be permanently enjoined and restrained from, in
              any manner, continuing, maintaining or renewing the contract, combination or
13            conspiracy alleged herein, or from engaging in any other contract, combination
              or conspiracy having similar purpose or effect, and from adopting or following
14            any practice, plan, program or device having a similar purpose or effect,
              pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.
15
       F.     Plaintiffs and the members of the Class have such other, further, and different
16            relief as the case may require and the Court may deem just and proper under the
              circumstances.

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

DM_US:22172748_1

1

**JURY DEMAND**

2      Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of

3   all issues triable by jury.

4   DATED:  May 27, 2009

5                                                     Respectfully Submitted,

6                                                       /s/ Emily L. Maxwell
                                                       Robert G. Abrams
7                                                      Thomas A. Isaacson
                                                       Peter A. Barile III
8                                                      HOWREY LLP
                                                       1299 Pennsylvania Avenue, N.W.
9                                                      Washington, DC 20004
                                                       Tel.: (202) 783-0800
10                                                     Fax: (202) 383-6610

11                                                     Paul Alexander
                                                       HOWREY LLP
12                                                     1950 University Avenue
                                                       East Palo Alto, CA 94303
13                                                     Tel.: (650) 798-3500
                                                       Fax: (650) 798-3600
14
                                                       Emily L. Maxwell
15                                                     HOWREY LLP
                                                       525 Market Street, Suite 3600
16                                                     San Francisco, CA 94105
                                                       Tel.: (415) 848-4947
17                                                     Fax: (415) 848-4999

18
                                                       *Lead Class Counsel and Member of the Steering Committee for*
19                                                     *Plaintiffs in MDL No. 2029*

20
                                                       Guido Saveri
21                                                     R. Alexander Saveri
                                                       Melissa Shapiro
22                                                     Cadio Zirpoli
                                                       SAVERI & SAVERI, INC.
23                                                     706 Sansome Street
                                                       San Francisco, CA 94111
24                                                     Tel.:  (415) 217-6810
                                                       Fax:  (415) 217-6813
25

26                                                     *Liaison Class Counsel and Member of the Steering Committee*
                                                       *for Plaintiffs in MDL No. 2029*
27

28

HOWREY LLP

26
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
Todd A. Seaver
BERMAN DEVALERIO
425 California Street, Suite 2100
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382

Manuel J. Dominguez
Daniel A. Bushell
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel: (561) 835-9400
Fax: (561) 835-0322

Eugene A. Spector
Jeffrey J. Corrigan
William G. Caldes
Theodore M. Lieverman
Jay S. Cohen
Jonathan M. Jagher
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 496-0300
Fax: (215) 496-6611

H. Laddie Montague, Jr.
Merrill G. Davidoff
David F. Sorensen
Peter Kohn
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3010
Fax: (215) 875-4604

***Members of the Steering Committee for Plaintiffs
in MDL No. 2029***

Natalie Finkelman Bennett
SHEPHERD, FINKELMAN, MILLER,
SHAH, LLP
35 East State Street
Media, PA 19063
Tel.:  (610) 891-9880
Fax:  (610) 891-9883

Gary E. Mason
Donna F. Solen
THE MASON LAW FIRM LLP
1225 19th Street, N.W., Suite 500
Washington, DC 20036
Tel.:  (202) 429-2290
Fax:  (202) 429-2294

Vahn Alexander
FARUQI & FARUQI, LLP
1901 Avenue of the Stars, 2nd Floor
Los Angeles, CA 90067
Tel.:  (310) 461-1426
Fax:  (310) 461-1427

Kendall S. Zylstra
Richard Schwartz
FARUQI & FARUQI, LLP
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
Tel.:  (215) 914-2460
Fax:  (215) 914-2462

Daniel A. Small
Benjamin D. Brown
Kit Pierson
Christopher Cormier
COHEN MILSTEIN SELLERS & TOLL PPLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel.:  (202) 838-7797
Fax:  (202) 838-7745

Daniel E. Girard
Elizabeth C. Pritzker
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, CA 94180
Tel.: (415) 981-4800
Fax: (415) 981-4846

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Bryan L. Clobes
Ellen Meriwether
Timothy Fraser
CAFFERTY FAUCHER LLP
1717 Arch Street, Ste., 3610
Philadelphia, PA 19103
Tel.: (215) 864-2100
Fax: (215) 864-2810

Nyran Rose Pearson
CAFFERTY FAUCHER LLP
30 N. LaSalle Street, Suite 3200
Chicago IL 60602
Tel.: (312) 788-4880
Fax: (312) 788-4485

Kevin Bruce Love
Michael E. Criden
CRIDEN & LOVE, P.A.
7301 S.W. 57 h Court, Suite 515
South Miami, FL 33143
Tel.: (305) 357-5000
Fax: (312) 357-5050

Judith L. Spanier
Jill S. Abrams
Natalie Marcus
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, New York 10016
Tel.:  (212) 889-3700
Fax:  (212) 684-5191

Craig H. Blinderman
MREJEN BLINDERMAN, P.L.
701 West Cypress Creek Road, Suite 302
Fort Lauderdale, FL 33309
Tel.:  (954) 771-3740
Fax:  (954) 771-3047

Mary Jane Fait
Theodore T. Bell
John E. Tangren
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
55 West Monroe Street, Suite 1111
Chicago, IL 60603

Lee Albert
Brian Brooks
Jacqueline Sailer
MURRAY, FRANK & SAILER LLP
275 Madison Avenue, Suite 801
New York, New York 10016
Tel.:  (212) 682-1818
Fax:  (212) 682-1892

HOWREY LLP

29

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Michael F. Ram
Erica Craven-Green
LEVY, RAM & OLSON LLP
639 Front Street, 4th Floor
San Francisco, CA 94111
Tel.:  (415) 433-4949
Fax:  (415) 433-7311

Alex C. Turan
MONTURA LAW GROUP
2070 N. Broadway, Suite 5492
Walnut Creek, CA 94596
Tel.:  (415) 308-0025
Fax:  (925) 256-9615

Guy A. Wilson
LAW OFFICES OF GUY A. WILSON
509 Orchard Street
Santa Rosa, CA 95404
Tel.:  (707) 525-1277

Roy A. Katriel
THE KATRIEL LAW FIRM
1101 30th Street
Washington, DC 20007
Tel.:  (202) 625-4342

Marc H. Edelson
EDELSON & ASSOCIATES, LLC
45 West Court Street
Doylestown, PA 18901
Tel.:  (215) 230-8043
Fax:  (215) 230-8735

Linda P. Nussbaum
KAPLAN, FOX & KILSHEIMER, LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Tel.:  (212) 680-1980
Fax:  (212) 687-7714

Laurence D. King
Linda M. Fong
KAPLAN, FOX & KILSHEIMER, LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Tel.:  (415) 772-4700
Fax:  (415) 772-4707

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

1    Douglas A. Millen
     FREED KANNER LONDON & MILLEN, LLC
2    2201 Waukegan Road, Suite 130
     Bannockburn, IL 60015
3    Tel.: (224) 632-4500
     Fax.: (224) 632-4521
4
     Harry Shulman
5    THE MILLS LAW FIRM
     880 Las Gallinas Avenue, Suite 2
6    San Rafael, CA 94903
     Tel.: 415-455-1326
7    Fax: 415-455-1327

8    David Pastor
     GILMAN & PASTOR, LLP
9    63 Atlantic Avenue, Third Floor
     Boston, MA 02110
10   Tel.: (617) 742-9700

11   Michael F. Germano
     LAW OFFICES OF MICHAEL GERMANO, P.C.
12   63 Atlantic Avenue, Third Floor
     Boston, MA 02110
13   Tel.: (617) 367-5911

14   Mark Warshaw
     Jaquelynn Pope
15   WARSHAW & POPE
     934 Hermosa Avenue, Suite 14
16   Hermosa Beach, CA 90254
     Tel.: (310) 379-3410
17
     Edward F. Haber
18   SHAPIRO HABER & URMY
     53 State Street
19   Boston, MA 02109
     Tel.: (617) 439-3939
20
     Richard M. Volin
21   Michael McLellan
     FINKELSTEIN THOMPSON LLP
22   1050 30th Street, N.W.
     Washington, DC 20007
23   Tel.: (202) 337-8000
     Fax: (202) 337-8090
24
     Rosemary M. Rivas
25   Mark Punzalan
     FINKELSTEIN THOMPSON LLP
26   100 Bush Street, Suite 1450
     San Francisco, CA 94104
27   Tel.: (415) 398-8700
     Fax: (415) 398-8704
28

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Gordon M. Fauth, Jr.
LITIGATION LAW GROUP
1801 Clement Avenue, Suite 101
Alameda, CA 94501
Tel.:  (510) 238-9610
Fax:  (510) 337-1431

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue
Berkeley, CA 94710
Tel.:  (510) 725-3000
Fax:  (510) 725-3100

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Tel.:  (206) 623-7292
Fax:  (206) 623-0594

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOCIATES, LLC
Two Penn Center
1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
Tel.:  (215) 814-6750
Fax:  (215) 814-6764

Gerald J. Rodos
Jeffrey B. Gittleman
Julie B. Palley
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19130
Tel.:  (215) 963-0600
Fax:  (215) 963-0838

Steve R. Basser
BARRACK, RODOS & BACINE
One American Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Tel.:  (619) 230-0800
Fax:  (619) 230-1874

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Frank J. Johnson
Francis A. Bottini, Jr.
JOHNSON BOTTINI, LLP
655 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 230-0063
Fax: (619) 233-5535

Bruce L. Simon
Jonathan M. Watkins
PEARSON, SIMON, SOTER, WARSHAW & PENNY LLP
44 Montgomery Street, Suite 1430
San Francisco, CA 94101
Tel.: (415) 433-9000
Fax: (415) 433-9008

Joseph Saveri
Michele C. Jackson
Eric B. Fastiff
Andrew S. Kingsdale
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, Suite 3000
San Francisco, CA 94111
Tel.: (415) 956-1000
Fax: (415) 956-1008

Mindee J. Reuben
WEINSTEIN KITCHENOFF & ASHER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Tel.: (215) 545-7200
Fax: (215) 535-6535

Mark J. Tamblyn
Neha Duggal
WEXLER WALLACE, LLP
455 Capitol Mall, Suite 231
Sacramento, CA 95814
Tel: (916) 492-1100
Fax: (916) 492-1124

Edward A. Wallace
Kenneth A. Wexler
WEXLER WALLACE, LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Bonny E. Sweeney
David W. Mitchell
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: (619) 231-1058
Fax: (619) 231-7423

William C. Wright
THE LAW OFFICES OF WILLIAM C.
WRIGHT, P.A.
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
Tel.: (561) 514-0904
Fax: (561) 514-0905

Garrett D. Blanchfield
REINHARDT, WENDORF & BLANCHFIELD
E1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel.: (651) 287-2100
Fax: (651) 287-2103

David P. McLafferty
MCLAFFERTY & ASSOCIATES, P.C.
923 Fayette Street
Conshohocken, PA 19428
Tel.: (610) 940-4000
Fax: (610) 940-4007

Dianne M. Nast
Joseph F. Roda
Michele S. Burkholder
Daniel N. Gallucci
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
Telephone: (717) 892-3000
Facsimile: (717) 892-1200

Edward M. Gergosian
Robert J. Gralewski
William D. Harris
GERGOSIAN & GRALEWSKI LLP
655 West Broadway Suite 1410
San Diego CA 92101
Tel 619-237-9500
Fax 619-237-9555 fax

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Matthew Schultz
Timothy D. Battin
Thomas M. Palumbo
STRAUS & BOIES, LLP
4041 University Drive, 5th Floor
Fairfax, Virginia  22030
Tel:  (703) 764-8700
Fax: (703) 764-8704

Terry Gross
Adam C. Belsky
Monique Alonso
GROSS BELSKY ALSONSO LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94101
Tel.:  (415) 544-0200
Fax:  (415) 544-0201

Mario N. Alioto
Lauren C. Russel
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Tel.:  (415) 563-7200
Fax:  (415) 346-0679

Joseph M. Patane
LAW OFFICE OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Tel.:  (415) 563-7200
Fax:  (415) 346-0679

Sherman Kassof
LAW OFFICES OF SHERMAN KASSOF
954 Risa Road, Suite B
Lafayette, CA 94549
Tel.:  (510) 652-2554
Fax:  (510) 652-9308

Mark A. Griffin
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 224-7553 office
(206) 623-3384 fax

Daniel E. Gustafson
Jason S. Kilene
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
(612) 333-8844 office
(612) 339-6622 fax

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

Steve Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Tel.: (206) 623-7292
Fax: (206) 623-0594

J. Barton Goplerud
HUDSON MALLANEY & SHINDLER P.C.
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel.: (515) 223-4567
Fax: (515) 223-8887

Stephen R. Fine
LAW OFFICES OF STEPHEN R. FINE
620 Chestnut Street
Manchester, NH 03104
Tel.: (603) 668-2343
Fax: (603) 626-0408

Dennis J. Johnson
JOHNSON & PERKINSON
1690 Williston Road
South Burlington, VT 05403
Tel.: (802) 862-0030
Fax: (802) 862-0060

Daniel E. Becnel, Jr.
BECNEL LAW FIRM
Nghana Lewis Gauff
Matthew B. Moreland
P.O. Drawer H
Reserve, LA 70084
(985) 536-1186 office
(985) 536-6445 fax

John R. Wylie
FUTTERMAN HOWARD WATKINS WYLIE & ASHLEY, CHTD.
122 S. Michigan Avenue, Suite 1850
Chicago, IL 60603
(312) 427-3600 office
(312) 427-1850 fax

Archie C. Lamb, Jr.
THE LAMB FIRM, LLC
P.O. Box 2088
Birmingham, AL 35201
(205) 324-4644 office
(205) 324-4649 fax

HOWREY LLP

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

E. Kirk Wood, Jr.
WOOD LAW FIRM, LLC
P.O. Box 382434
Birmingham, AL 35238
(205) 612-0243 office
(205) 705-1223 fax

Harry F. Bell, Jr.
William L. Bands, Jr.
BELL & BANDS, PLLC
P.O. Box 1723
Charleston, West Virginia 25326
(304) 345-1700 office
(304) 344-1956 fax

Irwin B. Levin
Richard E. Shevitz
Eric S. Pavlack
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
Fax: (317) 636-2593

Michael Goetz
MORGAN & MORGAN, P.A.
One Tampa City Center, Suite 700
Tampa, FL 33602
(813) 223-5505 office
(813) 223-5402 fax

Scott W. Weinstein
MORGAN & MORGAN, P.A.
One University Park
12800 University Drive
Fort Myers, FL 33906
(239) 433-6880 office
(239) 433-6836 fax

Andres F. Alonso
Jerrold S. Parker
David B. Krangle
PARKER WAICHMAN ALONSO LLP
111 Great Neck Road, Suite 101
Great Neck, NY 11021
(516) 466-6500 office
(516) 466-6665 fax

HOWREY LLP

37

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

DM_US:22172748_1

W. Mark Lanier
Richard D. Meadow
Evan M. Janush
THE LANIER LAW FIRM, PLLC
126 E. 56th Street, 6th Floor
New York, NY 10022
(212) 421-2800 office
(212) 421-2878 fax

David W. Zoll
Michelle L. Kranz
ZOLL, KRANZ & BORGESS, LLC
6620 W. Central Avenue, Suite 200
Toledo, OH 43617
(419) 841-9623 office
(419) 841-9719 fax

Joseph P. Danis
Michael J. Flannery
Corey D. Sullivan
CAREY & DANIS, LLC
8235 Forsyth Boulevard, Suite 1100
St. Louis, MO 63105
(314) 725-7700 office
(314) 721-0905 fax

Eric M. Quetglas Jordan
QUETGLAS LAW OFFICES
P.O. Box 16606
San Juan, PR 00908
(787) 722-0635 office
(787) 725-3970 fax

Robert M. Foote
Matthew Herman
Stephen Fung
FOOTE, MEYERS, MIELKE & FLOWERS, LLC
28 North First Street, Suite 2
Geneva, IL 60134
(630) 232-6333 office
(630) 845-8982 fax

Peter Currie
THE LAW FIRM OF PETER L. CURRIE, P.C.
536 Wing Lane
Saint Charles, IL 60174
(630) 862-1130 office
(630) 845-8982 fax

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kathleen C. Chavez
CHAVEZ LAW FIRM, P.C.
28 North First Street, Suite 2
Geneva, IL 60134
Tel.:  (630) 232-4480
Fax:  (630) 845-8982

***Additional Counsel for Plaintiffs***