Paul W. Rebein

The Rebein Law Firm, PLLC

500 East Kennedy Blvd., Suite 100

Tampa, FL 33602

Tel.: (813) 356-0567

Fax: (813) 902-6538

*Counsel for Plaintiff Carla Spears*

*Admitted Pursuant to JPML Rule 1.4*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE ONLINE DVD ANTITRUST LITIGATION**<br>**This document relates to:**<br>Spears v. Netflix, Inc., et al.,<br>Case No. 8:09-cv-00665, Middle District of Florida | Case No. M 09-2029 PJH<br>MDL No. 2029<br>Hon. Phyllis J. Hamilton |

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff brings this civil action for damages on her own behalf and on behalf of all similarly individuals against Netflix, Inc. ("Netflix"), Wal-Mart Stores, Inc. ("WalMart Stores") and Walmart.com, USA LLC ("Walmart.com") for restraint of trade for monopolizing the online DVD rental and DVD sales markets (online and in stores) and state and allege as follows:

INTRODUCTION

1. Plaintiff brings this class action pursuant to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, against Defendants.

2. This case arises out of Defendants' monopolization and manipulation of the market for DVD sales beginning by at least May 15, 2005 to the present which caused prices for DVD sales to be artificially high for Plaintiff and the Class.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331, 1332(d) & 1337 and l5U.S.C. §§ 1-2, 15 & 26.

4. Venue is proper in this District pursuant to 28 U.S.C. §§ 15, 22 & 26 and pursuant to 28 U.S.C. § 1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events at issue in Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  This Court has personal jurisdiction over Defendants because, *inter alia,* Netflix and Walmart.com are headquartered in this State and each of the Defendants has transacted business, maintained continuous and systemic contacts, purposefully availed itself of the benefits of doing business, and committed acts in furtherance of the alleged conspiracy in this State.

## PARTIES

*Plaintiff*

5. Plaintiff Carla Spears was a Florida citizen for the entire Class Period, and purchased DVDs from Wal-Mart Stores for her personal, noncommercial use in Florida during the Class Period, and was injured by the antitrust acts alleged in this Complaint.

*Defendants*

6. Defendant Netflix is a publicly traded Delaware Corporation with its principal place of business at 100 Winchester Circle, Los Gatos, California.

7. Defendant Wal-Mart Stores is a publicly traded Delaware Corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas.

8. Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores. Walmart.com is a Delaware Corporation with its principal place of business at 7000 Marina Blvd, Brisbane, California.

## BACKGROUND

9. Netflix, through the internet, rents DVDs to customers nationwide by charging customers monthly subscription fees which entitle customers to rent DVDs pursuant to various subscription plans. Netflix's revenues exceed $1 billion annually. At all times during the class period, Netflix has had a market share of at least 75% of the online DVD market in the United States, as Defined herein.

10. Wal-Mart Stores is the largest retailer in the United States. Wal-Mart Stores' revenues are approximately $400 billion annually. Through its retail stores and the internet, Wal-Mart Stores sells DVDs directly to customers nationwide. Wal-Mart Stores sells far more DVDs than any other retailer in the United States, accounting for approximately 40% of domestic DVD sales.

11. Prior to the conspiracy described herein, Walmart.com competed with Netflix by renting DVD's online through the website www.walmart.com.

12. On or about May 19, 2005, Netflix, Inc., Wal-Mart Stores, and Walmalt.com entered into a contract, combination, and conspiracy (the "Market Division Agreement") to divide the markets for the online rentals of Digital Video Discs ("DVDs") and for the sale of new DVDs in the United States. The purpose and effect of Defendants' illegal conduct and agreement is to monopolize and unreasonably restrain trade in the online DVD rental market as well as in the sale of DVDs.

13. The meetings that culminated in the illegal agreement began in early 2005, when the CEO of Netflix and the then CEO of Wallnart.com met to discuss the online DVD rental business and

-3-

the new DVD sales business. The CEOs wanted to discuss ways in which they could reduce or eliminate competition and thereby increase their profits. Reed Hastings, the CEO of Netflix, having "noticed how low Wal-Mart's prices [for DVDs] were," has admitted that he "called the CEO [of Walmart.com] in January and asked if he could have dinner." John Fleming, then the CEO of Walrnart.com, who reported directly to Wal-Mart Stores' CEO Lee Scott, accepted Hastings' invitation. As a result of this dinner meeting, as well as other meetings and exchanges, Defendants entered into the contract, combination, and conspiracy alleged herein. At the time of their initial meeting and prior to entering into to the Market Division Agreement, Netflix and Walmart.com were direct competitors in the online rental DVD market and were potential competitors in selling new DVDs to customers. Wal-Mart Stores and Walmart.com were already selling new DVDs and Netflix was preparing to enter that market.  No later than May 19, 2005 however, Netflix, Wal-Mart Stores, and Walmart.com entered into an agreement whereby Walmart.com would stop competing with Netflix in the online DVD rental market, and in return, Netflix would promote the sales of new DVDs by Wal-Mart Stores and Walmart.com. Netflix also agreed not to sell new DVDs that would have been in direct competition with Wal-Mart Stores and Walmart.com.

14.     Wal-Mart Stores actively participated in this conspiracy. This is confirmed by, among other things, the fact that prior to the announcement of the Market Division Agreement, John Fleming was promoted to Chief Marketing Officer of Wal-Mart Stores. As of the time of the announcement of the Market Division Agreement, Fleming thus was acting in his capacity both as the Chief Marketing Officer of Wal-Mart Stores and the Wal-Mart Stores executive responsible for overseeing the operations of Walmart.com. As Chief Marketing Officer of Wal-Mart Stores, Fleming was responsible for deciding "what the largest, most powerful retailer in history will stock on its shelves, and how much those products will cost. Such decisions, when made at Wal-Mart, can help make or break entire industries."

15. As a result of the Defendants' contract, combination, and conspiracy, Netflix was able to charge its customers higher subscription prices for the rental of DVDs than it otherwise would have been able to charge. In addition, Netflix unlawfully acquired and maintained market and monopoly power.

16. Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com agreed that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com. agreed that Walmart.com would stop competing with Netflix in the online DVD rental market and Netflix agreed that it would not sell new DVDs and instead would promote the DVD sales of Wal-Mart Stores and Walmart.com.

17. In agreeing to promote the sale of DVDs by Wal-Mart Stores and Walmart.com, Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com to exit the online DVD rental market and simultaneously confirmed to Wal-Mart Stores and Walmart.com that Netflix would not enter the market to sell new DVDs. Netflix was well positioned to enter the new DVD sales market, and had the unilateral economic incentive to do, so but refrained from doing so as a result of the Market Division Agreement. Since entering into the Market Division Agreement, neither Wal-Mart Stores nor Walmart.com has rented DVDs online and Netflix has not sold new DVDs. The Market Division Agreement served to entrench and enhance Defendants' dominant market positions and otherwise harmed competition, including by enabling Wal-Mart stores to charge higher prices for new DVD sales than it would have charged had it not entered into the agreement. In fact, Plaintiff and all other similarly situated customers paid the higher prices to Wal-Mart than they otherwise would have paid.

18. The relevant market is the DVD market, both online rental and sales.

19. The Market Allocation Agreement is *per se* illegal, as well as anticompetitive and illegal under the Rule of Reason.

20. At all relevant times, there have been no reasonably interchangeable substitutes for the service of online DVD rentals (which are uniquely priced on a subscription basis unlike pay-per-view rentals) or DVD sales. The DVD sales market, however, is a distinct market from online rentals. For example, the price to buy a new DVD depends heavily on how popular it is, including whether it is a new release or how successful the title originally was at the box office or on television. By contrast, online DVD renters generally charge based on a subscription fee, regardless of whether the consumer is renting popular or obscure DVDs. The industry and the public perceive online DVD rentals as separate from DVD sales, whether in-store or online. The factors motivating a consumer to buy a DVD are different from those that lead to renting a DVD. The former generally applies to DVDs that the consumer intends to view (either personally, or their family or friends) numerous times. The latter generally applies to DVDs that the consumer intends to view once and then return. DVDs sold at retail have other distinguishing characteristics, such as packaging and special features not available with rentals, which are delivered unadorned in envelopes. In addition, the fact of whether a DVD is new or used is not an issue in rental, but is a significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts. DVD sales and online rentals also are not reasonably interchangeable for consumers intending to collect physical DVDs or to give a DVD as a gift. The cross-elasticity of demand between these products and services is such that a significant non transitory increase in price would not cause consumers to switch from online renting to purchasing DVDs, and *vice versa.*

21. The geographic market for DVD sales as a result of the entry of online sales was increasingly the United States, which is precisely the reason Wal-Mart agreed to restrict its online rentals in exchange for Netflix's agreement to restrict online sales. Sales of DVDs online would have cut into Wal-Mart's in-store sales nationwide, and the Market Allocation Agreement not only precluded that competition with Netflix, but turned a competitor into a promoter for Wal-Mart. For example, Business Week reported on August 31, 2006, that the online sales by Apple Computer also forced Wal-

Mart to lower its DVD sales prices to be competitive. Online search sites such as www.dvdpricesearch.com also monitor and direct buyers of DVDs to the most competitively priced DVDs whether that be through Walmart.com or other sellers of DVDs.

21. Even though DVD sales volumes have continued to increase, pricing has been falling for years. Without the Market Allocation Agreement, prices would have fallen faster and further. Plaintiffs and the other members of the Class paid higher DVD prices to Wal-Mart and Walmart.com than they otherwise would have paid. Wal-Mart is the largest seller of DVDs with a 40% market share of the almost $25 billion annual market. According to the trade group Digital Entertainment, the U.S. DVD sales market peaked in 2004 at $24.9 million and has fallen every year since then to $22.4 million in 2008.

22. The Market Allocation Agreement was not in the independent self-interest of Wal-Mart Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an agreement not to compete for new DVD retail sales. But for the Market Allocation Agreement, Walmart.com would not have exited the Online DVD Rental Market when it did. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of subscribers—a base of customers who purchase on average 25 DVDs per year each—and would not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them not to compete against Netflix's online rental business.

23. Defendants' market allocation scheme is a naked restraint of trade; it was not and is not ancillary to any legitimate business collaboration. Rather, the market allocation scheme was a core activity of the Market Allocation Agreement itself. The co-promotion aspects of the Agreement were a means to reinforce the market allocation. To the extent that those aspects were portrayed as the sole

-7-

reason for the Market Allocation Agreement, that portrayal was misleading and pretextual, allowing Defendants' market allocation conspiracy to escape scrutiny and "hide in plain sight."

24. This action is brought by Plaintiff individually and on behalf of all other similarly individuals in the United States, and pursuant to Federal Rules of Civil Procedure 23(a), 23(b) and 23(c) as representatives of a class (the "Class").

25. The Class is defined as:

> Any person in the United States who purchased DVDs from Wal-Mart Stores from May 19, 2005 - present.
> Excluded from the Class are governmental entities; Defendants, their Reed Hastings, John Fleming, Defendants' parents, subsidiaries, and other affiliated entities; and presiding judges in this case and their spouses, persons related to either of them within the third degree of relationship.

26. Plaintiff reserves the right to expand, modify or alter the class definition, including the time period, in response to information learned during discovery.

27. Plaintiff does not presently possess information identifying the exact size of the Class. Based upon the nature of the trade and commerce involved, Plaintiff believes the total number of class members is in the millions and sufficiently numerous such that joinder of all Class members would be impracticable.

28. Numerous questions of law or fact arise from Defendants' anticompetitive conduct which are common to the class. Among the questions of law or fact common to the class are:

  a. Whether Defendants engaged in a contract, combination, or conspiracy to allocate markets;

  b. Whether Defendants unreasonably restrained trade in the online DVD Rental and DVD sales markets:

  c. Whether Defendants conspired to reduce competition in the online DVD Rental and sales Markets;

-8-

    d.  The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

    e.  Whether the alleged contract, combination, and conspiracy violated the Sherman Act;

    f.  The anticompetitive effects of Defendants' violations of law;

    g.  Whether the conduct of Defendants, as alleged in this Complaint, caused Wal-Mart's DVD sales prices to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiff and other members of the Class;

  29.  These common questions of law or fact are common to the class, and predominate over any other questions affecting only individual class members.

  30.  Plaintiff in this proposed class action asserts claims typical of those of the individual members of the proposed Class. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

  31.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has no interests antagonistic to the Class. Plaintiff has suffered the same harm as the members of the Class and has, and will continue to, zealously pursue claims against Defendant. Plaintiff has retained counsel competent and experienced in the prosecution of complex class actions, and in particular, counsel has broad experience in complex antitrust litigation similar in size, scope, and complexity to the present case.

  32.  A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct.  Thus, it would be virtually impossible for the Class

members individually to redress effectively the wrongs done to them. Moreover, even if the Class members themselves could afford such individual litigation, the judicial system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the judicial system due to the Class;

33. Adjudge and decree that Defendants engaged in an unlawful conduct in restraint of trade or commerce, in violation of the Sherman Act causing antitrust injuries, and that the Court award Plaintiff and the Class: (i) overcharge damages in an amount to be proved at trial as a result of the wrongful conduct alleged; (ii) treble such damages; (iii) pre-judgment and post-judgment interest; (iv) reasonable attorneys' fees, and (v) costs of Court.

**COUNT I**
**Sherman Act Section One**

34. Plaintiff hereby adopts and incorporates by this reference each of the preceding paragraphs as if fully set forth herein.

35. Defendants have entered into *a per se* illegal market division agreement, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

36. In the alternative, if evaluated under the Rule of Reason, the Market Allocation Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

37. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. In addition, Netflix was a potential competitor of Wal-Mart Stores and Walmart.com in new DVD sales. Wal-Mart Stores and Walmart.com were actual participants and Netflix was a potential participant, with the means and economic incentive to sell new DVDs—in the absence of the Market Allocation Agreement.

38.     Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of allocating the markets for online DVD rentals and new DVD sales. The Market Allocation Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and Walmart.com agreeing not to compete in that market. The agreement also allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new DVDs in competition with them.

39.     In addition to explicitly or *de facto* agreeing not to sell new DVDs, Netflix also obtained the Market Allocation Agreement by providing potentially valuable promotion to Wal-Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and both Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

40.     The Market Allocation Agreement has created significant anticompetitive effects and no pro-competitive benefits. It eliminated competition in the Relevant Markets raising prices paid by consumers for both online DVD rentals and for DVD sales. To the extent that there were any procompetitive benefits resulting from the agreement, they would not outweigh the agreement's anticompetitive effects and could have been achieved by less restrictive means.

41.     As a result of this violation of law, Netflix's subscription prices as well as Wal-Mart's DVD sales prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, for the relief requested herein, and respectfully request the Court to certify the Class.

## JURY DEMAND

Plaintiff demands a trial by jury.

<u>ATTORNEYS' LIEN CLAIM</u>

Respectfully Submitted,

Paul W. Rebein FB#488003

The Rebein Law Firm, PLLC

500 East Kennedy Blvd.

Suite 100

Tampa, FL 33602

(813)356-0567

(813)902-6538

ATTORNEYS FOR PLAINTIFF

Certificate of Service

I certify that I served all counsel of record herein via the ECF filing system.

Paul Rebein