1  Robert G. Abrams  (*pro hac vice*)
   Thomas A. Isaacson  (*pro hac vice*)
2  Peter A. Barile III  (*pro hac vice*)
   HOWREY LLP
3  1299 Pennsylvania Avenue, N.W.
   Washington, DC 20004
4  Tel.: (202) 783-0800
   Fax: (202) 383-6610
5  abramsr@howrey.com
   isaacsont@howrey.com
6  barilep@howrey.com

7  Paul Alexander  (49997)
   HOWREY LLP
8  1950 University Avenue
   East Palo Alto, CA 94303
9  Tel.: (650) 798-3500
   Fax: (650) 798-3600
10  alexanderp@howrey.com

11  Emily L. Maxwell  (185646)
    HOWREY LLP
12  525 Market Street, Suite 3600
    San Francisco, CA 94105
13  Tel.: (415) 848-4947
    Fax: (415) 848-4999
14  maxwelle@howrey.com

Guido Saveri  (22349)
R. Alexander Saveri  (173102)
Lisa Saveri  (112043)
Cadio Zirpoli  (179108)
Melissa Shapiro  (242724)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
Fax: (415) 217-6813
guido@saveri.com
rick@saveri.com
lisa@saveri.com
cadio@saveri.com
melissa@saveri.com

15  *Lead Counsel for Plaintiffs and the*
    *Proposed Class*

*Liaison Counsel for Plaintiffs and the*
*Proposed Class*

16

17                   UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19                        OAKLAND DIVISION

| | |
|---|---|
| 20  **IN RE ONLINE DVD RENTAL** <br> **ANTITRUST LITIGATION** | **Master File No. M:09-CV-2029 PJH** <br><br> **MDL No. 2029** <br><br> **Hon. Phyllis J. Hamilton** |
| 23  **This document relates to:** <br><br> **ALL ACTIONS** | **NOTICE OF MOTION AND PLAINTIFFS'** <br> **MOTION FOR CLASS CERTIFICATION;** <br> **MEMORANDUM IN SUPPORT THEREOF** <br><br> Date:  September 1, 2010 <br> Time:  9:00 a.m. <br> Judge:  Hon. Phyllis J. Hamilton <br> Courtroom:  3, 3rd Floor |

27

28                       <u>**REDACTED VERSION**</u>

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION..........................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ...........................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES................................................................1

I.      INTRODUCTION ..............................................................................................................1

II.     BACKGROUND.................................................................................................................3

      A.      The Online DVD Rental Market .............................................................................3

      B.      Defendants' Illegal Market Allocation Agreement .................................................3

      C.      Wal-Mart's Competitive Significance......................................................................5

      D.      The Price Effects Of The Transition To Three-Firm Competition...........................5

      E.      The Price Effects Of The Return To A Two-Firm Market.........................................7

      F.      The Expert Report Of Dr. John C. Beyer .................................................................8

III.    ARGUMENT ......................................................................................................................8

      A.      The Governing Law...................................................................................................8

      B.      The Proposed Class Action Satisfies The Requirements Of Rule
             23(a).........................................................................................................................10

             1.      The Class is so numerous that joinder of all members is
                     impracticable. .............................................................................................10

             2.      The case involves questions of law and fact common to the
                     Class. ..........................................................................................................10

             3.      The claims of the class representatives are typical of the
                       claims of the Class.....................................................................................11

             4.      The class representatives will fairly and adequately protect
                       the interests of the Class. ...........................................................................12

      C.      Common Questions Of Law And Fact Predominate Over
             Individual Questions................................................................................................13

             1.      Proof of the existence and terms of the Market Allocation
                     Agreement will involve common evidence. ...............................................14

              2.      Proof that the Market Allocation Agreement caused
                     antitrust injury will involve common evidence. ........................................14

i

        a.    Proof that continued competition from Wal-Mart would have affected Netflix's pricing will be common to all class members..................................................16

        b.    Had Netflix lowered its prices, all class members would have paid less...........................................................19

        c.    The fact that Netflix had multiple plans does not change the predominance of common questions...................20

        d.    Reliable statistical methods are available to demonstrate and quantify the fact of injury...........................21

     3.    Proof of damages will involve predominately common questions. .........................................................................22

  D.    A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Case................................................23

IV.    THE COURT SHOULD CONFIRM ITS APPOINTMENT OF CLASS COUNSEL...........................................................................................................24

CONCLUSION ..................................................................................................................24

HOWREY LLP

MOTION AND MEM. OF POINTS AND AUTH. ISO PLTFS' MOTION FOR CLASS CERT.
MDL No. 2029; Master File No. M:09-CV-2029

# TABLE OF AUTHORITIES

## CASES

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) ..................................................................................................13

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ................................................................................9, 22

*Cummings v. Connell,*
  316 F.3d 886 (9th Cir. 2003) ....................................................................................13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,*
  No. M-02-1486-PJH, 2006 U.S. Dist. LEXIS 39841 (N.D. Cal. June 5, 2006)...............*passim*

*eMag Solutions LLC v. Toda Kogyo Corp.,*
  426 F. Supp. 2d 1050 (N.D. Cal. 2006)......................................................................10

*Gintis v. Bouchard Transport Co.,*
  No. 09-1717, 2010 U.S. App. LEXIS 3644 (1st Cir. Feb. 23, 2010) ................................22, 23

*In re Graphics Processing Units Antitrust Litigation,*
  253 F.R.D. 478 (N.D. Cal. 2008) ..........................................................................9, 12

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ................................................................................*passim*

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ......................................................................................9

*In re Infineon Technologies AG Securities Litigation,*
  No. C-04-04156, 2009 U.S. Dist. LEXIS 103385 (N.D. Cal. Mar. 6, 2009) .........................11

*Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
  244 F.3d 1152 (9th Cir. 2001) ...........................................................................14, 23

*Lozano v. AT&T Wireless Services, Inc.,*
  504 F.3d 718 (9th Cir. 2007) ....................................................................................11

*Palmer v. BRG of Georgia, Inc.,*
  498 U.S. 46 (1990) ..................................................................................................10

*In re Rubber Chemicals Antitrust Litigation,*
  232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................11, 14

*Simpson v. Fireman's Fund Insurance Co.,*
  231 F.R.D. 391 (N.D. Cal. 2005) ..............................................................................12

*In re Static Random Access Memory (SRAM) Antitrust Litigation,*
  No. C-07-01819, 2009 U.S. Dist. LEXIS 110407 (N.D. Cal. Nov. 25, 2009)......12, 20, 21, 22

*In re Static Random Access (SRAM) Antitrust Litigation,*
  No. C- 07-01819, 2008 U.S. Dist. LEXIS 107523 (N.D. Cal. Sept. 29, 2008)................21, 22

*In re Tableware Antitrust Litigation,*
  241 F.R.D. 644 (N.D. Cal. 2007) ................................................................................*passim*

*United States v. Topco Associates, Inc.,*
  405 U.S. 596 (1972) ................................................................................................ 10

*United Steel, Paper & Forestry, Rubber Manufacturing, Energy, Allied Industrial & Service*
  *Workers International Union v. ConocoPhillips Co.,*
  593 F.3d 802 (9th Cir. 2010) .............................................................................. 9, 10

*Yokoyama v. Midland National Life Insurance Co.,*
  No. 07-16825, 2010 U.S. App. LEXIS 2631 (9th Cir. Feb. 8, 2010) ............................. 22, 23

HOWREY LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HOWREY LLP**

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 1, 2010, at 9:00 a.m., before the Honorable Phyllis J. Hamilton, Courtroom 3, United States District Court, Northern District of California, 1301 Clay Street, Oakland, California, Plaintiffs Andrea Resnick, Amy Latham, Bryan Eastman, Melanie Miscioscia Salvi, Stan MaGee, Michael Orozco, Liza Sivek, and Michael Wiener will, and hereby do, move the Court, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for an Order certifying a Plaintiff Class defined as follows:

> **Any person or entity in the United States that paid a subscription fee to Netflix on or after May 19, 2005 up to and including the date of class certification.**
>
> **Excluded from the Class are government entities, Defendants, their co-conspirators, Reed Hastings, John Fleming, Defendants' subsidiaries, corporate affiliates, and counsel in this action. Also excluded are persons who subscribed to Wal-Mart DVD Rentals as of May 19, 2005. Also excluded are the Judge presiding over this action, her law clerks, her spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.**

This Motion is based upon this Notice of Motion and Motion, Plaintiffs' Memorandum of Points and Authorities, the Expert Report of Dr. John C. Beyer, the Declaration of Peter A. Barile III, the pleadings and other documents and testimony on file, and other written or oral arguments as may be presented to the Court.

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are: (1) whether the Court should certify this action as a class action and (2) whether the Court should confirm the appointments of lead counsel, liaison counsel and the steering committee.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This is an example of an antitrust conspiracy case for which class certification is especially appropriate. Plaintiffs are direct purchasers of online DVD rental subscriptions from Defendant Netflix. Plaintiffs allege violations of Sections 1 and 2 of the Sherman Antitrust Act and will prove on a class-wide basis that Netflix and the two Wal-Mart defendants (collectively, "Wal-Mart"), who had

1

MOTION AND MEM. OF POINTS AND AUTH. ISO PLTFS' MOTION FOR CLASS CERT.
MDL No. 2029; Master  File No. M:09-CV-2029

1  been competitors in the online DVD rental market, conspired to allocate markets.  Wal-Mart agreed to,

2  and did, exit the online DVD rental market and Netflix agreed not to sell, and did not sell, new DVDs.

3  Netflix subscribers paid artificially higher monthly subscription fees than they would have paid as a

4  direct result of the conspiracy.

5        Plaintiffs readily meet the requirements of Rule 23(a).  The class – consisting of millions of

6  members – satisfies the numerosity requirement.  There are many common issues, including the

7  formation and terms of the conspiracy and its effect on Netflix's prices.  The claims of the class

8  representatives, which focus on the Defendants' conduct, are typical of those of the entire class.  The

9  class will be adequately represented:  the class representatives face no conflicts and counsel will

10  continue to vigorously pursue this litigation.

11        With respect to the requirements of Rule 23(b)(3), common issues predominate over issues, if

12  any, affecting only individual class members.  Proof of the conspiracy between Netflix and Wal-Mart

13  will be common to all class members.  The conspiracy's impact on Netflix's pricing, as a result of the

14  loss of competition from Wal-Mart, will be measured with common evidence, not individualized

15  evidence.  That evidence will include the following class-wide facts:  The conspiratorial

16  communications between Netflix and Wal-Mart began at a time of rapid price reductions resulting

17  from the recent arrival of a third competitor, Blockbuster.  Netflix's purpose in instigating the

18  conspiracy was to avoid further price reductions, which it would have been forced to make, had three-

19  firm competition continued.  Wal-Mart had ambitious expansion plans at the time the conspiratorial

20  communications began.  Netflix predicted that Wal-Mart's departure would cause a rise in profits, and

21  that is what happened.  The nature of this market assures that a loss of competition from one of only

22  three firms would and did affect prices.  There has been no entry by any new online DVD rental

23  businesses since Wal-Mart's exit; competition is based on price; and the products are highly similar.

24        Netflix's standardized pricing assures that, had the price of its plans been lower, all class

25  members would have paid less.

26

27

28

HOWREY LLP

2

MOTION AND MEM. OF  POINTS AND AUTH. ISO PLTFS' MOTION FOR CLASS CERT.
MDL No. 2029; Master File No. M:09-CV-2029

[REDACTED]

A class action is not only the superior means for resolving these claims, it is the only means. The Netflix subscribers' individual claims are far too small to prosecute a complex antitrust case against these large defendants on a non-class basis.

## II.   BACKGROUND

### A.   The Online DVD Rental Market

The online DVD rental market consists of those firms that rent DVDs online by subscription for delivery by mail in the United States. From August 2004 to May 2005, there were three major online DVD rental providers—Blockbuster, Netflix, and Wal-Mart.[1]  As a result of the conduct alleged herein, which began in October 2004, the market was reduced to just two firms: Netflix and Blockbuster, a situation which has continued to the present.

Like other online DVD rental firms, Netflix charges a monthly fee based on how many DVDs subscribers wish to rent. Plans that allow more rentals have higher monthly fees. [REDACTED] (Barile Decl. Ex. 1, at 287-88.)[2]

[REDACTED] (*Id.* at 37, 53-54.)

### B.   Defendants' Illegal Market Allocation Agreement

As of August 2004, Netflix and Wal-Mart were the only meaningful competitors in this market. Netflix charged $21.99 for its most popular plan, the 3-out plan. On August 11, 2004, a third competitor – Blockbuster – entered the market with a price of $19.99 for its 3-out plan. On October

---

[1] Walmart.com was the entity immediately responsible for the Wal-Mart Online DVD Rentals Service. Its parent, Wal-Mart Stores, Inc., is a co-conspirator. For purposes of this Motion, the distinction between the two Wal-Mart entities is immaterial. Any issues regarding the role of the parent entity and its relationship to Walmart.com will be class-wide in nature.

[2] Citations to Barile Decl. Ex. 1 refer to Exhibit 1 attached to the Declaration of Peter A. Barile III, submitted herewith, and to which all Exhibits referenced herein are attached.

1    14, 2004, Netflix responded to the increased competition by dropping its price to $17.99.  (Barile Decl.

2    Ex. 2, at 0710.)  The next day Netflix's stock dropped by 40% and its CEO, Reed Hastings, attributed

3    the price cut to strong competition, including from Blockbuster and Wal-Mart, whom he identified as

4    "major competitors."  (*Id*. at 0709.)  That same day Blockbuster reduced its 3-out price to $17.49.

5         Facing the threat of further price reductions, Netflix reacted quickly to reduce or eliminate

6    competition.  Not even waiting until the next business day, Hastings contacted John Fleming, the CEO

7    of Walmart.com.  (Barile Decl. Ex. 3, at 0121-22.)  The two CEOs met later in October 2004.  (Barile

8    Decl. Ex. 4, at 1569.)  The communications continued over the next several months.  (*Id*.; Barile Decl.

9    Ex. 5, at 0123.)  By March 17, 2005, Netflix and Wal-Mart had reached a ██████████ on the

10   Market Allocation Agreement.³  (Barile Decl. Ex. 6, at 8042; Barile Decl. Ex. 1, at 280.)  The process

11   of documenting the public aspects of the deal continued through April 2005, and a joint press release

12   announcing Wal-Mart's exit was issued on May 19, 2005.  (CAC ¶ 53; Barile Decl. Ex. 7, at 0004.)

13        From their beginning on October 17, 2004, the discussions initiated by Netflix sought to have

14   Wal-Mart exit the online DVD rental market.  From Netflix's perspective, Wal-Mart's exit was not

15   only the central goal of the discussions; Wal-Mart's agreement to promote Netflix to Wal-Mart's

16   customers across all plans only made sense if Wal-Mart was agreeing to exit this market.  (Barile Decl.

17   Ex. 8, at 4818; Barile Decl. Ex. 1, at 247.)  Wal-Mart would hardly tell its own customers to use

18   Netflix if Wal-Mart was staying in the online DVD rental market and providing a competing rental

19   service.  (CAC, ¶ 57-58; Barile Decl. Ex. 9, at 1402.)

20        For its part, Netflix agreed not to enter the market for the sale of new DVD sales.  Netflix had

21   seriously considered new DVD sales as an additional revenue stream at least as late as December 2004.

22   (Barile Decl. Ex. 10, at 5901; Barile Decl. Ex. 3, at 0122.)  It was at Netflix's suggestion that Wal-

23

24

25   _____

26   ³ The phrase "Market Allocation Agreement" refers to the entirety of the conspiratorial agreement
     between Netflix and Wal-Mart, not merely the formal document that was announced on May 19, 2005.
27   The conspiratorial Agreement apparently was reached more than two months earlier, on March 17,
     2005.

28

4
MOTION AND MEM. OF POINTS AND AUTH. ISO PLTFS' MOTION FOR CLASS CERT.
MDL No. 2029; Master File No. M:09-CV-2029

1  Mart agreed to exit the online DVD rental market in exchange for Netflix's promotion of Wal-Mart's

2  new DVD sales.  (Barile Decl. Ex. 1, at 277; Barile Decl. Ex. 11, at 2710.)

3      **C.**    **Wal-Mart's Competitive Significance**

4      When Netflix initiated discussions in the Fall of 2004, leading to the Market Allocation

5  Agreement, Wal-Mart was planning to expand its online DVD rental business.  In November 2004,

6  Wal-Mart declared that its outlook for 2005 for DVD rentals was to ███████████████

7  ████████████████████████" (Barile Decl. Ex. 12, at 1702.)  Its CEO, John Fleming,

8  told CNBC on January 7, 2005 that the DVD rental business was among the company's "very good

9  businesses" which it was "focused on developing over the next year or two." (Barile Decl. Ex. 13, at

10 941.) Another senior Walmart.com executive stated that this was "a viable business for us, with

11 growth potential" and that Wal-Mart planned to add more distribution facilities. (Barile Decl. Ex. 14,

12 at 2793.)  In its Fiscal Year 2005 planning, Wal-Mart listed DVD rentals as a "████" of its

13 business.  (Barile Decl. Ex. 15, at 5605.)  ███████████████████████████████

14 (*Id.*) ████████████████████████  (*Id.* at 5623.)

15     This optimism was shared by Walmart.com's parent, the world's largest corporation.  During

16 the Fall of 2004, Wal-Mart Stores' CEO H. Lee Scott stated that the DVD rental business had

17 "██████████████████████████████████████████████"

18 (Barile Decl. Ex. 16, at 2262.)  Scott also stated that in 2005, Wal-Mart would "████████

19 ██████████████████████████████████████████████" and

20 that Wal-Mart "████████████████████████████████████████

21 █████████████████████" (*Id.* at 2262-63.)

22     **D.**    **The Price Effects Of The Transition To Three-Firm Competition**

23     From the time Wal-Mart launched its online DVD rental service in June 2003, until June 2004,

24 Wal-Mart's and Netflix's prices remained stable, with their 3-out plans at $18.76 and $19.99,

25 respectively.  Shortly after hearing that Blockbuster would soon launch a competing online service,

26 however, Netflix raised the price of its 3-out plan as of June 15, 2004 from $19.99 to $21.99 per

27 month, ████████████████████████████████ (Barile Decl.

28