1    Robert G. Abrams
     Thomas A. Isaacson
2    Peter A. Barile III
     HOWREY LLP
3    1299 Pennsylvania Avenue, N.W.
     Washington, DC 20004
4    Tel.: (202) 783-0800
     Fax: (202) 383-6610
5    abramsr@howrey.com
     isaacsont@howrey.com
6    barilep@howrey.com

7    Paul Alexander (49997)
     HOWREY LLP
8    1950 University Avenue                      Guido Saveri (22349)
     East Palo Alto, CA 94303                   R. Alexander Saveri (173102)
9    Tel.: (650) 798-3500                        Lisa Saveri (112043)
     Fax: (650) 798-3600                         Cadio Zirpoli (179108)
10   alexanderp@howrey.com                       SAVERI & SAVERI, INC.
                                                 706 Sansome Street
11   Emily L. Maxwell (185646)                   San Francisco, CA 94111
     HOWREY LLP                                  Tel.: (415) 217-6810
12   525 Market Street, Suite 3600               Fax: (415) 217-6813
     San Francisco, CA 94105                     guido@saveri.com
13   Tel.: (415) 848-4947                        rick@saveri.com
     Fax: (415) 848-4999                         lisa@saveri.com
14   maxwelle@howrey.com                         cadio@saveri.com

15   *Lead Class Counsel and*                    *Liaison Class Counsel and*
     *Member of the Steering Committee for*      *Member of the Steering Committee for*
16   *Plaintiffs in MDL No. 2029*                *Plaintiffs in MDL No. 2029*

17
                     UNITED STATES DISTRICT COURT
18                  NORTHERN DISTRICT OF CALIFORNIA
                          (OAKLAND DIVISION)
19

| | |
|---|---|
| 20  **IN RE ONLINE DVD RENTAL ANTITRUST LITIGATION** | **Master File No. M:09-CV-2029 PJH** |
| 21 | **MDL No. 2029** |
| 22 | **Hon. Phyllis J. Hamilton** |
| 23  **This document relates to:** | **BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT** |
| 24  *Pierson v. Walmart.com USA LLC, et al.,* M:09-CV-2163-PJH | |
| 25  *Levy, et al. v. Walmart.com USA LLC, et al.,* M:09-CV-2296-PJH | **JURY TRIAL DEMANDED** |
| 26 | |

27

28

HOWREY LLP

1    NOW COME Plaintiffs,  DANIEL KAFFER, JASON LAWTON, ALAN LEVY, JUSTIN MEADOWS,

2  ROSEMARY PIERSON, and REBECCA SILVERMAN, for their Complaint brought under Sections 1 and 2 of

3  the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Antitrust Act, 15

4  U.S.C. §§ 15 & 26, for treble damages and injunctive relief, against Defendants Netflix, Inc.

5  ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Wal-Mart.com USA LLC

6  ("Walmart.com") (collectively, with "Wal-Mart Stores," "Wal-Mart").

7    Based upon personal knowledge, information, belief, and the investigation of counsel, Plaintiffs

8  allege as follows:

9    **<u>NATURE OF THE ACTION</u>**

10    1.   This lawsuit is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil

11  Procedure on behalf of a Class of all persons and entities that paid a subscription fee to Blockbuster,

12  Inc. ("Blockbuster") to rent DVDs through its online rental service, "Blockbuster Online," between

13  August 19, 2005 and the date of class certification (the "Class Period").

14    2.   This Complaint does not name Blockbuster as a defendant, nor does it allege that

15  Blockbuster violated the antitrust laws.  Rather, Blockbuster's online subscribers were injured when, as

16  a direct, foreseeable, intended, and proximate result of the loss of competition caused by Defendants'

17  anti-competitive conduct, Blockbuster charged higher prices to subscribers of Blockbuster Online.  But

18  for the conduct alleged herein, Blockbuster, as a competitor in this market, would have charged lower

19  prices to Plaintiffs and other members of the Class.  Defendants are jointly and severally liable for

20  those injuries to Plaintiffs and other members of the Class.

21    3.   Plaintiffs allege a conspiracy between Blockbuster's direct competitors, Netflix and Wal-

22  Mart, to monopolize and otherwise restrain trade in the Online DVD Rental Market—the rental of

23  DVDs online by subscription for delivery by mail in the United States.  From August 2004 to June

24  2005, there were three major Online DVD Rental providers—Blockbuster, Netflix, and Wal-Mart—

25  and a potential fourth: Amazon.com, Inc. ("Amazon").  As a result of the conduct alleged herein,

26  which began at least as early as October 2004, the market was reduced to just two competitors: Netflix

27  and Blockbuster.

28

4.   In mid-October 2004, Netflix, whose stock had crashed more than 40% in the wake of a significant price decrease it announced in order to combat actual and potential competition from Blockbuster, Wal-Mart, and Amazon, sought out its direct competitor, Wal-Mart, in an attempt to monopolize and strike an illegal deal that would decrease the competition it faced in order to prevent Netflix from having to drop its prices any further.

5.   On October 17, 2004, Reed Hastings, the President, Chief Executive Officer, and Chairman of the Board of Directors of Netflix, reached out to James Breyer, a member of the Board of Directors of Wal-Mart Stores and asked for an introduction to Walmart.com's CEO John Fleming, with the purpose and intent of forming an anticompetitive "alliance" with Wal-Mart.  Hastings and Fleming met within days and set in motion a scheme that would and did eliminate the then-increasing competition in the Online DVD Rental Market.  The scheme would come to involve dealings with Blockbuster and Amazon as well.

6.   On or before May 19, 2005, Defendants announced an illegal anticompetitive agreement (the "Market Allocation Agreement") to divide the markets for the sales and online rentals of DVDs in the United States.  Under the arrangement, Wal-Mart would exit the Online DVD Rental Market and Netflix would promote Wal-Mart's new DVD sales business, and, therefore, Netflix would not enter the new DVD sales market, which it was well-positioned for and had planned to do.  Since the Market Allocation Agreement, Wal-Mart has not rented DVDs online and Netflix has not sold new DVDs. The Market Allocation Agreement served to eliminate all competition (including price competition) between Wal-Mart and Netflix in the Online DVD Rental Market.

7.   Netflix and Blockbuster have charged higher subscription prices for Online DVD Rentals than they would have, but for Defendants' conduct.  Millions of Blockbuster Online subscribers did in fact pay, and continue to pay, higher subscription prices than they otherwise would have paid, as a direct, foreseeable, intended, and proximate result of Defendants' violations of law.

## **PLAINTIFFS**

8.   Plaintiffs are subscribers to Blockbuster Online during the Class Period.  They are suing for overcharges they paid to Blockbuster as a result of the conduct alleged herein.  They do not seek any

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

1  damages for the overcharges paid by Netflix subscribers, whose overcharge damages are distinct from

2  those suffered by Plaintiffs.

3      9.  DANIEL KAFFER is an adult individual who resides in San Diego, California. During the

4  Class Period, Mr. Kaffer directly subscribed to Blockbuster Online for his personal, non-commercial

5  use and paid Blockbuster fees in connection therewith.  The subscription fees Mr. Kaffer paid to

6  Blockbuster were supracompetitive; they were greater than he would have paid, but for the antitrust

7  violations alleged herein.  Mr. Kaffer thereby suffered injury in his property, in the form of

8  overcharges, injury which the antitrust laws are intended to prevent and remedy.

9      10. JASON LAWTON is an adult individual who resides in Holmen, Wisconsin.  During the Class

10  Period, Mr. Lawton directly subscribed to Blockbuster Online for his personal, non-commercial use

11  and paid Blockbuster fees in connection therewith.  The subscription fees Mr. Lawton paid to

12  Blockbuster were supracompetitive; they were greater than he would have paid, but for the antitrust

13  violations alleged herein.  Mr. Lawton thereby suffered injury in his property, in the form of

14  overcharges, injury which the antitrust laws are intended to prevent and remedy.

15      11. ALAN LEVY is an adult individual who resides in Highland Park, Illinois.  During the Class

16  Period, Mr. Levy directly subscribed to Blockbuster Online for his personal, non-commercial use and

17  paid Blockbuster fees in connection therewith.  The subscription fees Mr. Levy paid to Blockbuster

18  were supracompetitive; they were greater than he would have paid, but for the antitrust violations

19  alleged herein.  Mr. Levy thereby suffered injury in his property, in the form of overcharges, injury

20  which the antitrust laws are intended to prevent and remedy.

21      12. JUSTIN MEADOWS is an adult individual who resides in Indianapolis, Indiana.  During the

22  Class Period, Mr. Meadows directly subscribed to Blockbuster Online for his personal, non-

23  commercial use and paid Blockbuster fees in connection therewith.  The subscription fees Mr.

24  Meadows paid to Blockbuster were supracompetitive; they were greater than he would have paid, but

25  for the antitrust violations alleged herein.  Mr. Meadows thereby suffered injury in his property, in the

26  form of overcharges, injury which the antitrust laws are intended to prevent and remedy.

27

28

13. ROSEMARY PIERSON is an adult individual who resides in Yuba City, California.  During the Class Period, Ms. Pierson directly subscribed to Blockbuster Online for her personal, non-commercial use and paid Blockbuster fees in connection therewith.  The subscription fees Ms. Pierson paid to Blockbuster were supracompetitive; they were greater than she would have paid, but for the antitrust violations alleged herein.  Ms. Pierson thereby suffered injury in her property, in the form of overcharges, injury which the antitrust laws are intended to prevent and remedy.

14.  REBECCA SILVERMAN is an adult individual who resides in Deerfield, Illinois.  During the Class Period, Ms. Silverman directly subscribed to Blockbuster Online for her personal, non-commercial use and paid Blockbuster fees in connection therewith.  The subscription fees Ms. Silverman paid to Blockbuster were supracompetitive; they were greater than she would have paid, but for the antitrust violations alleged herein.  Ms. Silverman thereby suffered injury in her property, in the form of overcharges, injury which the antitrust laws are intended to prevent and remedy.

## **DEFENDANTS**

### **NETFLIX**

15. Defendant NETFLIX is a Delaware corporation headquartered at 100 Winchester Circle, Los Gatos, California, 95032.  Netflix is publicly traded on the NASDAQ under the symbol NFLX.  Its revenues earned from engaging in interstate commerce exceed $1 billion annually.  Through its website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by charging monthly subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans.  Netflix has possessed a market share of at least 75% of the Online DVD Rental Market in the United States, as defined herein, at all times during the Class Period.

### **WAL-MART**

16. **Wal-Mart Stores.**  Defendant WAL-MART STORES is the largest retailer in the United States.  Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville, Arkansas, 72716.  Wal-Mart Stores is publicly traded on the New York Stock Exchange under the symbol WMT.  Its revenues earned from engaging in interstate and foreign commerce exceed $400 billion annually.  Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells

HOWREY LLP

1  new DVDs directly to consumers nationwide.  Wal-Mart Stores sells far more DVDs than any other

2  retailer in the United States, accounting for about 40% of all new DVDs sold to consumers

3  domestically.  During fiscal years 2005-2008 combined, Wal-Mart Stores had revenues in excess of

4  $25 billion from selling DVDs to consumers.  Prior to the Market Allocation Agreement, Wal-Mart

5  Stores' and its wholly-owned subsidiary Walmart.com competed with Netflix in the Online DVD

6  Rental Market through the "Wal-Mart DVD Rentals" service, which was available on

7  www.walmart.com.

8      17. **Walmart.com.**  Defendant WALMART.COM is a California Limited Liability Company with

9  offices at 7000 Marina Boulevard, Brisbane, California, 94005.  Its registration with the California

10  Secretary of State lists its address as 702 S.W. 8th St., Bentonville, AR 72716—the same address as

11  Wal-Mart Stores.  It is the online component of Wal-Mart Stores' retail empire that is the leading seller

12  of new DVDs in the United States.

13      18. Prior to the conspiracy alleged herein, Walmart.com was also a major competitor of Netflix

14  in the Online DVD Rental Market through the "Wal-Mart DVD Rentals" service, which was available

15  on www.walmart.com.  While its financials are not publicly reported by Wal-Mart Stores,

16  Walmart.com is ranked as the 14th largest online retailer in the United States.  Walmart.com sells new

17  DVDs directly to consumers nationwide.  Consumers who purchase DVDs via www.walmart.com may

18  have them either mailed or otherwise delivered to them directly, or may pick them up at a Wal-Mart

19  Stores retail location via Walmart.com's and Wal-Mart Stores' "Site to Store" program.

20      19. **Wal-Mart Stores and Walmart.com.**  Walmart.com and Wal-Mart Stores are, in essence,

21  operated as a single commercial enterprise and hold themselves out to the public as such, by which

22  Walmart.com is an internet sales channel for Wal-Mart Stores, rather than being an independent

23  business entity.  Wal-Mart Stores is the registrant of the www.walmart.com domain name that is used

24  to sell products and services by Walmart.com.  Likewise, Wal-Mart Stores is the registrant of

25  www.walmartdvdrentals.com.

26      20. On January 28, 2010, Wal-Mart Stores significantly changed its corporate reporting

27  structure, and, in the process, Wal-Mart Stores underscored that Walmart.com is not a truly

28

HOWREY LLP

1   independent subsidiary corporation but instead is a mere instrumentality of Wal-Mart Stores, when

2   Wal-Mart Stores formally folded the merchandising, operations, marketing, and other vital corporate

3   functions of Walmart.com into various divisions of Wal-Mart Stores.

4       21. **Wal-Mart Stores' Active Participation in the Conspiracy.**  Wal-Mart Stores was actively

5   involved in the conspiracy alleged herein, as alleged more specifically below.  For purposes of these

6   allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each

7   is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and

8   benefiting from, the Market Allocation Agreement.  Moreover, Wal-Mart Stores directed, ratified,

9   approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

10      22. Wal-Mart Stores had a strong motive to conspire with Netflix.  In addition to its interests as

11  the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to enter into the Market

12  Allocation Agreement, since it obtains substantial revenues from sales of new DVDs, as well as store

13  traffic resulting in the sales of other goods, which would have been threatened by Netflix's entry into

14  new DVD sales, and which were enhanced by Netflix's promotion of Wal-Mart Stores and

15  Walmart.com through the Market Allocation Agreement.

16      23. In a letter submitted in connection with a prior antitrust case brought against Netflix by

17  other plaintiffs for other alleged violations of law, an assistant general counsel of Wal-Mart Stores,

18  referring specifically to Wal-Mart Stores, wrote of "Wal-Mart's decision to discontinue renting

19  DVDs."  Moreover, it was Wal-Mart Stores that announced in part the Market Allocation Agreement,

20  which identifies Wal-Mart Stores, in the "About" section of the press release.  The announcement

21  quoted John Fleming, at the time both the Chief Marketing Officer of Wal-Mart Stores and the

22  outgoing CEO of Walmart.com still overseeing Walmart.com operations, regarding the Agreement.  It

23  explained that Walmart.com's DVD sales are in fact Wal-Mart Stores' "online movie sales business,"

24  and that, more generally, Wal-Mart Stores' "[o]nline merchandise sales are available at

25  www.walmart.com."

26

27

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

**THIRD-PARTY BLOCKBUSTER**

24. BLOCKBUSTER is a Delaware corporation headquartered at 1201 Elm Street, Dallas, Texas 75270. Blockbuster is publicly traded on the New York Stock Exchange under the symbol BBI. Its revenues earned from engaging in interstate and foreign commerce exceed $5 billion annually. Among other things, Blockbuster operates the leading chain of video rental stores in the United States. In addition, through its internet division, Blockbuster Online, www.blockbusteronline.com, Blockbuster rents DVDs directly to consumers nationwide by charging monthly subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans, including "Total Access," and "Blockbuster-By-Mail." Blockbuster has possessed a market share of around 25% of the Online DVD Rental Market in the United States, as defined herein, during the Class Period.

25. Whenever this Complaint refers to a statement or transaction of any corporation or entity, the allegation means that the corporation or entity acted by or through its directors, members, partners, officers, employees, affiliates, or agents, while engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within its scope of authority.

**JURISDICTION AND VENUE**

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d) & 1337 and 15 U.S.C. §§ 1-2, 15 & 26.

27. Venue is proper in this District pursuant to 15 U.S.C. §§ 15, 22 & 26 and pursuant to 28 U.S.C. § 1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events at issue in Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

28. This Court has personal jurisdiction over Defendants because, *inter alia*, Netflix and Walmart.com are headquartered in this State and each of the Defendants has transacted business; maintained continuous and systemic contacts; purposefully availed itself of the benefits of doing business; and committed acts in furtherance of the alleged conspiracy in this State.

HOWREY LLP

**INTERSTATE TRADE AND COMMERCE**

29. Defendants' conduct has taken place within the flow of, and substantially affected the interstate commerce of, the United States.  Defendants and Blockbuster have sold and/or rented DVDs throughout the United States, involving billions of dollars in interstate commerce, and have used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to sell and/or to rent DVDs throughout the United States.

**RELEVANT MARKET**

30. **Product Market.**  For those claims that may require market definition, the Relevant Market for purposes of these allegations during the Class Period is: the rental of DVDs online by subscription for delivery by mail in the United States (the "Online DVD Rental Market").  At all relevant times, Netflix and Blockbuster have been competitors in the Relevant Market.  Prior to entering into the Market Allocation Agreement, Defendants Wal-Mart Stores and Walmart.com competed in the Relevant Market.

31. The Market Allocation Agreement, however, is *per se* illegal and requires no allegation of market definition.

32. Plaintiffs also allege, in the alternative, that the Market Allocation Agreement is anticompetitive and illegal under the Rule of Reason.  Among other facts alleged herein, the Defendants' conduct ended competition between direct competitors in the Online DVD Rental Market, conferred a monopoly upon Netflix in that market and has no pro-competitive benefits.

33. "DVD," as defined herein, refers to a Digital Video Disc, Digital Versatile Disc, HD-DVD, or Blu-ray Disc containing commercially recorded entertainment programs for personal viewing. DVDs are the primary medium by which movies and other recorded entertainment are distributed in the United States.  Revenues on DVDs far exceed those generated from box office receipts.  In addition, DVDs have become a particularly lucrative means for the distribution of previously-aired television programs, surpassing even television syndication rights as a revenue stream in many

HOWREY LLP

1   instances.  As defined herein, "DVD" does not refer to blank DVDs, which are used to store or record

2   data.

3       34. At all relevant times, there have been no reasonably interchangeable substitutes for the

4   service of online DVD rentals, which is differentiated, from both the demand and the supply side, from

5   other methods of DVD distribution channels, as well as other methods of entertainment content

6   delivery.  In the Online DVD Rental Market, for a monthly subscription fee, a consumer may rent

7   DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to its exit from

8   this market) Wal-Mart DVD Rentals.  Within any given plan, the consumer pays the subscription fee

9   regardless of how many DVDs he or she rents per month.  Thus, even a consumer who does not rent a

10  DVD for months still is charged the subscription fee; Netflix CEO Reed Hastings has called this the

11  "gym membership effect."  To rent DVDs, consumers fill out a rental "queue" in their online profile,

12  listing in order of preference the DVDs they wish to rent.  The DVDs are then sent to the consumer's

13  home via U.S. mail.  To return the DVD and receive the next DVD in the queue, the consumer inserts

14  the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then

15  mails the next available movie in the queue to the consumer.

16      35. From the consumer's perspective, online DVD rentals are a differentiated service that is not

17  reasonably interchangeable with in-store video rental.  In video rental from stores, consumers drive to

18  or otherwise arrive at the store, find (or do not find) what they are looking for, and, for the most part,

19  pay on a per-DVD basis for their selection(s).  After the designated rental period, usually depending

20  upon the release date of the DVD, the consumer returns the selection or potentially incurs late fees.

21  During the Class Period as alleged herein, these late fees have accounted for as much as 20% of the

22  revenues in traditional video rental stores; there are no late fees or due dates in the Online DVD Rental

23  Market.

24      36. There are numerous other practical indicia of the Online DVD Rental Market being a

25  relevant product market, distinct from other forms of video rental, including, a lack of price

26  competition, functional differences, and public and industry perceptions of the market.

27

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

37. **Lack of Price Competition.**  No direct price competition exists between Online DVD Rental and other forms of video rental, whether in-store, kiosk, video-on-demand, or video downloading, which are not reasonably interchangeable with online DVD rental.  For example, Online DVD Rentals generally are priced on a monthly subscription basis.  Within any given plan, the subscription rate is independent of the number of DVDs the customer actually rents in a month.  In-store DVD rentals, kiosks, and downloading generally are priced on a pay-per-view basis.  Also, changes in the price of online rentals do not closely track changes in the price of in-store rentals.  The pricing of Online DVD Rentals is generally nationwide in scope and is not affected by local in-store prices and competition.  As a result, the pricing of Online DVD Rentals would generally be the same to a customer, regardless of whether the nearest rental store is two minutes or two hours away.  Online DVD rentals generally offer additional services, such as movie reviews, customer-specific recommendations based on viewing and preference history, and other metrics of popularity.  The cross-elasticity of demand between these products and services is such that a small but significant nontransitory increase in price ("SSNIP") would not cause consumers to switch from Online DVD Rental to in-store rental or any other arguable method of DVD or video distribution, and *vice versa*.

38. **Functional Differences.**  Online DVD rentals fundamentally differ from in-store rentals in that (1) they do not require travel to a store (including a second trip to return the DVD and potentially multiple trips if the store does not have the DVD in stock at the right time), (2) are available to anyone with a postal address, regardless of proximity to a store, (3) are primarily subscription-based services, and (4) provide a much wider selection of titles than a bricks-and-mortar store—the library of titles available from online service providers has grown over time, now ranging near 100,000 DVDs—often twenty to one-hundred times the selection of titles stocked (not to mention available) at any single video rental store.  For these reasons, among others, online and in-store DVD rentals are not reasonably interchangeable.  Likewise, other modes of video distribution, such as kiosk, video-on-demand, and downloading, among other forms, are not reasonably interchangeable with Online DVD Rentals for a number of reasons, including relative selection and convenience for consumers, pricing, as well as, from the supply perspective, licensing considerations and technological limitations.

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

39. **Public and Industry Perceptions.** The Online DVD Rental market is recognized as a distinct market by the public and the industry, including by Defendants and Blockbuster. Defendants have confirmed and recognized the existence of a discrete online rental market. For instance, in September 2008, Netflix spokesman Steve Swasey told the Wall Street Journal that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix explaining, "We see kiosks as competing with video stores. They're very new-release centric—that's all they offer—and that's what the stores offer. You're still going to a destination to pick it up, you have to return it, and you pay by the day." Mr. Swasey acknowledged that while video downloads may be a competitive force in the future, "[m]ainstream consumers are still happy with DVDs, and probably will be for five to 10 years."

40. Reed Hastings has observed that video kiosks are closely competitive with in-store rental, but pose no serious competitive threat to Online DVD Rental, explaining that "Despite kiosk growth . . . we had a record quarter [in the first quarter of 2009] and we expect to have a record year because our differentiators continue to be our vast selection—over 100,000 titles—the convenience of mail and streaming, that you don't have to drive anywhere to receive or return a Netflix disc, and our unlimited rentals for one flat fee." He has also observed that in-store rentals, video streaming or downloading, and DVD sales would be even less of a competitive threat to online DVD rentals than would be video kiosks.

41. Blockbuster itself alleged that the Online DVD Rental Market was the Relevant Market in an antitrust countersuit filed against Netflix in this Court by Blockbuster in 2006. That market definition was not disputed by Netflix, despite their having moved to dismiss the counterclaim. Netflix's motion to dismiss the antitrust claim brought by Blockbuster was denied and the matter was quickly settled by Netflix in 2007.

42. **Online DVD Rentals and Sales.** Online DVD rentals are also a separate market from DVD sales. The pricing of DVD sales and Online DVD Rentals is very different. For example, the price to buy a new DVD depends heavily on how popular it is, including whether it is a new release or how successful the title originally was at the box office or on television. By contrast, Online DVD

-12-

HOWREY LLP

1   Rental providers generally charge based on a subscription fee, regardless of whether the consumer is

2   renting popular or obscure DVDs.  The industry and the public perceive online DVD rentals as

3   separate from DVD sales, whether in-store or online.  The factors motivating a consumer to buy a

4   DVD are different from those that lead to renting a DVD.  The former generally applies to DVDs that

5   the consumer intends to view (either personally, or their family or friends) numerous times.  The latter

6   generally applies to DVDs that the consumer intends to view once and then return.  DVDs sold at retail

7   have other distinguishing characteristics, such as packaging and special features not available with

8   rentals, which are delivered unadorned in envelopes.  In addition, the fact of whether a DVD is new or

9   used is not an issue in rental, but is a significant factor in sales, for used DVDs are sold at a significant

10  discount to their new counterparts.  DVD sales and online rentals also are not reasonably

11  interchangeable for consumers intending to collect physical DVDs or to give a DVD as a gift.  The

12  cross-elasticity of demand between these products and services is such that a SSNIP would not cause

13  consumers to switch from online renting to purchasing DVDs, and *vice versa*.

14      43. **Geographic Market.**  The Geographic Market for the Online DVD Rental Market is the

15  United States.  The United States is the only area of effective competition where consumers can turn

16  for alternative sources of supply of Online DVD Rental services.  Among other things, shipping costs

17  and transglobal differences in DVD data encoding make it neither practical nor feasible for entities

18  operating in other countries to rent DVDs to U.S. consumers.

19                          **MARKET AND MONOPOLY POWER**

20      44. At all relevant times, Netflix dominated the Online DVD Rental Market.  Netflix has had an

21  approximate market share of 75% in the Online DVD Rental Market, and is far and away the market

22  leader in the Online DVD Rental Market.  As a result of this market share, Netflix has had and

23  continues to have market and monopoly power in the Online DVD Rental Market; it has the power to

24  control prices or exclude competition in this Relevant Market.

25      45. Netflix also has the power to control prices or exclude competition in the Relevant Market

26  for other reasons.  Specifically, Netflix (a) set subscription prices well in excess of marginal costs, (b)

27  enjoyed high profit margins thereon, (c) sold such subscriptions generally in excess of the competitive

28

**HOWREY LLP**

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1 price, and (d) did not, and would not, lose sufficient sales were it to hold its prices steady in the face of

2 a significant decrease in price by a competitor to make such a pricing strategy unprofitable.

3     46. Netflix's market and monopoly power is strengthened by the significant barriers to entry in

4 the Relevant Market. There have been no significant market entrants in the nearly four years since the

5 announcement of the Market Allocation Agreement, which increased those barriers. Online DVD

6 Rental is highly capital intensive. A firm must operate on a large scale to be successful. It requires the

7 possession of a significant number of shipping facilities strategically located throughout the United

8 States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain

9 the selection of titles that consumers demand. Reed Hastings has stated that the barriers to creating the

10 scale to compete profitably are very substantial. These barriers are far greater now that they were

11 when Netflix began. Netflix was able to enter on a much smaller scale but a new entrant today would

12 need a much larger scale of operations.

13     47. Since the implementation of the Market Allocation Agreement, the Online DVD Rental

14 Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which

15 possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not

16 control. Blockbuster's presence does not preclude Netflix's monopoly and market power. Reed

17 Hastings has stated that Blockbuster actually "works very well for us" because it creates "a lot of

18 press," but, from a competitive perspective, it has a "relatively not strong balance sheet and [is] in the

19 business in a small way."

20     48. In addition, Netflix has attempted to keep Blockbuster close, with its executives

21 communicating on a regular basis with current and former executives of Blockbuster starting in at least

22 October 2004 and continuing throughout the Class Period. Indeed, on October 8, 2004, CEO Reed

23 Hastings acted as a self-proclaimed "mole" within Netflix to secretly funnel information to

24 Blockbuster; Netflix Chief Financial Officer Barry McCarthy and Chief Content Officer Ted Sarandos

25 regularly used investment bankers, who had code names such as "Deep Throat" as conduits for

26 information. Netflix also signaled its competitive intentions in public statements made to investors in

27 an attempt to manage and decrease the ostensible competition between Netflix and Blockbuster. In a

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1  market with on-going three-firm competition and no efforts to eliminate such competition, these forms

2  of cooperation and communication between Netflix and Blockbuster would not have occurred, or at

3  least would have been less frequent.

4      49. During fiscal years 2005-2008 combined, Netflix earned more than $6 billion in revenues

5  and nearly $2.5 billion in gross profit from renting DVDs to consumers—a margin of nearly 40%.  As

6  a result of Netflix's market and monopoly power alleged herein, its subscription fees have been higher

7  than they otherwise would have been.

8      50. Further evidence of Netflix's market and monopoly power is reflected in the

9  anticompetitive effects alleged herein.

10                         **FACTUAL ALLEGATIONS**

11     51. Defendant Netflix was founded in 1997 by Reed Hastings and Marc Randolph both to rent

12  and sell DVDs online.  Initially, when Netflix began operations on April 14, 1998, the products offered

13  were more similar to in-store rentals in that consumers would pay a fee to rent a DVD for a certain

14  amount of time and additional fees were charged for keeping the DVD longer.  Customers had the

15  option to purchase the rented DVD and could also buy new DVDs from the website.

16     52. **Early Market Allocation.**  In November 1998, Amazon.com opened an online video store,

17  which sold new DVDs.  Shortly thereafter, on December 4, 1998, Netflix announced a deal with

18  Amazon to allocate online DVD sales to Amazon and online rentals to Netflix.  Under the terms of the

19  agreement, Netflix directed its customers to Amazon.com for DVD purchases and Amazon.com

20  directed its customers to Netflix for Online DVD Rentals.  Customers on the Netflix website wanting

21  to purchase any DVD on Netflix could click the "BUY THIS DVD" button, which would link the

22  purchaser to the Amazon website.

23     53. On September 11, 2001, after having adopted its "unlimited" subscription business model

24  allowing consumers to subscribe for $19.95 for a four-out plan, Netflix announced a deal with Best

25  Buy, a leading big box retail chain, which was similar to the deal it had previously entered into with

26  Amazon. Netflix's deal with Best Buy essentially split the markets for online DVD rentals and DVD

27  sales, with Best Buy selling Netflix rental subscriptions, and Netflix using a "Buy" button to direct

28

1   Netflix's potential buyers to Best Buy, rather than selling the DVDs itself.  As a part of the deal, Best

2   Buy acquired a significant equity interest in Netflix.  Various amendments to the agreement would

3   extend it through May 2005, the same month the Wal-Mart agreement was announced publicly.

4        54. As a result, by 2002 Netflix had virtually no competition in the Online DVD Rental Market

5   other than from a few fringe companies.  Netflix kept its subscription rate at $19.95, but changed its

6   main subscription plan from a 4-out to a 3-out unlimited plan.  On June 20, 2002, Netflix went public.

7   A year passed and, on June 9, 2003, Netflix announced it would have its first quarterly profit ever.

8        55. **Enter Wal-Mart.**  The next morning, June 10, 2003, Wal-Mart announced it would be

9   entering the Online DVD Rental Market, leading with a 2-out unlimited plan at $15.54 per month.  In

10  an internal email, John Fleming, CEO of Walmart.com, boasted that the timing of the launch was

11  "brilliant," because the announcement had a severe negative effect upon the stock value of Netflix.

12  Wal-Mart's entry was viewed by the financial world as a major threat to Netflix's business.  John

13  Fleming observing this reaction asked his fellow Walmart.com executives "How's it feel to be the 800

14  lb Gorilla?"

15       56. From its beginnings in 2003 through the January 2005 dinner, Wal-Mart trumpeted the

16  success of its Online DVD Rental business.  As early as November 2003, Cynthia Lin, a spokeswoman

17  for Walmart.com, observed that "Customers have really been responsive to the convenience of

18  ordering online. . . . There's definitely a large appetite for this."  The recognition of the potential of its

19  Online DVD Rental business also was reflected in the dramatic expansion of Wal-Mart DVD Rentals

20  during 2004 by the doubling of its capacity and expressions of plans to continue that expansion in

21  2005.  During 2004, for instance, Wal-Mart DVD Rentals expanded its DVD selection from 13,000

22  titles to 20,000 and doubled the number of distribution centers from 7 to 14.  Wal-Mart was going to

23  add even more distribution centers the following year.  According to Wal-Mart, Wal-Mart DVD

24  Rentals was a "viable business for us, with growth potential."

25       57. As of August 2004, Netflix was charging $21.99 per month for its 3-out unlimited plan,

26  which, at that time, was far and away its most popular plan.  It also had other unlimited plans allowing

27  for 4 or more DVDs out at a time, as well as a 2-out plan capped at 4 rentals per month for $14.99 per

28

**HOWREY LLP**

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1  month.

2       58. At that same time, Wal-Mart was charging $15.54 per month for a 2-out unlimited plan,

3  which was then its most popular plan; 70% of its customers had the 2-out unlimited plan.  Wal-Mart

4  also had 3-out and 4-out plans priced at $18.76 and $21.94, respectively.  None of its plans were

5  capped.

6       59. **Blockbuster Enters and Undercuts Netflix on Price.**  On August 11, 2004, Blockbuster

7  launched its Blockbuster Online.  In doing so, Blockbuster undercut Netflix by 10% per month.  Its 3-

8  out unlimited plan was priced at $19.99.  Shane Evangelist, Blockbuster Vice President and General

9  Manager of Blockbuster Online stated in the formal announcement: "We think now is the opportune

10 time for Blockbuster to enter the online rental business, and we plan to quickly establish ourselves in

11 this arena by aggressively marketing, pricing and combining our online program and in-store

12 capabilities. . . . To this end, the Blockbuster Online monthly fee is currently priced below our biggest

13 competitor for the three-out rental plan."  Blockbuster's strategy was to market and price its Online

14 DVD Rental service aggressively to be a low priced service.  Blockbuster was the dominant force in

15 the bricks-and-mortar in-store rental market and intended to extend its business into the Online DVD

16 Rental Market.  It presented a direct and immediate competitive threat to Netflix.

17      60. Netflix initially aimed to "kill Blockbuster and get ready for a big fight" in order to

18 maintain its "massive market share in DVD rentals worldwide."  Netflix's primary concern was that

19 Blockbuster Online's "very existence" was a "huge drag" on its stock price.  Its strategy was to "Go

20 big, go worldwide, and don't give anyone else a chance to compete or catch up."

21      61. **Amazon Ponders U.S. Entry.**  But only six weeks after Blockbuster Online entered the

22 Online DVD Rental Market, Netflix dramatically changed strategies.  It learned through investment

23 bankers and hedge fund managers with whom Netflix's executives had relationships of what it

24 believed to be an imminent entry by Amazon into the Online DVD Rental Market.  Amazon's Chief

25 Financial Officer publicly stated in October 2004 that Online DVD Rental is "a business we're well

26 positioned to do," and that it could "afford to offer low prices," particularly because Amazon's

27 "customer acquisition costs would be low to none, given Amazon's traffic."  Amazon CEO Jeff Bezos

28

-17-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1 echoed this in January 2005, stating that Online DVD Rental "is a business we know something about.

2 One of the big costs here is that an extremely large fraction of those monthly subscription fees are used

3 to acquire new customers.  Amazon is well positioned to offer a low-priced service of high quality, and

4 we wouldn't have to pay heavy marketing fees."

5   62. Netflix, which was now possibly facing the prospect of a four firm market in the United

6 States, including Wal-Mart, Blockbuster, and Amazon, quite logically feared the entry of Amazon.  On

7 average, Netflix was making a 50% profit per subscriber as of late September 2004; its $21.99 3-out

8 unlimited plan, for instance, cost Netflix about $11.  Netflix predicted that since Amazon generally

9 tried to maintain a margin of 25%, Amazon would enter the market with a competitive price of about

10 $15 per month for a 3-out plan and would offer other lower priced plans as well.

11   63. With Blockbuster at $19.99 for its 3-out unlimited plan, Wal-Mart at $15.54 for its 2-out

12 unlimited plan and $18.76 for its 3-out unlimited plan, and Amazon potentially entering at a profitable

13 $14.99, Netflix's $21.99 3-out price was above-market.  Netflix determined that price competition was

14 too important a factor in this market to ignore and that it would cut its price at that time to remain

15 competitive.

16   64. On Thursday, October 14, 2004, Netflix announced its strategy: Netflix would lower its 3-

17 out unlimited price nearly 20% from $21.99 per month to $17.99 per month as of November 1, 2004.

18 Netflix also disclosed its belief that Amazon would enter the market along with Blockbuster and Wal-

19 Mart.  Netflix was downgraded by a number of investment banks and its stock price plummeted more

20 than 40% the next day.

21   65. Appearing on CNBC as his stock was in free-fall the next morning, October 15, 2004,

22 Hastings engaged in the following exchange:

23     QUESTION: And I don't mean to take away anything from your success, which is

24     really phenomenal. But you're worried about something here. What is it? You're

25     making these big cuts and changes, you're worried about something.

26     HASTINGS: Absolutely. This market's heating up a lot faster than we thought it would.

27     Blockbuster is coming in, Amazon is coming in, Wal-Mart has been in the market for

28

two years. So it's Netflix up against Wal-Mart, Amazon, Blockbuster, and that gives anybody smart reason to worry. And it's why we're doing the price cut, it's why we're focused on growth, and it's why we're focused on extending our lead.

66. **The First Blockbuster Price Cut.** Blockbuster's CEO John Antioco told Reuters that Blockbuster Online would lower its monthly subscription rate from $19.99 to $17.49 in order to undercut Netflix's price reduction.  According to Antioco, but for Netflix's online DVD rental price cut, Blockbuster Online would have been content to keep its price at $19.99 per month, he explained "We were growing our business at a very nice clip, but would not have elected to lower our prices. Having said that, we are determined that we are not going to be beaten from a price/value perspective."

67. Taken aback by the difference in price competition inherent in a three-firm versus a two-firm market, Ted Sarandos, Netflix's Chief Content Officer, responded: "This is really new for us.  We have to digest a bit before we can make a comment."  A Netflix executive internally remarked: "The war is on."

68. By the time Netflix implemented its new $17.99 price, Wal-Mart undercut both Netflix and Blockbuster in the pricing of its 3-out plan, announcing it would drop its 3-out price to $17.36 per month.  Wal-Mart's monthly price was now more than 50 cents lower than Netflix's, and about 15 cents lower than Blockbuster's.

69. Faced with lower priced competition from Blockbuster and Wal-Mart and potentially Amazon, and seeing Wall Street's extremely negative reaction to his newly announced strategy, Netflix's Hastings abruptly abandoned trying to compete legally on the merits and embarked upon a scheme to monopolize and restrain trade in the Online DVD Rental Market with the specific intent to acquire and maintain monopoly power and to avoid having to sacrifice further profits and losses in the market by setting subscription prices lower than they were already set at $17.99 per month.

70. **The October Overture to Wal-Mart.** Hastings sought to engage Wal-Mart in a market allocation deal reminiscent of ones he had done with Amazon and Best Buy in previous years.  Unable to wait until the next business day after his stock crashed, on Sunday October 17, 2004, Reed Hastings

HOWREY LLP

1    emailed Jim Breyer, a member of the Wal-Mart Stores Board of Directors, asking:

2            Jim: Could you give me an email introduction to the head of

3            Walmart.com.  With Amazon entering dvd rental, there may be a good

4            alliance to make for Walmart and us.

5        71. Breyer then introduced Hastings and Fleming by email, saying, "It would be worthwhile for

6    the two of you to meet."  Hastings asked Fleming to lunch the same day and the two eventually met in

7    Walmart.com's Brisbane offices on October 27, 2004.

8        72. Hastings thus misinformed the public when he made public statements in 2005 that Netflix

9    and Wal-Mart began working together in January 2005 after Hastings had been at a Wal-Mart retail

10   store while Christmas shopping in late 2004 and saw how low Wal-Mart's DVD prices were.  These

11   public statements were merely part of a calculated public relations campaign to pitch the deal to the

12   public—the two, Hastings and Fleming, actually began communicating and meeting months earlier.

13       73. Hastings did not misstate the fact, however, that it was he who approached Wal-Mart.  At

14   the time Hastings approached Wal-Mart, Wal-Mart had not made a decision to exit the online DVD

15   rental business.  Indeed, on October 24, 2004, within days of Hastings' and Fleming's first meeting,

16   Kevin Swint, a Walmart.com executive deeply involved in Wal-Mart's online rental business, said that

17   Wal-Mart DVD Rentals had "grown beyond our expectations," and that "[w]e're really bullish about

18   this service . . . and our customers are enthusiastic."

19       74. The specific intent and purpose of Netflix's CEO Reed Hastings in having the October

20   2004 meeting between these two direct competitors was to eliminate competition—and Walmart.com's

21   CEO John Fleming and Board member Jim Breyer knew it.  Hastings sought to strike a deal that would

22   directly eliminate Wal-Mart from the Online DVD Rental Market.  Such a deal would also serve to

23   dissuade Amazon from entering the U.S. market.  Not only was the intent of the meeting and

24   subsequent dealings and agreement with Wal-Mart to eliminate competition, but that was its actual

25   effect as well.  As Reed Hastings would later publically state, a two competitor market was in Netflix's

26   best interest.

27       75. **Keeping Blockbuster Close.**  Reflecting its changed approach to competition, Netflix

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1   continued to keep close contact with Blockbuster in a continued attempt to reduce competition further.

2   In addition to acting as a "mole" to curry favor with Blockbuster, in October 2004, Hastings and other

3   Netflix executives obtained confidential information through investment bankers in 2004 and

4   throughout 2005 and well beyond, including from one informant nicknamed "Deep Throat," using

5   them as conduits, and signaling in public statements to investors, in order to try to manage and

6   decrease the ostensible competition between the two companies.

7       76. **Stepping Up Dealings with Amazon.**  Netflix was not content just to try to eliminate Wal-

8   Mart directly or to communicate with Blockbuster.  Netflix still wanted to ensure a two competitor

9   market and, in order to reach this goal, also tried to neutralize the potential Amazon threat as well.  In a

10  further attempt to eliminate competition in the Online DVD Rental Market, Netflix engaged in

11  extensive dealings with Amazon.  During the latter part of 2004 and beyond, Netflix had numerous

12  direct communications and meetings with Amazon CEO Jeff Bezos and other top Amazon executives.

13  The communications came with increased frequency in late November.  In a December 8, 2004 letter

14  to Reed Hastings, Amazon CEO Jeff Bezos confirmed these communications: "I have very much

15  enjoyed the opportunities we have had over the phone the past few weeks to speak by phone and

16  appreciate your candor."  Bezos indicated that a deal with Netflix could be achieved very quickly.

17      77. The very next day, December 9, 2004, Amazon announced its entry into the Online DVD

18  Rental Market—in the United Kingdom.  Amazon remained publicly non-committal about entering the

19  U.S. market, although it did state that it could do so successfully if it so chose.

20      78. Netflix had planned to "Compete hard in the U.K."  Netflix had set up shop in the U.K. and

21  started beta-testing its service there.  However, after communications with Amazon, by the end of

22  December, Netflix had canceled its plans to enter the U.K., stopped its beta testing, shut down its

23  operations in the U.K., and laid off its workers, other than two employees that it brought back to the

24  U.S.  Thus, at the time their CEOs were communicating about an alliance, Netflix abandoned its plans

25  to enter in the UK and Amazon did not enter in the U.S., a situation which remains to this day.

26      79. **The Second Blockbuster Price Cut.**  On December 15, 2004, Reed Hastings emailed his

27  executive staff: "Deep Throat says blockbuster will do something big online in the next two weeks."  A

28

-21-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

week later, on December 22, 2004, Blockbuster once again cut its prices; this time even more

dramatically—**and right at the level that Hastings predicted that Amazon would profitably enter the**

**market:** $14.99 for a 3-out unlimited plan.  In the press release on the price cut, Evangelist announced:

"We are lowering our subscription price to $14.99 a month. For those who subscribe now, this price is

guaranteed through January 2006.  Existing Blockbuster Online subscribers will enjoy the same

guarantee."  Evangelist went on to say:

> This is not a promotion. We want to make it clear to anyone who is now subscribing to
>
> an online service or considering such a service that Blockbuster is committed to being
>
> the high-quality, low-cost provider in the online rental space.

80. **The Second Walmart Price Cut.**  On January 4, 2005, and less than two weeks after the

Blockbuster price cut was announced, Wal-Mart DVD Rentals dropped the price on its most popular

DVD rental plan significantly—to $12.97 per month creating further downward price pressure on

Netflix to reduce its DVD rental prices.  In order to respond to the increased competition, Netflix

would have been forced to lower its prices and thereby reduce its profits.

81. The $12.97 price level was, nevertheless, profitable for Wal-Mart, which was considering

even further cuts, including going as low as to $9.97, the purpose of which would be, in the words of

Wal-Mart executive Kevin Swint, to "bleed our competitors."

82. This increased competition was not good news for Netflix.  Since its core business is online

DVD rentals, Netflix might have been the company most threatened by Wal-Mart's push into the

sector.  Because of its size, buying power and agreements with movie distributors, Wal-Mart could

have put significant pricing pressure on Netflix over time.

83. At $17.99, Netflix's price premium over Blockbuster and Wal-Mart (and potentially

Amazon) was once again untenable in this three (or maybe four) firm market:  Wal-Mart's leading plan

was $12.97, Blockbuster's leading plan was $14.99, and Netflix suspected that Amazon would enter at

$14.99 as well.  In order to remain competitive in this market legally, Netflix would have to cut its

prices below $17.99, which may have caused prices to spiral downward even further.

84. **Netflix's Illegal Scheme Continues in 2005.**  Hastings was determined not to lower

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1  Netflix's 3-out subscription rate to a competitive price level, which—by the time of the Blockbuster

2  and Wal-Mart price cuts in late December 2004 to $14.99 and early January 2005 to $12.97—was

3  lower than $17.99 per month, perhaps as low as $9.97.  To do this, he would attempt to: 1) rein in

4  Blockbuster's competitive efforts; 2) keep Amazon out of the U.S. market; and 3) get Wal-Mart out of

5  the Online DVD Rental Market.

6      85. **Reining in Blockbuster.**  In his desperation to reduce competition, Hastings engaged in

7  communications with Blockbuster that signaled his desire not to remain arms-length competitors.  No

8  longer content to communicate by phone or email or through intermediaries, Hastings met in-person

9  with the Vice President and General Counsel of Blockbuster, Edward Stead, on January 26, 2005 at the

10  Sundance Film Festival.  There, Hastings again shared competitively sensitive information, confiding

11  in Stead that Netflix's business method patent was a "joke."  Hastings continued to keep in close touch

12  with Stead and other current and former Blockbuster executives throughout the Class Period, which

13  facilitated remarkable pricing similarity between Netflix and Blockbuster once Wal-Mart eventually

14  exited the market later that year pursuant to Defendants' illegal conspiracy.

15      86. **Attempt to Keep Out Amazon.**  Building upon numerous communications and

16  negotiations during 2004, Netflix attempted to arrange a deal with Amazon that would keep Amazon in

17  Europe and out of the Online DVD Rental Market in the United States.  Amazon and Netflix had

18  numerous meetings, telephone conversations, and emails relating to a U.S.-U.K. "alliance," while, at

19  the very same time, Netflix was conspiring with Wal-Mart.  Calling it "fabulous news," on January 20,

20  2005, Hastings passed on to his executive staff an email from Amazon Vice President of Business

21  Development Jeff Blackburn indicating Amazon's continued interest in collaborating with Netflix.

22      87. Numerous communications and possibilities were exchanged; and at least one in-person

23  meeting was hosted by Netflix on March 24, 2005 with Hastings and Bezos in attendance.  An

24  agreement to allocate the global markets for Online DVD Rentals was on the table during those talks.

25      88. For instance, on April 7, 2005, Leslie Kilgore, Netflix's Chief Marketing Officer, proposed

26  a three-year deal to Amazon in which Netflix would pay $45 million to Amazon for promotional

27  considerations and for Amazon "[n]ot to enter the US rental market during the term of the deal."

28

89. Although it appears that the parties may not have agreed on all the terms of Kilgore's April 7th proposal, as to the global market allocation agreement, Amazon was "OKAY" with that specific term.  Amazon directly participated in the European market from 2004 through 2008, and it is now the largest shareholder of the leading online DVD rental service in Europe.

90. **Complete the Market Allocation Agreement with Wal-Mart.**  Hastings continued to work with Fleming in early 2005, including meeting with him for dinner in February 2005.  In preparation for the meeting with Fleming, Hastings directed his administrative assistant to prepare a mock-up of a "Buy DVDs at Wal-Mart" mailing envelope for Hastings to bring with him to the dinner meeting with Fleming.

91. On February 9, 2005, Hastings and Fleming met.  Hastings continued to scheme to allocate DVD sales to Wal-Mart and Online DVD Rentals to Netflix.  By March 17, 2005, Netflix had struck a "handshake deal" with Wal-Mart that would result in Wal-Mart's exit from the Online DVD Rental Market.  The Market Division Agreement was "Reed's baby."

92. Shortly thereafter, John Fleming was promoted from Walmart.com to be the Chief Marketing Officer of Wal-Mart Stores.  He continued to oversee Walmart.com, splitting his time between Bentonville and Brisbane.

93. **Hastings' Subsequent "Prediction."**  On April 21, 2005, in Netflix's First Quarter earnings call with financial analysts, held about one month after the handshake deal and about one month before the public announcement of the Market Allocation Agreement, Hastings made plain the motive for Netflix to conspire with Wal-Mart Stores and Walmart.com:

> In terms of profitability over the coming years, the key issue is the number of major competitors.  If there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets.  If, on the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in online rental, then the profits would likely be small.

Hastings went on to "predict" on that conference call:

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

1    [T]he likely case is [that] online rental becomes a two-firm market over the coming

2    years.

3    94. **The Public Announcement.**  On May 19, 2005, shortly after Fleming had been promoted,

4    Defendants issued a joint press release that revealed the existence of the Market Allocation Agreement.

5    By entering into the Market Allocation Agreement, Defendants unlawfully divided and allocated the

6    markets for DVD sales and rentals, and did, in fact, create the two-firm market that Hastings sought.

7    Recognizing the tremendous benefits that this improper agreement would bring them, Hastings

8    admitted that "This agreement bolsters both Netflix's leadership in DVD movie rentals and Wal-

9    Mart's strong movie sales business."

10    95. Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the Online DVD

11    Rental Market.  Walmart.com announced to all of the subscribers to Wal-Mart DVD Rentals that it was

12    exiting the Relevant Market and that those subscribers could be transferred to Netflix.  Wal-Mart took

13    additional steps to affirmatively implement the Market Allocation Agreement by adding a prominently

14    placed link to the Netflix website to encourage customers to transfer their subscriptions to and

15    otherwise rent from Netflix.  Since the date of their joint announcement on May 19, 2005 (apart from

16    the 30 days that Walmart.com used to wind down its existing online rental business), Wal-Mart has not

17    participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

18    96. As a result of the Market Allocation Agreement, downward pricing pressure from

19    Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors.

20    Absent the Market Allocation Agreement, Netflix would have lowered its prices no later than May 19,

21    2005.  As a result of the elimination of a competitor in this Relevant Market, Netflix was able to hold

22    its subscription rate steady at $17.99 per month and its only competitor left, Blockbuster, was able to

23    raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per

24    month.  This was in accord with Hastings' expectation that "[i]f there are only two major players,

25    Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment

26    markets."  As one business publication proclaimed: "That's one less competitor for the DVD rental

27    pioneer . . . . Now it looks like the competitive storm is dying down."  In Netflix's next earnings call,

28

**HOWREY LLP**

on July 25, 2005, Hastings boasted:

> Last quarter we said online rental was shaping up to be a two-player market, and that is
> indeed what is happening.

97. The Market Allocation Agreement was not in the independent self-interest of Wal-Mart or Netflix.  Wal-Mart would not have wanted to withdraw from the online rental market, encourage its subscribers to be transferred to Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an agreement not to compete for new DVD retail sales.  But for the Market Allocation Agreement, Wal-Mart would not have exited the Online DVD Rental Market when it did.

98. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of subscribers—a base of customers who purchase on average 25 DVDs per year each—and would not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them not to compete against Netflix's online rental business.  In late 2004, as its Best Buy arrangement was nearing its end, Netflix very seriously considered entering the market for new DVD sales.  In a presentation prepared by Hastings for an executive staff offsite meeting on December 1, 2004, Hastings acknowledged that Netflix had "[m]ore efficient ops and shipping than Amazon," which was and is the largest online seller of new DVDs in the United States.  Hastings also projected that Netflix could earn a profit of $1 for every DVD it sold.  At the time, Netflix projected that it would have four million subscribers by the end of 2005—meaning that Netflix could profit enormously from offering new DVDs for sale, even if Netflix could sell a portion of the 100 million DVDs Netflix subscribers would buy in 2005.  Before it embarked upon its scheme, Netflix bragged to movie studios about how its customers were prolific DVD buyers.  After the Wal-Mart deal, Netflix changed its tone, telling studios that "we're not going to compete on sales with the Wal-Mart's of the world."

99. Wal-Mart's exit from the Online DVD Rental Market was not a unilateral decision.  It was a key element of the Market Allocation Agreement as set forth herein.  First, Wal-Mart's exit was expressly part of the Market Allocation Agreement with Netflix that directly stemmed from the

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

1   meetings between the two companies' CEOs.  Second, it was Netflix who initiated the meetings and

2   approached Wal-Mart.  Third, it was Hastings who brought the "Buy DVDs at Wal-Mart" envelope to

3   the February meeting with Wal-Mart's Fleming.  Prior to that Agreement, Wal-Mart had not

4   announced anything about exiting this market.

5        100.    As detailed above, shortly prior to the October meeting, Wal-Mart repeatedly described

6   its success in the Online DVD Rental business and expressed its intention to continue and expand in

7   that business.   Going into 2005, H. Lee Scott, then the President and CEO of Wal-Mart Stores,

8   continued this theme, reporting to the Wal-Mart Stores Board of Directors that Wal-Mart experienced

9   phenomenal growth and customer response in Wal-Mart DVD Rentals since its official launch and that

10  he expected that over the next five years Wal-Mart DVD Rentals would expand.  Contemporaneous

11  Wal-Mart financial projections confirm Mr. Scott's statements and reveal that Wal-Mart expected

12  revenues from its Online DVD Rentals to grow 4200% between 2004 and 2008.  During a January 7,

13  2005 interview, Walmart.com CEO John Fleming told CNBC that Wal-Mart DVD Rentals was among

14  its "very good businesses that we're focused on developing over the next year or two."  Its conduct

15  after engaging in discussions with Netflix thus represents a sudden and sharp reversal in its plans and

16  did not make business sense in the absence of a conspiracy.

17       101.    **Single agreement**.  The conduct alleged herein constitutes a single overarching

18  conspiracy consisting of both the terms that were publicly announced as well as the other aspects of the

19  Market Allocation Agreement.

20                                  **BLOCKBUSTER'S REACTION**

21       102.    Prior to the public announcement of the deal, Wal-Mart informed a number of movie

22  studios of its impending exit from the market due to its agreement with Netflix.  Wal-Mart Stores

23  senior executive Gary Severson warned, "As soon as we visit with them the word will get out that we

24  are exiting the business."  Wal-Mart did in fact visit with studios prior to the deal and news of the deal

25  leaked.  In the days leading up to the announcement, the trading volume of Netflix increased

26  dramatically and its stock price rose, as is the case when confidential positive information about a

27  corporate transaction of a public company is leaked prior to its announcement.

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

103.   On May 18, 2005, one day before the Wal-Mart-Netflix deal was announced, Blockbuster reported that starting on Monday, May 16, it had begun testing a higher priced 3-out $17.99 offer.  Blockbuster explained that it was a limited test and that the company had not decided whether to adopt the new price.

104.   In any event, online price testing is not an uncommon practice and Netflix and Blockbuster engaged in it regularly during this time.  Blockbuster spokeswoman Jeri Anne Thomas stated: "We are a retail company; we test a lot of things.  We are testing $17.99.  That is one of several tests."  Indeed, Shane Evangelist, then the general manager of Blockbuster Online, said Blockbuster tested some 25 different offers from January through May 2005.

105.   **The Blockbuster Offer to Defecting Netflix and Wal-Mart Subscribers.**  The same day the Wal-Mart-Netflix deal was announced, Blockbuster unveiled an offer to current Netflix and Wal-Mart subscribers in response: With proof of cancellation of either service, Blockbuster offered the opportunity for defectors to subscribe to Blockbuster at their current Wal-Mart or Netflix rate for one year, and get a new DVD and 2 free months of service from Blockbuster.

106.   Netflix actually regarded this promotion as a price increase.  Netflix subscribers were paying $17.99.  Had those subscribers simply switched to Blockbuster they would have paid $14.99 per month, but by taking the special offer they would presumably pay $17.99—a higher rate than the regular $14.99 Blockbuster rate in effect at the time.  Although for those Wal-Mart subscribers in the $12.97 plan, there may have been a temporary benefit, the Blockbuster offer was a direct short-term temporary response and grab for customers during the transition period of the Wal-Mart-Netflix deal, and nothing more.

107.   **Expecting an Eventual Blockbuster Online Price Increase in Response to the Wal-Mart Deal.**  Shortly after Wal-Mart actually exited the Online DVD Rental market a month after the announcement, Netflix stated that Blockbuster likely would raise its subscription prices given the new market dynamics.  Others in the know shared the same sentiment.  For instance, in a Netflix executive staff offsite presentation dated June 21, 2005, it was assumed that "Blockbuster will raise online prices to Netflix levels or within $ .50 by Q1 2006."

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

108.    Once Wal-Mart DVD Rentals was officially closed on June 17, 2005, Netflix was now Blockbuster's only competition in the market and was priced 20% higher than Blockbuster Online for its 3-out plan.  This provided Blockbuster with the opportunity and incentive to raise its price to the artificially high levels set and maintained by Netflix.

109.    Within three weeks, as early as July 7, 2005, Blockbuster had decided it was going to raise its prices.  This was conveyed to Netflix by investment bankers with inside information.  The passage of a relatively short amount of time between its discovery of Wal-Mart's exit and the time that Blockbuster decided to raise its prices is consistent with the fact that Blockbuster's decision was tied to that discovery.   In a business like this, raising prices is a particularly significant decision.  When Netflix raised its price to $21.99, it took several months to make that decision.

110.    On August 4, 2005, an analyst upgraded Netflix to "Buy," noting, "Our channel checks suggest that Blockbuster will raise the price on its most popular service to $17.99 up from $14.99 shortly, bringing it inline with Netflix's flagship service."  On August 5, 2005, *The Hollywood Reporter* echoed that "Blockbuster might boost the price of its flagship service from $14.99 to $17.99 as early as next week, putting it in line with Netflix's most popular price option."

111.    Days later, on August 9, 2005, just weeks after Wal-Mart DVD Rentals closed, Blockbuster Online officially announced that it would be raising the subscription price of its most popular 3-out plan from $14.99 per month to $17.99 per month—the very same price charged by Netflix.  On that same day, Blockbuster announced it would be raising other prices to precisely match Netflix's higher prices for its 5-out and 8-out plans as well.

112.    When the Blockbuster price increase actually went into effect on August 19, 2005, a Netflix market forecaster said it was a "momentous day."  A Wal-Mart executive confirmed that this was an expected result.  Hastings wrote to his executive staff: "**a pretty picture: BBI at $18 as planned.**"

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

1

**DIRECT ANTICOMPETITIVE EFFECTS**

2       113.    A direct, foreseeable, proximate, and intended effect of Defendants' violations of law,

3   including the Market Allocation Agreement, was to cause Blockbuster to have higher prices than it

4   otherwise would.  The directness of that effect is established by many facts, including:

5       •   The strong negative reaction of the stock market to Netflix's October 14, 2004

6           announcement of a price cut gave Netflix a powerful incentive to avoid any further price

7           cuts and maintain its price at $17.99.

8       •   The anticompetitive conduct and conspiratorial communications that followed were a direct

9           outgrowth of Netflix's recognition that it would need to cut prices and would not be able to

10          maintain its price at $17.99, absent some change in the competitive landscape.

11      •   The initial anticompetitive and conspiratorial communications with Wal-Mart were just two

12          days after Blockbuster undercut Netflix on price.  The communications directly stemmed

13          from growing price competition and Netflix's desire to stop that competition.  Absent those

14          communications, Netflix would have needed to respond to that price reduction, and the

15          subsequent price reduction by Wal-Mart, with further price reductions of its own.

16      •   The period of three-firm competition prior to the onset of conspiratorial communications

17          involved a rapid series of substantial price reductions.  That sequence had not fully run its

18          course and would have continued with further price reductions, including one or more by

19          Netflix, absent the Market Allocation Agreement and the communications that led to it.

20      •   Netflix's, Wal-Mart's, and Blockbuster's actual profit margins and Amazon's anticipated

21          profit margins were such all of them could have lowered prices further than the actual and

22          anticipated prices actually charged and sustained such lower prices.

23      •   Netflix's profit margins were declining during the period of three-firm competition and

24          stopped declining when three-firm competition was replaced by two-firm competition.

25          Absent that change in competition, the prior trend would have continued, which would have

26          required Netflix to reduce its prices.  Netflix could not have maintained such profit margins

27          in the face of three-firm competition.

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

- Blockbuster tested $17.99 pricing after news of the Market Allocation Agreement leaked, its promotional offer to Netflix defectors was regarded as a price increase to Netflix's higher prices level, and Blockbuster privately acknowledged shortly thereafter that it would be raising prices.

- Netflix's CEO's recognition that a two-firm market would produce higher profits demonstrates an awareness that prices and profits would be higher in a two-firm market than a three-firm market and admissions that Blockbuster's August 2005 price increase to $17.99 was planned and expected, demonstrate that an intended anticompetitive effect of Defendants' violations of law was that Blockbuster would increase its prices in a two-firm market, which would allow Netflix to maintain its artificially high $17.99 price.

- The transition to a two-firm market also made Blockbuster a less effective competitor, both because of Netflix's market and monopoly power and because the two-firm market structure encouraged tacit collusion and other forms of cooperation between Netflix and Blockbuster, since there was no longer a fear that Wal-Mart would exploit such opportunities.

- The facts and circumstances of Netflix's interactions with Amazon during this time period were part of Netflix's attempt to monopolize the market with the specific intent and actual effect of eliminating the threat of competition from Amazon, which, along with the Market Allocation Agreement, left Blockbuster as Netflix's only competitor in the domestic Online DVD Rental Market.

- Netflix originally intended to compete vigorously with Blockbuster. This, too, would have resulted in both firms lowering their prices more than they actually did. Had Netflix not embarked on its scheme to eliminate competition, it would have competed vigorously against Wal-Mart and Blockbuster – and Amazon as well, had it entered.

114.   Had Netflix lowered its prices further, Blockbuster's prices would have been lower as a direct consequence. Historically, lower Netflix prices have resulted in lower Blockbuster prices. When Netflix announced a price reduction on October 14, 2004, Blockbuster lowered its prices the

-31-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1   very next day.  Thus, even if Blockbuster merely matched Netflix's prices, rather than undercut them,

2   lower Netflix prices would inevitably have meant lower Blockbuster prices.

3          115.    Had Netflix's price of its 3-out plan been lower than $17.99, Blockbuster would not

4   have raised its prices to $17.99, as it actually did.  At most, Blockbuster would have raised its prices, if

5   at all, only to match the lower Netflix price.

6          116.    Not only did the Market Allocation Agreement cause Netflix not to lower its prices

7   further (which would have translated into lower Blockbuster prices), but the transition to a two-firm

8   market changed how Blockbuster priced relative to Netflix.  When Blockbuster raised its prices in

9   August 2005 to match Netflix, it was the first time Blockbuster's prices were not lower than those of

10  Netflix.  Blockbuster was always less expensive while Wal-Mart was present in the market.  In August

11  2004, Blockbuster was $19.99 when Netflix was $21.99; Blockbuster went to $17.49 before Netflix

12  implemented its October 2004 price of $17.99; Blockbuster cut prices to $14.99 while Netflix stayed at

13  $17.99.  With Wal-Mart gone, Blockbuster's prices were equal to Netflix's prices.  Wal-Mart's market

14  presence in the Online DVD Rental Market mattered.

15         117.    By their anticompetitive conduct, Netflix and Wal-Mart facilitated remarkable

16  similarity in price between Netflix and Blockbuster.  Similarity in price, which, on a plan-for-plan

17  basis, was relatively consistent throughout the Class Period and remains to this day.  Indeed, as of

18  March 1, 2010, the basic subscription rates for Netflix and Blockbuster Online DVD Rental are

19  identical.

20                    **ONLINE DVD RENTAL PRICES AS OF MARCH 1, 2010**

21

| Plans | Blockbuster | Netflix |
|-------|-------------|---------|
| 1-out unlimited | $8.99 | $8.99 |
| 2-out unlimited | $13.99 | $13.99 |
| 3-out unlimited | $16.99 | $16.99 |

25         118.    The Market Allocation Agreement and Defendants' acts and practices in furtherance

26  thereof have no procompetitive benefits.  The co-promotion aspects of the Agreement do not create

27  information that consumers need, nor do they create new or better products or services.  Rather, they

28

HOWREY LLP

1   have served to reinforce the true anticompetitive nature of the Market Allocation Agreement by

2   assuring, for example, that Walmart.com not only withdrew from the Online DVD Rental Market, but

3   further enhanced Netflix's position in that market.  Even if there were any such benefits, they would

4   not outweigh any of the anticompetitive effects described herein, and, in any event, could be achieved

5   by less restrictive means.

6        119.    Defendants' market allocation scheme is a naked restraint of trade; it was not and is not

7   ancillary to any legitimate business collaboration.  The co-promotion aspects of the Market Allocation

8   Agreement were a means to reinforce the market allocation.  To the extent that those aspects were

9   portrayed as the sole reason for the Market Allocation Agreement, that portrayal was and is misleading

10  and pretextual, allowing Defendants' market allocation conspiracy to escape scrutiny and "hide in

11  plain sight."

12                          **CLASS ACTION ALLEGATIONS**

13       120.    Plaintiffs bring this action on their own behalf and as a class action under Rules

14  23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the

15  following Class:

16       Any person or entity in the United States that paid a subscription fee to Blockbuster to

17       subscribe to Blockbuster Online on or after August 19, 2005 up to and including

18       the date of class certification.

19       Excluded from the Class are government entities, Defendants, their co-conspirators,

20       Reed Hastings, John Fleming, Defendants' subsidiaries, corporate affiliates, and

21       counsel in this action, as well as Blockbuster, and its subsidiaries, affiliates and counsel

22       in this action.  Also excluded are persons who subscribed to Walmart.com's online

23       DVD rental program as of May 19, 2005.  Also excluded are the Judge presiding over

24       this action, her law clerks, her spouse, and any person within the third degree of

25       relationship living in the Judge's household and the spouse of such a person.

26

27       121.    The Class numbers in the millions, the exact number and identities of the members

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

being known by Blockbuster. At all times during the Class Period, Blockbuster Online had more than one million subscribers.

122. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

123. There are questions of law and fact common to the Class and the members thereof. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injuries sustained as a result thereof. The questions include, but are not limited to:

    a.    Whether Defendants engaged in a contract, combination, or conspiracy to allocate markets;

    b.    Whether Defendants unreasonably restrained trade in the Online DVD Rental Market;

    c.    Whether Defendants had the specific intent for Netflix to monopolize the Online DVD Rental Market;

    d.    The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

    e.    Whether Netflix attempted to or actually did monopolize the Online DVD Rental Market, including by the conduct alleged herein;

    f.    Whether Blockbuster charged higher prices than it otherwise would have charged as a proximate consequence of Defendants' conduct alleged herein;

    g.    Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

h.     Whether the alleged contract, combination, and conspiracy and other conduct violated Section 2 of the Sherman Act;

i.     The anticompetitive effects of Defendants' violations of law;

j.     Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

k.     Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class.

124.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

125.    Each Plaintiff is a member of the Class.  Plaintiffs' claims are typical of the claims of other members of the Class, and they will fairly and adequately protect the interests of the members of the Class.  Their interests are aligned with, and not antagonistic to, those of the other members of the Class.

126.    Plaintiffs are represented by counsel competent and experienced in class action antitrust litigation.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## ANTITRUST INJURY AND STANDING

128.    During the Class Period, Plaintiffs and the members of the Class have directly paid

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

1   monthly DVD subscription fees to Blockbuster in the United States, and many continue to do so.

2       129.   Plaintiffs and the members of the Class have suffered, and many continue to suffer,

3   injury of the type that the antitrust laws are designed to punish and prevent.  Plaintiffs and the

4   members of the Class have directly paid, and many continue to directly pay, more to subscribe

5   to Blockbuster than they would have, absent Defendants' violations of law.

6       130.   As a direct foreseeable, intended, and proximate result of the unreasonable restraint of

7   trade and market and monopoly power created by the illegal acts and practices alleged herein,

8   including the Market Allocation Agreement, which is continuing to this day, Plaintiffs and the

9   members of the Class were, and many continue to be, injured and financially damaged in their

10  property, in amounts that are not presently determined.  Plaintiffs are direct victims of Defendants'

11  antitrust violations.

12      131.   Defendants' illegal conduct, including the Market Allocation Agreement, was a

13  material cause of Plaintiffs' injuries, which were inextricably intertwined with the injuries suffered

14  by Netflix subscribers resulting from the overall harm to competition in the Online DVD Rental

15  Market caused by Defendants' antitrust violations.

16      132.   This Complaint seeks damages for subscription fees paid to Blockbuster Online.  No

17  apportionment between the damages suffered by Blockbuster subscribers and the damages suffered

18  by Netflix subscribers is required or even warranted.  The Blockbuster Plaintiffs will efficiently

19  enforce the antitrust laws to remedy their injuries and damages, which are distinct from those

20  suffered by Netflix subscribers.  This Complaint does not seek damages for subscription fees paid to

21  Netflix, or passed on by Netflix subscribers.

**COUNT ONE**

**SHERMAN ACT SECTION ONE (15 U.S.C. § 1)**
**Market Allocation of Online DVD Rental Market**
**(Against All Defendants)**

25      133.   Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

26      134.   Defendants have entered into a *per se* illegal market division agreement, in violation of

27  Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

135.    In the alternative, if evaluated under the Rule of Reason, the Market Allocation Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

136.    Prior to and at the time of the agreement, Netflix and Wal-Mart were actual competitors in the Online DVD Rental Market.  In addition, Netflix was a potential competitor of Wal-Mart in new DVD sales.  Wal-Mart was an actual participant and Netflix was a potential participant—with the plans, means, and economic incentive to sell new DVDs—in the absence of the Market Allocation Agreement.

137.    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of allocating the markets for Online DVD Rentals and new DVD sales.  The Market Allocation Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart agreeing not to compete in that market.  The Agreement also allocated new DVD sales to Wal-Mart, with Netflix agreeing to refrain from selling new DVDs in competition with Wal-Mart.

138.    The Market Allocation Agreement has created significant anticompetitive effects and no pro-competitive benefits.  It eliminated competition in the Relevant Market, raising prices paid by consumers.  To the extent that there were any procompetitive benefits resulting from the agreement, they would not outweigh the agreement's anticompetitive effects and could have been achieved by less restrictive means.

139.    As a result of this violation of law, Blockbuster's online subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

## COUNT TWO

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2 )**
**Monopolization of Online DVD Rental Market**
**(Against Netflix)**

140.    Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

141.    Netflix has monopoly power in the Online DVD Rental Market.

142.    Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market by its acts and practices described herein, including, but not limited to, by executing,

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

implementing, and otherwise complying with the Market Allocation Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. That monopolization was achieved or strengthened through restrictive or exclusionary conduct, rather than by means of superior business acumen. It was Netflix's conscious object to control prices and/or exclude competition in the Relevant Market.

143. As a result of this violation of law, Blockbuster's online subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

## COUNT THREE

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Attempt to Monopolize Online DVD Rental Market**
**(Against Netflix)**

144. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

145. If Netflix does not already have monopoly power, then Netflix has a dangerous probability of success in achieving monopoly power in the Online DVD Rental Market.

146. With the specific intent to achieve a monopoly, Netflix, by its acts and practices described herein, including, but not limited to, by executing, implementing, and otherwise complying with the Market Allocation Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. It was Netflix's conscious object to control prices and/or exclude competition in the Relevant Market.

147. As a result of this violation of law, Blockbuster's online subscription prices charged to, and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

## COUNT FOUR

**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Conspiracy to Monopolize Online DVD Rental Market**
**(Against All Defendants)**

148. Plaintiffs reallege each allegation set forth above, as if fully set forth herein.

149. Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time of the Agreement, Netflix and Wal-Mart were actual competitors in that market.

150. Defendants conspired with the specific intent, knowledge and purpose that their

-38-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1  anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in
2  the Relevant Market. Wal-Mart knew that the natural and probable consequence of the Market
3  Allocation Agreement would be the monopolization of the Relevant Market by Netflix.

4       151.    Defendants have committed overt acts in furtherance of their conspiracy, including, but
5  not limited to, entering into, complying with, and implementing the Market Allocation Agreement, in
6  violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

7       152.    As a result of this violation of law, Blockbuster's online subscription prices charged to,
8  and paid by, Plaintiffs and the Class are, and have been, higher than they otherwise would have been.

9  **PRAYER FOR RELIEF**

10     WHEREFORE, Plaintiffs respectfully request that:

11     A.    The Court determine that this action may be maintained as a class action under
12 Rule 23 of the Federal Rules of Civil Procedure and that Plaintiffs be appointed
13 class representatives.

14     B.    Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust
15 Act, 15 U.S.C. §§ 1-2.

16     C.    The Court declare the Market Allocation Agreement between Defendants
17 announced May 19, 2005, to be unlawful and null and void.

18     D.    Judgment be entered for Plaintiffs and the members of the Class against
19 Defendants, jointly and severally, for three times the amount of damages
20 sustained by Plaintiffs and the Class, under Section 4 of the Clayton Antitrust
21 Act, 15 U.S.C. § 15, together with the costs of the action, including reasonable
22 attorneys' fees, and such other relief as is appropriate.

23     E.    Defendants, their affiliates, successors, transferees, assignees, and the officers,
24 directors, partners, agents and employees thereof, and all other persons acting or
25 claiming to act on their behalf, be permanently enjoined and restrained from, in
26 any manner, continuing, maintaining or renewing the contract, combination or
27 conspiracy alleged herein, or from engaging in any other contract, combination

28

HOWREY LLP

1    or conspiracy having similar purpose or effect, and from adopting or following

2    any practice, plan, program or device having a similar purpose or effect,

3    pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

4    F.    Plaintiffs and the members of the Class have such other, further, and different

5    relief as the case may require and the Court may deem just and proper under the

6    circumstances.

7                            **JURY DEMAND**

8    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of

9    all issues triable by jury.

10   DATED:  March 1, 2010

11                                    Respectfully Submitted,

12                                      /s/ Robert G. Abrams
                                       Robert G. Abrams
13                                     Thomas A. Isaacson
                                       Peter A. Barile III
14                                     HOWREY LLP
                                       1299 Pennsylvania Avenue, N.W.
15                                     Washington, DC 20004
                                       Tel.: (202) 783-0800
16                                     Fax: (202) 383-6610

17                                     Paul Alexander
18                                     HOWREY LLP
                                       1950 University Avenue
19                                     East Palo Alto, CA 94303
                                       Tel.: (650) 798-3500
20                                     Fax: (650) 798-3600

21                                     Emily L. Maxwell
                                       HOWREY LLP
22                                     525 Market Street, Suite 3600
                                       San Francisco, CA 94105
23                                     Tel.: (415) 848-4947
                                       Fax: (415) 848-4999
24
                                       ***Lead Class Counsel and Member of the Steering Committee***
25                                     ***for Plaintiffs in MDL No. 2029***

26
                                       Guido Saveri
27                                     R. Alexander Saveri
                                       Melissa Shapiro
28

HOWREY LLP

-40-
BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1                                    Cadio Zirpoli

Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.:  (415) 217-6810
Fax:  (415) 217-6813

*Liaison Class Counsel and Member of the Steering
Committee for Plaintiffs in MDL No. 2029*

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
Todd A. Seaver
Matthew Ruan
BERMAN DEVALERIO
425 California Street, Suite 2100
San Francisco, CA 94104
Tel.:  (415) 433-3200
Fax:  (415) 433-6382

Manuel J. Dominguez
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel: (561) 835-9400
Fax: (561) 835-0322

Eugene A. Spector
Jeffrey J. Corrigan
William G. Caldes
Theodore M. Lieverman
Jay S. Cohen
Jonathan M. Jagher
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.:  (215) 496-0300
Fax:  (215) 496-6611

H. Laddie Montague, Jr.
Merrill G. Davidoff
David F. Sorensen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel.:  (215) 875-3010
Fax:  (215) 875-4604

*Members of the Steering Committee for Plaintiffs
in MDL No. 2029*

Eric D. Freed
Paul M. Weiss

-41-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

Jeffrey A. Leon
FREED WEISS
111 W. Washington, Suite 1331
Chicago, IL 60602
Tel: (312) 220-0000
Fax: (312) 220-7777

Daniel A. Small
Benjamin D. Brown
Kit Pierson
Christopher Cormier
Brent Johnson
COHEN MILSTEIN SELLERS & TOLL PPLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel.:  (202) 838-7797
Fax:  (202) 838-7745

Irwin B. Levin
Richard E. Shevitz
Eric S. Pavlack
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.:  (317) 636-6481
Fax:  (317) 636-2593

Douglas A. Millen
FREED KANNER LONDON & MILLEN, LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel.: (224) 632-4500
Fax.: (224) 632-4521

Daniel E. Gustafson
Jason S. Kilene
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel.: (612) 333-8844
Fax: (612) 339-6622

Natalie Finkelman Bennett
SHEPHERD, FINKELMAN, MILLER,
SHAH, LLP
35 East State Street
Media, PA 19063
Tel.:  (610) 891-9880
Fax:  (610) 891-9883

Gary E. Mason
Donna F. Solen

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

THE MASON LAW FIRM LLP
1225 19th Street, N.W., Suite 500
Washington, DC 20036
Tel.:  (202) 429-2290
Fax:  (202) 429-2294

Vahn Alexander
FARUQI & FARUQI, LLP
1901 Avenue of the Stars, 2nd Floor
Los Angeles, CA 90067
Tel.:  (310) 461-1426
Fax:  (310) 461-1427

Kendall S. Zylstra
Richard Schwartz
Peter Kohn
FARUQI & FARUQI, LLP
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
Tel.:  (215) 914-2460
Fax:  (215) 914-2462

Daniel E. Girard
Elizabeth C. Pritzker
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, CA 94180
Tel.: (415) 981-4800
Fax: (415) 981-4846

Bryan L. Clobes
Ellen Meriwether
Timothy Fraser
CAFFERTY FAUCHER LLP
1717 Arch Street, Ste., 3610
Philadelphia, PA 19103
Tel.: (215) 864-2100
Fax: (215) 864-2810

Nyran Rose Pearson
CAFFERTY FAUCHER LLP
30 N. LaSalle Street, Suite 3200
Chicago IL 60602
Tel.: (312) 788-4880
Fax: (312) 788-4485

Kevin Bruce Love
Michael E. Criden
CRIDEN & LOVE, P.A.
7301 S.W. 57 h Court, Suite 515
South Miami, FL 33143
Tel.: (305) 357-5000
Fax: (312) 357-5050

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

Judith L. Spanier
Jill S. Abrams
Natalie Marcus
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, New York 10016
Tel.:  (212) 889-3700
Fax:  (212) 684-5191

Craig H. Blinderman
MREJEN BLINDERMAN, P.L.
701 West Cypress Creek Road, Suite 302
Fort Lauderdale, FL 33309
Tel.:  (954) 771-3740
Fax:  (954) 771-3047

Mary Jane Fait
Theodore T. Bell
John E. Tangren
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
55 West Monroe Street, Suite 1111
Chicago, IL 60603
(312) 984-0000 office
(312) 984-0001 fax

Lee Albert
Brian Brooks
Jacqueline Sailer
MURRAY, FRANK & SAILER LLP
275 Madison Avenue, Suite 801
New York, New York 10016
Tel.:  (212) 682-1818
Fax:  (212) 682-1892

Michael F. Ram
RAM & OLSON LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Tel.: (415) 433-4949
Fax: (415) 433-7311

Erica L. Craven-Green
LAW OFFICES OF ERICA L. CRAVEN-GREEN
P.O. Box 460367
San Francisco, California 94146-0367
Tel.: (415) 572-9028

Alex C. Turan
MONTURA LAW GROUP
2070 N. Broadway, Suite 5492
Walnut Creek, CA 94596
Tel.:  (415) 308-0025
Fax:  (925) 256-9615

HOWREY LLP

-44-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

Guy A. Wilson
LAW OFFICES OF GUY A. WILSON
509 Orchard Street
Santa Rosa, CA 95404
Tel.:  (707) 525-1277

Roy A. Katriel
THE KATRIEL LAW FIRM
1101 30th Street
Washington, DC 20007
Tel.:  (202) 625-4342

Marc H. Edelson
EDELSON & ASSOCIATES, LLC
45 West Court Street
Doylestown, PA 18901
Tel.:  (215) 230-8043
Fax:  (215) 230-8735

Linda P. Nussbaum
KAPLAN, FOX & KILSHEIMER, LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Tel.:  (212) 680-1980
Fax:  (212) 687-7714

Laurence D. King
Linda M. Fong
KAPLAN, FOX & KILSHEIMER, LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Tel.:  (415) 772-4700
Fax:  (415) 772-4707

Harry Shulman
THE MILLS LAW FIRM
880 Las Gallinas Avenue, Suite 2
San Rafael, CA 94903
Tel.:  415-455-1326
Fax: 415-455-1327

David Pastor
GILMAN & PASTOR, LLP
63 Atlantic Avenue, Third Floor
Boston, MA 02110
Tel.:  (617) 742-9700

Michael F. Germano
LAW OFFICES OF MICHAEL GERMANO, P.C.
63 Atlantic Avenue, Third Floor
Boston, MA 02110
Tel.:  (617) 367-5911

Mark Warshaw

HOWREY LLP

-45-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

Jaquelynn Pope
WARSHAW & POPE
934 Hermosa Avenue, Suite 14
Hermosa Beach, CA 90254
Tel.:  (310) 379-3410

Edward F. Haber
SHAPIRO HABER & URMY
53 State Street
Boston, MA 02109
Tel.:  (617) 439-3939

Richard M. Volin
Michael McLellan
FINKELSTEIN THOMPSON LLP
1050 30th Street, N.W.
Washington, DC 20007
Tel.:  (202) 337-8000
Fax:  (202) 337-8090

Rosemary M. Rivas
Mark Punzalan
FINKELSTEIN THOMPSON LLP
100 Bush Street, Suite 1450
San Francisco, CA 94104
Tel.:  (415) 398-8700
Fax:  (415) 398-8704

Gordon M. Fauth, Jr.
LITIGATION LAW GROUP
1801 Clement Avenue, Suite 101
Alameda, CA 94501
Tel.:  (510) 238-9610
Fax:  (510) 337-1431

Jeff D. Friedman
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue
Berkeley, CA 94710
Tel.:  (510) 725-3000
Fax:  (510) 725-3100

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Tel.:  (206) 623-7292
Fax:  (206) 623-0594

Anthony J. Bolognese
Joshua H. Grabar
BOLOGNESE & ASSOCIATES, LLC
Two Penn Center

-46-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

1500 JFK Boulevard, Suite 320
Philadelphia, PA 19102
Tel.:  (215) 814-6750
Fax:  (215) 814-6764

Gerald J. Rodos
Jeffrey B. Gittleman
Julie B. Palley
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19130
Tel.:  (215) 963-0600
Fax:  (215) 963-0838

Steve R. Basser
BARRACK, RODOS & BACINE
One American Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Tel.:  (619) 230-0800
Fax:  (619) 230-1874

Frank J. Johnson
Francis A. Bottini, Jr.
JOHNSON BOTTINI, LLP
655 West Broadway, Suite 1400
San Diego, CA 92101
Tel.:  (619) 230-0063
Fax:  (619) 233-5535

Joseph Saveri
Michele C. Jackson
Eric B. Fastiff
Andrew S. Kingsdale
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, Suite 3000
San Francisco, CA 94111
Tel.:  (415) 956-1000
Fax:  (415) 956-1008

Mindee J. Reuben
WEINSTEIN KITCHENOFF & ASHER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Tel.:  (215) 545-7200
Fax:  (215) 535-6535

Mark J. Tamblyn
Neha Duggal
WEXLER WALLACE, LLP
455 Capitol Mall, Suite 231
Sacramento, CA 95814

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

Tel.: (916) 492-1100
Fax: (916) 492-1124

Edward A. Wallace
Kenneth A. Wexler
WEXLER WALLACE, LLP
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022

Bonny E. Sweeney
David W. Mitchell
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: (619) 231-1058
Fax: (619) 231-7423

Bruce L. Simon
Jonathan M. Watkins
PEARSON, SIMON, SOTER, WARSHAW & PENNY LLP
44 Montgomery Street, Suite 1430
San Francisco, CA 94101
Tel.: (415) 433-9000
Fax: (415) 433-9008

William C. Wright
LEOPOLD KUVIN, P.A.
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel.: (561) 935-4801
Fax: (561) 515-1401

Garrett D. Blanchfield
Brant Penney
REINHARDT, WENDORF & BLANCHFIELD
E1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel.: (651) 287-2100
Fax: (651) 287-2103

David P. McLafferty
MCLAFFERTY & ASSOCIATES, P.C.
923 Fayette Street
Conshohocken, PA 19428
Tel.: (610) 940-4000
Fax: (610) 940-4007

Dianne M. Nast
Joseph F. Roda
Michele S. Burkholder

-48-
BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

Daniel N. Gallucci
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
Tel.: (717) 892-3000
Fax: (717) 892-1200

Edward M. Gergosian
Robert J. Gralewski
William D. Harris
GERGOSIAN & GRALEWSKI LLP
655 West Broadway Suite 1410
San Diego CA 92101
Tel.: (619) 237-9500
Fax: (619) 237-9555 fax

Matthew Schultz
Timothy D. Battin
Thomas M. Palumbo
STRAUS & BOIES, LLP
4041 University Drive, 5th Floor
Fairfax, Virginia  22030
Tel:  (703) 764-8700
Fax: (703) 764-8704

Terry Gross
Adam C. Belsky
Monique Alonso
GROSS BELSKY ALSONSO LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94101
Tel.:  (415) 544-0200
Fax:  (415) 544-0201

Mario N. Alioto
Lauren C. Russel
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Tel.:  (415) 563-7200
Fax:  (415) 346-0679

Joseph M. Patane
LAW OFFICE OF JOSEPH M. PATANE
2280 Union Street
San Francisco, CA 94123
Tel.:  (415) 563-7200
Fax:  (415) 346-0679

Sherman Kassof
LAW OFFICES OF SHERMAN KASSOF
954 Risa Road, Suite B
Lafayette, CA 94549
Tel.:  (510) 652-2554

-49-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

1    Fax:  (510) 652-9308

2    Mark A. Griffin
     KELLER ROHRBACK LLP
3    1201 Third Avenue, Suite 3200
     Seattle, WA 98101-3052
4    (206) 224-7553
     (206) 623-3384
5
     J. Barton Goplerud
6    HUDSON MALLANEY & SHINDLER P.C.
     5015 Grand Ridge Drive, Suite 100
7    West Des Moines, IA 50265
     Tel.:  (515) 223-4567
8    Fax:  (515) 223-8887

9    Stephen R. Fine
     LAW OFFICES OF STEPHEN R. FINE
10   620 Chestnut Street
     Manchester, NH 03104
11   Tel.:  (603) 668-2343
     Fax:  (603) 626-0408
12
     Dennis J. Johnson
13   JOHNSON & PERKINSON
     1690 Williston Road
14   South Burlington, VT 05403
     Tel.:  (802) 862-0030
15   Fax:  (802) 862-0060

16   Daniel E. Becnel, Jr.
     Nghana Lewis Gauff
17   Matthew B. Moreland
     BECNEL LAW FIRM
18   P.O. Drawer H
     Reserve, LA 70084
19   Tel.: (985) 536-1186
     Fax: (985) 536-6445
20
     John R. Wylie
21   FUTTERMAN HOWARD WATKINS WYLIE & ASHLEY,
     CHTD.
22   122 S. Michigan Avenue, Suite 1850
     Chicago, IL 60603
23   Tel.: (312) 427-3600
     Fax: (312) 427-1850
24
     Archie C. Lamb, Jr.
25   THE LAMB FIRM, LLC
     P.O. Box 2088
26   Birmingham, AL 35201
     Tel. : (205) 324-4644
27   Fax: (205) 324-4649

28
HOWREY LLP
     -50-
     BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
     COMPLAINT (M:09-CV-2029 PJH)

E. Kirk Wood, Jr.
WOOD LAW FIRM, LLC
P.O. Box 382434
Birmingham, AL 35238
Tel.: (205) 612-0243
Fax: (205) 705-1223

Harry F. Bell, Jr.
William L. Bands, Jr.
THE BELL LAW FIRM, PLLC
30 Capitol Street
Charleston, West Virginia 25326
Tel.: (304) 345-1700
Fax: (304) 344-1956

Michael Goetz
MORGAN & MORGAN, P.A.
One Tampa City Center, Suite 700
Tampa, FL 33602
Tel.: (813) 223-5505
Fax: (813) 223-5402

Scott W. Weinstein
MORGAN & MORGAN, P.A.
One University Park
12800 University Drive
Fort Myers, FL 33906
Tel.: (239) 433-6880
Fax: (239) 433-6836

Andres F. Alonso
Jerrold S. Parker
David B. Krangle
PARKER WAICHMAN ALONSO LLP
111 Great Neck Road, Suite 101
Great Neck, NY 11021
Tel.: (516) 466-6500
Fax: (516) 466-6665

W. Mark Lanier
Richard D. Meadow
Evan M. Janush
THE LANIER LAW FIRM, PLLC
126 E. 56th Street, 6th Floor
New York, NY 10022
Tel.: (212) 421-2800
Fax: (212) 421-2878

David W. Zoll
Michelle L. Kranz
ZOLL, KRANZ & BORGESS, LLC
6620 W. Central Avenue, Suite 200
Toledo, OH 43617
Tel.: (419) 841-9623

-51-
BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

HOWREY LLP

1   Fax: (419) 841-9719

2   Joseph P. Danis
    Michael J. Flannery
3   Corey D. Sullivan
    CAREY & DANIS, LLC
4   8235 Forsyth Boulevard, Suite 1100
    St. Louis, MO 63105
5   Tel.: (314) 725-7700 office
    Fax: (314) 721-0905 fax
6
    Eric M. Quetglas Jordan
7   QUETGLAS LAW OFFICES
    P.O. Box 16606
8   San Juan, PR 00908
    Tel.: (787) 722-0635
9   Fax: (787) 725-3970

10  Robert M. Foote
    Matthew Herman
11  Stephen Fung
    FOOTE, MEYERS, MIELKE & FLOWERS, LLC
12  28 North First Street, Suite 2
    Geneva, IL 60134
13  Tel.: (630) 232-6333
    Fax: (630) 845-8982
14
    Peter Currie
15  THE LAW FIRM OF PETER L. CURRIE, P.C.
    536 Wing Lane
16  Saint Charles, IL 60174
    Tel.: (630) 862-1130 office
17  Fax: (630) 845-8982 fax

18  Kathleen C. Chavez
    CHAVEZ LAW FIRM, P.C.
19  28 North First Street, Suite 2
    Geneva, IL 60134
20  Tel.:  (630) 232-4480
    Fax:  (630) 845-8982
21
    Paul W. Rebein
22  THE REBEIN LAW FIRM PLLC
    500 E. Kennedy Blvd. Suite 100
23  Tampa, FL 33602
    Tel.: (813)356-0567
24  Fax: (813) 902-6538
25
    Donald Amamgbo
26  AMAMGBO & ASSOCIATES
    7901 Oakport Street, Suite 4900
27  Oakland, CA 94261
    Tel.: (510) 615-6000
28

HOWREY LLP

-52-

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)

1          Fax: (510) 615-6025

2          Reginald Terrell
           THE TERRELL LAW GROUP
3          Post Office Box 13315, PMB #148
           Oakland, CA 94661
4          Tel.: (510) 237-9700
           Fax: (510) 237-4616

5          ***Additional Counsel for Plaintiffs***

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' CONSOLIDATED SECOND AMENDED CLASS ACTION
COMPLAINT (M:09-CV-2029 PJH)