Case4:09-md-02029-PJH Document143 Filed04/14/10 Page1 of 24

Robert G. Abrams *(pro hac vice)*
Thomas A. Isaacson *(pro hac vice)*
Peter A. Barile III *(pro hac vice)*
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 783-0800
Fax: (202) 383-6610
abramsr@howrey.com
isaacsont@howrey.com
barilep@howrey.com

Paul Alexander (49997)
HOWREY LLP
1950 University Avenue
East Palo Alto, CA 94303
Tel.: (650) 798-3500
Fax: (650) 798-3600
alexanderp@howrey.com

Emily L. Maxwell (185646)
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA 94105
Tel.: (415) 848-4947
Fax: (415) 848-4999
maxwelle@howrey.com

***Lead Class Counsel and Member of the Steering Committee for Plaintiffs in MDL No. 2029***

Guido Saveri (22349)
R. Alexander Saveri (173102)
Lisa Saveri (112043)
Cadio Zirpoli (179108)
Melissa Shapiro (242724)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
Fax: (415) 217-6813
guido@saveri.com
rick@saveri.com
lisa@saveri.com
cadio@saveri.com
melissa@saveri.com

***Liaison Class Counsel and Member of the Steering Committee for Plaintiffs in MDL No. 2029***

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| **IN RE ONLINE DVD RENTAL ANTITRUST LITIGATION** | **Master File No. M:09-CV-2029 PJH**<br><br>**MDL No. 2029**<br><br>**Hon. Phyllis J. Hamilton** |
| **This document relates to:**<br><br>*Pierson v. Walmart.com USA LLC, et al.*, M:09-CV-2163-PJH<br>*Levy, et al. v. Walmart.com USA LLC, et al.*, M:09-CV-2296-PJH | **BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**Date: May 5, 2010**<br>**Time: 9:00 a.m.** |

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page2 of 24

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. FACTUAL BACKGROUND ..... 2
  A. The Effects Of Competition On Netflix's Prices ..... 2
  B. Blockbuster's Pricing Strategy ..... 4
  C. Netflix's Attempted Alliance With Amazon ..... 5
III. ARGUMENT ..... 6
  A. The Legal Standard for a Motion to Dismiss ..... 6
  B. Antitrust Standing Requirements ..... 7
IV. PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS SHOWING THEIR ANTITRUST STANDING UNDER THE *AGC* FACTORS. ..... 8
  A. The Nature of Plaintiffs' Injury. ..... 8
  B. There Is No Risk of Duplicative Recovery. ..... 8
  C. There Is No Complexity in Apportioning Damages. ..... 8
  D. Plaintiffs' Injuries Are Sufficiently Direct to Support Antitrust Standing. ..... 9
    1. Plaintiffs Have Alleged Sufficient Facts Showing A Direct Link Between Defendants' Anti-competitive Conduct And Blockbuster's Prices. ..... 10
      a. Netflix Would Have Lowered Its Prices But-for Defendants' Anti-competitive Conduct. ..... 11
      b. Blockbuster Would Have Met or Beaten Netflix's Lower Prices. ..... 14
    2. Plaintiffs' Allegations That Blockbuster Raised Its Prices Because Of Wal-Mart's Exit, Though Not Necessary, Further Strengthen Plaintiffs' Claims. ..... 15
    3. The Injuries To Blockbuster Subscribers Are Not Remote. ..... 18
  E. The Measure of Harm to Plaintiffs Is Not Speculative. ..... 19
  F. The Balance Of Factors Favors The Blockbuster Plaintiffs' Standing. ..... 20
V. CONCLUSION ..... 20

HOWREY LLP

-i-

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page3 of 24

**TABLE OF AUTHORITIES**

Page

**CASES**

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1997) ........ 7, 8, 10

*American Ad Management, Inc. v. General Telephone Co. of California*,
190 F.3d 1051 (9th Cir. 1999) ........ 7, 8, 9, 20

*Antoine L. Garabet, M.D., Inc. v. Autonomous Technologies Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ........ 9

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ........ 6

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
459 U.S. 519 (1983) ........ 7, 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
516 F. Supp. 2d 1072 (N.D. Cal. 2007) ........ 18

*Federal Trade Commission v. Mylan Laboratories, Inc.*,
62 F. Supp. 2d 25 (D. D.C. 1999) ........ 9

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ........ 6

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) ........ 10

*Los Angeles Memorial Coliseum Commission v. National Football League*,
791 F.2d 1356 (9th Cir. 1986) ........ 7

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ........ 6

*Oregon Laborers-Employers Heath & Welfare Trust Fund v. Philip Morris, Inc.*,
185 F.3d 957 (9th Cir. 1999) ........ 18

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,
608 F. Supp. 2d 1166 (N.D. Cal. 2009) ........ 9, 10

*In re Tableware Antitrust Litigation*,
484 F. Supp. 2d 1059 (N.D. Cal. 2007) ........ 9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ........ 9

HOWREY LLP

-ii-

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page4 of 24

## I. INTRODUCTION

The Blockbuster Plaintiffs sought and obtained leave to file a Consolidated Second Amended Class Action Complaint ("SAC") to allege the specific facts that addressed and cured the deficiencies this Court previously found in dismissing these claims for lack of antitrust standing. *See Order Granting Motion to Dismiss*, Dec. 1, 2009, Dkt. 87 ("*Order*"). In that *Order*, the Court rejected a blanket rule against the antitrust standing of so-called umbrella plaintiffs, finding that such standing is governed by a generally applicable five-factor test. Although some of those factors indisputably favor standing, this Court denied standing because of the lack of a direct connection between Defendants' anti-competitive conduct, which eliminated one of the three competitors, and Blockbuster's prices.

The Blockbuster Plaintiffs' injury and standing stem from two facts: (1) but-for the anti-competitive conduct, Netflix's prices would have been lower and (2) had Netflix's prices been lower, Blockbuster's prices also would have been lower. This Court questioned the sufficiency of the prior complaint's allegations of the first fact. Specifically, based on the allegations of the prior complaint, this Court noted that Netflix first set its $17.99 price in mid-October 2004 yet the conspiratorial communications with Wal-Mart did not begin until much later. (*Order* at 10.)

The prior complaint's allegation regarding the January 2005 start date of the communications was based on public statements by Netflix. Subsequent discovery has revealed a very different story. In fact, the initial sequence of key events occurred within just two business days. On October 14, 2004 Netflix responded to Blockbuster's entry (and the start of three-firm competition) by lowering its price from $21.99 to $17.99. The next day Netflix's stock tumbled and Blockbuster lowered its price from $19.99 to $17.49. Faced with this double whammy, Netflix had a choice: continue to lower prices with the attendant financial consequences or find a way to reduce competition. It quickly chose the latter course. Without even waiting until the next business day, on October 17, 2004, Netflix CEO Reed Hastings reached out to his counterpart at Wal-Mart and began a series of communications which were intended to, and ultimately did, eliminate Wal-Mart as a competitor.

Thus, the point of the conspiracy was to put a stop to price competition that would have forced Netflix to lower its prices further. As set forth below, a wide variety of additional facts corroborate

-1-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

that eliminating competition from Wal-Mart allowed Netflix to avoid the further price cuts three-firm competition inevitably would have caused. That was the point of the conspiracy and Netflix correctly predicted that eliminating Wal-Mart would benefit Netflix through higher prices.

The connection between lower Netflix prices and lower Blockbuster prices is very direct. As a matter of basic policy, Blockbuster always met or beat Netflix's price. After Wal-Mart's exit, Blockbuster matched Netflix's $17.99 price. Had continued three-firm competition driven Netflix's price below $17.99, which Plaintiffs have alleged with considerable factual detail, Blockbuster would have met (or beaten) that lower price. That is a direct and non-speculative injury to the Blockbuster Plaintiffs and confers antitrust standing on them.

## II. FACTUAL BACKGROUND

Prior to 2003, Netflix enjoyed a virtually competition-free environment. (*SAC* ¶ 54.) However, starting in June 2003, Netflix faced competition for the first time. On June 10, 2003, Wal-Mart announced it would enter the Online DVD Rental Market – an announcement that "had a severe negative effect upon the stock value of Netflix." (*Id*. ¶ 55.) During 2004, Wal-Mart grew the business substantially, increasing its library of movies and doubling its distribution centers from 7 to 14. (*Id*. ¶ 56.) Wal-Mart saw this as a "viable business . . . with growth potential." (*Id*.) It viewed itself as the "800 lb Gorilla." (*Id*. at ¶ 55.)

### A. The Effects Of Competition On Netflix's Prices.

As of August 2004, Netflix's price for its key 3-out plan was $21.99. (*Id*. ¶ 57.) That month, Blockbuster entered the online DVD rental market with a price of $19.99. (*Id*. ¶ 59.) On October 14, 2004, Netflix lowered its price to $17.99 and, as a result, its stock suffered a big drop. (*Id*. ¶¶ 64, 65.) Netflix attributed the price reduction to competition, specifically mentioning Wal-Mart and Blockbuster. (*Id*. ¶ 65.) The next day, Friday, October 15, 2004, Blockbuster again signaled its intent to beat Netflix on price by lowering its price to $17.49. (*Id*. ¶¶ 66, 114.)

This sudden price competition motivated Netflix to seek out Wal-Mart and begin the anti-competitive discussions:

> The initial anticompetitive and conspiratorial communications with Wal-Mart were just two days after Blockbuster undercut Netflix on price. The communications directly stemmed from growing price competition and Netflix's desire to stop that competition.

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page6 of 24

> Absent those communications, Netflix would have needed to respond to that price reduction, and the subsequent price reduction by Wal-Mart, with further price reductions of its own.

(*Id.* ¶ 113.) On Sunday, October 17, 2004, Netflix CEO Reed Hastings contacted an intermediary on Wal-Mart's board of directors who put Hastings in touch with Walmart.com CEO John Fleming. (*Id.* ¶ 70.) The express purpose was to discuss an "alliance." (*Id.*) The two met soon thereafter. (*Id.* ¶ 71.)[1] Netflix's goal in reaching out to Wal-Mart was to eliminate Wal-Mart as a competitor. (*Id.* ¶ 74.) Wal-Mart had not made any decision to exit the market unilaterally but, rather, was continuing to plan further expansions and was optimistic about its prospects. (*Id.* ¶¶ 56, 99-100.)

Despite Netflix's initial efforts, the parties were unable at that time to reach an agreement. Indeed, Wal-Mart kept up the competitive pressure and lowered its prices in November 2004 below those of Netflix and Blockbuster. (*Id.* ¶ 68.) Blockbuster, in turn, dramatically lowered its price in December 2004 to $14.99. (*Id.* ¶ 79.) Blockbuster announced that this was not a mere promotion. (*Id.*) In January 2005, Wal-Mart lowered the price of its most popular (2-out) plan, from $15.54 to $12.97. (*Id.* ¶¶ 63, 80.) Thus, with three firms on the market, Wal-Mart and Blockbuster engaged in strong price competition. Netflix avoided lowering its prices during this time because it was pursuing a different strategy – seeking to reduce competition by getting Wal-Mart to exit the market. (*Id.* ¶¶ 69, 83-84.)

Ultimately, Netflix's plan succeeded. Discussions intensified in early 2005. (*Id.* ¶ 90.) On March 17, 2005, Netflix reached a handshake deal with Wal-Mart under which Wal-Mart would exit the online DVD rental market and Netflix would not sell new DVDs ("the Market Allocation Agreement") (*Id.* ¶ 91).

---

1 Hastings thus lied when he told the public that the meeting first occurred in January 2005. (*Id.* ¶ 72.) While that misled Plaintiffs into alleging in the prior complaint that the first meeting occurred in January 2005, the deception is important for a substantive reason. Netflix claimed that the January 2005 meeting resulted from Hastings' discovery during Christmas shopping that Wal-Mart had low prices for new DVDs. (*Id.*) But, the real purpose of the meetings with Wal-Mart was not to find a way to point out Wal-Mart's low prices on DVD sales to Netflix subscribers but, rather, to eliminate Wal-Mart as a competitor in the online DVD rental market.

HOWREY LLP

-3-

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

The agreement was not immediately announced. The next month, fully aware of the deal, Hastings stated that "[i]n terms of profitability over the coming years, the ***key issue is the number of major competitors***." (*Id.* ¶ 93 (emphasis added).) He identified Wal-Mart as one of those major competitors and predicted that with only two competitors, "profitability may be substantial." (*Id.*) On May 19, 2005 the Market Allocation Agreement was publicly announced. (*Id.* ¶ 94.) A month later Wal-Mart exited the online DVD rental market. (*Id.* ¶ 95.) One publication commented "[n]ow it looks like the competitive storm is dying down." (*Id.* ¶ 96.)

In short, Plaintiffs allege that the period of three-firm competition prior to the onset of conspiratorial communications involved a rapid series of substantial price reductions. That sequence had not fully run its course and would have continued with further price reductions, including one or more by Netflix, absent the Market Allocation Agreement and the communications that led to it. Had Netflix competed legally in the market, it would have been forced to lower its prices below $17.99. (*Id.* ¶¶ 83, 113.)

**B. Blockbuster's Pricing Strategy.**

During the period of three-firm competition, Blockbuster always priced at or below Netflix's prices. (*Id.* ¶ 114.) Indeed, generally Blockbuster undercut Netflix's prices as part of its competitive strategy in a three-firm market. (*Id.*) When Blockbuster entered the market, it made clear that it intended to compete with Netflix on price. Blockbuster initially priced its 3-out plan at $19.99 ($2 less than Netflix's comparable plan) and publicly stated that it intended to aggressively price its plan relative to Netflix. (*Id.* ¶ 59.) Blockbuster specifically stated that its service was "priced below our biggest competitor." (*Id.*) Blockbuster held fast to that commitment and kept its prices at or below Netflix's prices. When Netflix lowered its prices, Blockbuster lowered its prices the very next day. (*Id.* ¶ 66.) Blockbuster explained that it was doing this because it was "not going to be beaten from a price/value perspective." (*Id.* ¶ 66.) When Blockbuster lowered its price to $14.99, it explained the rationale for its pricing decision – it was committed to being the "high-quality, low-cost provider in the online rental space." (*Id.* ¶ 79.)

In a two-firm market, the competitive dynamics changed. Blockbuster was now content merely to match Netflix's prices. (*Id.* ¶¶ 117, 118.) Thus, Netflix was able to correctly predict that Blockbuster would "raise online prices to Netflix level or within $.50 by Q1 2006." (*Id.* ¶¶ 107, 111.) Wal-Mart and Netflix both confirmed that the Blockbuster price increase was planned and expected. (*Id.* ¶112.) By early July 2005, three weeks after Wal-Mart's exit, Blockbuster had decided to raise its price. (*Id.* ¶ 109). On August 9, 2005 it announced it was matching Netflix's $17.99 price. (*Id.* ¶ 110.) Hastings wrote "a pretty picture: BBI at $18 *as planned*." (*Id.* ¶ 112 (emphasis added).) In short, the Blockbuster price increase was an intended, expected and direct result of Wal-Mart's exit.

Additionally, Plaintiffs allege that the transition to a two-firm market made Blockbuster a less effective competitor, both because of Netflix's market and monopoly power and because the two-firm market structure encouraged tacit collusion and other forms of cooperation between Netflix and Blockbuster, since there was no longer a fear that Wal-Mart would exploit such opportunities. (*Id.* ¶ 113.) Indeed, after Wal-Mart's exit and after Blockbuster raised its price to match Netflix in August 2005, the two companies' prices continue to remain remarkably parallel to this day. (*Id.* ¶ 117.)

**C. Netflix's Attempted Alliance With Amazon.**

The SAC contains substantial new allegations regarding Netflix's efforts to obtain an alliance with Amazon during the Fall of 2004 and Winter of 2005. (*Id.* ¶¶ 61, 76-78, 86-89.) Contrary to Defendants' arguments, Plaintiffs have not yet alleged that these constitute a separate antitrust violation or that Amazon would have entered the online DVD market in the U.S. in 2004 or 2005 absent Netflix's offers to conspire. For now, these allegations demonstrate Netflix's course of conduct and its desperation to limit competition. At the same time it was pursuing a deal to get Wal-Mart out of the market, it was seeking a deal that would keep Amazon, too, out of the market – in exchange for Netflix's agreement not to compete with Amazon in the U.K. While evidence that but-for these communications Amazon would have entered the online DVD rental market in the U.S. could further strengthen the existing allegations, and perhaps increase damages, the SAC does not depend upon such a theory of antitrust injury. The allegations regarding Wal-Mart's exit suffice to show antitrust injury.

## III. ARGUMENT

### A. The Legal Standard for a Motion to Dismiss.

A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), although it does demand more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). In deciding a motion to dismiss, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn therefrom. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). These principles equally apply to motions to dismiss that challenge a plaintiff's antitrust standing. *See Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000).

Though familiar and well-established, these basic principles are set forth here because Defendants repeatedly offer their own version of events and the inferences they wish to draw from those events. This is not the procedural stage at which the fact-finder weighs the competing inferences drawn by the parties. That will come later in the case, after discovery. For now, the only issue is whether the SAC alleges sufficient facts to show that the Blockbuster Plaintiffs have antitrust standing.

An example of Defendants improperly spinning the facts is their characterization of Netflix CEO Reed Hastings' meeting with Blockbuster executive Edward Stead at the Sundance Film Festival in January 2005 as a chance encounter, contending that Sundance is "hardly a suspicious or unusual place for individuals in the movie industry to run into each other." (*Def. Mot.* at 16 (citing SAC ¶ 85).) Maybe so, but that's not how it happened here. Paragraph 85's allegation is firmly grounded in documents which show that the meeting was planned six weeks in advance and was painstakingly scheduled by Hastings' and Stead's administrative assistants to occur at a particular time and place. *See* Declaration of Peter A. Barile III in Support of Blockbuster Subscribers' Opposition to

Defendants' Motion to Dismiss the Consolidated Second Amended Class Action Complaint, at ¶¶ 2-5, and Exhibits A-D attached thereto (April 14, 2010).[2]

**B. Antitrust Standing Requirements.**

As this Court held, the Blockbuster Plaintiffs' standing is based on the approach announced in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") and adopted by the Ninth Circuit in *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1054-55 (9th Cir. 1999). Under *AGC*, the Court balances these five factors, in no particular order:

(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;

(2) the risk of duplicative recovery;

(3) the complexity in apportioning damages;

(4) the directness of the injury; and

(5) the speculative measure of the harm.

*Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997) (*citing AGC*, 459 U.S. at 535).

A court "need not find in favor of the plaintiff on each factor." *American Ad Mgmt.*, 190 F.3d at 1055. Because "no single factor is decisive . . . the court must balance the factors." *Amarel*, 102 F.3d at 1507 (internal citation omitted). As the Ninth Circuit has held: "[i]n basing their argument upon only some of the factors, appellants implicitly assume that a favorable finding on each and every one of the above [*AGC*] factors is a necessary precondition to a finding of antitrust standing. We reject any such implication. . . ." *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1363 (9th Cir. 1986). This point is especially important because there is no dispute that at least some of the *AGC* factors favor standing here.

---

[2] By designating these documents as "HIGHLY CONFIDENTIAL," Netflix represented that, even now, five years later, revealing the planning and occurrence of this January 2005 meeting "would create a substantial risk of serious injury" to Netflix. Stipulation and Protective Order, ¶ 2.4 (Dkt. 82). It is estopped from arguing that this meeting was anything other than serious business.

In the *Order*, this Court held that there is no blanket rule against the standing of plaintiffs asserting so-called umbrella liability claims but, instead, the standing of such plaintiffs is governed by the same *AGC* factors as other disputes over standing. (*Order* at 6-7.) Yet, Defendants repeatedly make arguments that seek the very blanket rule against umbrella standing that this Court already rejected. For example, Defendants frequently note that Blockbuster was not a conspirator, was not forced to raise or lower its prices, and that it was a competitor acting independently in the market. Such is always the case with umbrella claims which, by definition, involve Plaintiffs who purchased from a non-conspirator.

## IV.  PLAINTIFFS HAVE ALLEGED SUFFICIENT FACTS SHOWING THEIR ANTITRUST STANDING UNDER THE *AGC* FACTORS.

### A.  The Nature of Plaintiffs' Injury.

This Court concluded that Plaintiffs pled a classic type of antitrust injury: the payment of higher prices by consumers due to anti-competitive conduct. The SAC alleges the same type of injury and Defendants do not deny that this factor favors standing. Although no factor is decisive, this factor has "tremendous significance." *Amarel*, 102 F.3d at 1507; *see also American Ad Mgmt*., 190 F.3d at 1055 ("[W]e give great weight to the nature of the plaintiff's alleged injury.").

### B.  There Is No Risk of Duplicative Recovery.

The Blockbuster Plaintiffs paid subscription fees directly to Blockbuster; no one else has a damage claim for these purchases. This Court found no risk of duplicative recovery and Defendants do not deny that the same is true under the SAC. (*Order* at 7.) This factor favors standing.

### C.  There Is No Complexity in Apportioning Damages.

This factor asks whether the complexity of dividing one pool of damages among *different groups* of plaintiffs is too burdensome to undertake. *AGC*, 459 U.S. at 544-45. In *AGC*, for example, the Court found the apportionment of the damages between "directly victimized contractors and subcontractors" and "indirectly affected employees and union entities" to be unduly complex. *Id*.

Here, there is no issue of apportioning a single pool of damages among different groups of plaintiffs. There are two separate pools: the Netflix pool and the Blockbuster pool. Neither group has

a claim to the other's pool of damages. No other group has a claim for injuries caused by inflated Blockbuster prices, nor do Defendants argue otherwise. The Blockbuster Plaintiffs have the entire claim for those inflated prices. *See id.* at 544.

Where, as here, the damages are calculated based on overpayments by a single group of plaintiffs at one level of injury, apportionment of damages, by definition, is not too complex. *See American Ad Mgmt.*, 190 F.3d at 1060. For example, in *In re Tableware Antitrust Litigation*, 484 F. Supp. 2d 1059, 1067 (N.D. Cal. 2007), the Court found no complexity in apportioning damages where purchasers of fine china from two department stores based their damages on their payment of increased prices resulting from the defendants' boycott of sales to a third department store. *Id*. Here, as in *Tableware*, Defendants eliminated one of three competitors from the market thereby injuring customers who purchased from the two remaining competitors. Thus, also as in *Tableware*, there is no complexity in apportionment because damages will be based only on payments at one level of injury – the Blockbuster Plaintiffs' direct overpayments to Blockbuster.

With respect to this *AGC* factor, the key point is that the Blockbuster Plaintiffs have alleged they have suffered their own set of damages. Defendants' analysis and cited cases discuss *how* damages are measured, not how damages are apportioned.[3] (*Def. Mot*. at 17-18.) As in any antitrust case, the Blockbuster Plaintiffs will need to prove that the challenged conduct was a material cause of their injuries and the amount of those injuries. But, that is not an apportionment issue. Whatever damages the Blockbuster Plaintiffs suffered, the antitrust claim for those injuries belongs entirely to them and no other group. This factor, too, favors antitrust standing.

**D. Plaintiffs' Injuries Are Sufficiently Direct to Support Antitrust Standing.**

The *AGC* factor regarding the directness of the injury should be viewed in light of the legal standard for showing causation in an antitrust case. Under that standard, "[i]t is enough that the

---

[3] Defendants' two cited cases – *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 39 (D.D.C. 1999) and *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1168 (C.D. Cal. 2000) – address the speculativeness of the injury, not issues of apportionment among injured groups. The speculativeness issue, addressed below, is an entirely separate factor under *AGC*. Defendants improperly conflate these distinct concepts.

illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969); *see also Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 608 F. Supp. 2d 1166, 1195 (N.D. Cal. 2009) ("[I]n establishing the fact of injury, the antitrust violation need not be the sole cause of the injury, though it must be a material and substantial cause of the injury."). Thus, Plaintiffs need not exclude the possibility that other factors also contributed to Blockbuster's pricing decisions. Plaintiffs need only show that Defendants' violations of law materially caused Blockbuster's prices to be higher than they otherwise would have been.

As this Court held, material cause may exist where the conduct was not aimed directly at the plaintiff. *Sun Microsystems, Inc.*, 608 F. Supp. 2d at 1204-05. Secondary victims of antitrust violations may also have standing. *See Amarel*, 102 F.3d at 1512. Causation has even been found across different markets – a complicating factor not even present here. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 483-84 (7th Cir. 2002). Indeed, were the law otherwise, there would be a blanket rule against the standing of umbrella plaintiffs, which is a conclusion this Court has rejected.

**1. Plaintiffs Have Alleged Sufficient Facts Showing A Direct Link Between Defendants' Anti-competitive Conduct And Blockbuster's Prices.**

Plaintiffs allege that Defendants' anti-competitive conduct was a material cause of their injuries. Plaintiffs specifically allege that: (1) but-for the anti-competitive conduct, Netflix's prices would have been lower and (2) Blockbuster would have met or beaten Netflix's lower prices. Thus, if Netflix had lowered its prices (as it would have been required to do but-for the anti-competitive conduct), Blockbuster's prices would have been lower as well. Both of those facts are alleged with substantial and specific factual details which, taken as true, readily meet the test for pleading antitrust injury under the material cause standard.

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page14 of 24

**a. Netflix Would Have Lowered Its Prices But-for Defendants' Anti-competitive Conduct.**

Plaintiffs alleged substantial facts, not mere conclusions, which directly address and fill the gap this Court previously found in Plaintiffs' allegations. Specifically, this Court concluded that the gap in time between Blockbuster's price reduction (to $17.49) in mid-October 2004 and the first meeting between the CEOs of Netflix and Wal-Mart in January 2005 was too long to support Plaintiffs' theory. (*Order* at 10.) Under the Court's analysis, Netflix's failure to lower its prices during that three-month period made it improbable that the conspiracy was the cause of Netflix's pricing. (*Id.*)

The SAC, reflecting information obtained in early discovery, fills the gap completely. In contrast to the three-month gap that was alleged in the prior complaint (based on Netflix's false public statements), the SAC correctly and specifically alleges that there was no time gap at all. Blockbuster lowered its prices on Friday, October 15, 2004. That Sunday, October 17, 2004, Netflix CEO Reed Hastings began communicating with Walmart.com CEO John Fleming. *Not a single business day passed* before Netflix began the conspiratorial communications that led to the market allocation agreement.

In addition to curing the deficiency this Court found in the prior allegations, the SAC alleges many other specific facts demonstrating that Netflix would have lowered its prices had three-firm competition continued.

**Netflix's prior response to three-firm competition**. At the time of Blockbuster's entry in August 2004, Netflix's price was $21.99. (*SAC* ¶ 57.) Within two months, Netflix lowered its price to $17.99, far below what it charged when this was a two-firm market. (*Id.* ¶ 64.) Netflix had already demonstrated that it would respond to three-firm competition with price reductions.

**Netflix's motivation in seeking out, and completing, the market allocation agreement**. Netflix's purpose in trying to get Wal-Mart out of the market was to avoid the need for further price cuts. (*Id.* ¶¶ 69, 113.) The stock market reacted negatively to Netflix's October 14, 2004 price reduction. (*Id.* ¶ 69.) And, with Blockbuster's decision to cut prices the very next day, Netflix knew that further price reductions would be needed if such competition continued. (*Id.* ¶¶ 69, 113.)

-11-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

**The additional price reductions by Blockbuster and Wal-Mart during three-firm competition**. There was a multi-month period from October 17, 2004 to March 17, 2005 during which Netflix was seeking Wal-Mart's agreement to exit the market but Wal-Mart had not yet agreed to do so. That time period illustrates how Blockbuster and Wal-Mart responded to three-firm competition. Both cut their prices. Wal-Mart reduced its price in November 2004 from $18.76 to $17.36. (*Id*. ¶¶ 63, 68.) Blockbuster reduced its price in December 2004 to $14.99. (*Id*. ¶ 79.) Had three-firm competition continued, Netflix would have been forced to reduce its prices. (*Id*. ¶ 113.) It was able to delay such a price reduction during the period in which it was pursuing an agreement with Wal-Mart and then, having reached an agreement, no longer needed to lower its prices since three-firm competition was about to end. (*Id*. ¶ 69.)

Contrary to Defendants' unsupported arguments, Plaintiffs do not allege that the agreement was reached in October 2004, or that merely meeting with a competitor is illegal. Instead, Plaintiffs allege that the existence of the communications leading to the agreement, which was reached on March 17, 2005, gave Netflix the confidence to avoid further price cuts because Netflix knew it was working behind the scenes to eliminate competition and thereby put itself in a position where it could avoid lowering its prices altogether. (*Id*. ¶ 113.)

**Wal-Mart's price reduction on its 2-out plan**. During the Fall of 2004, Wal-Mart lowered its 2-out price to $12.97 and could have lowered it further to $9.97, had conditions so dictated. (*Id*. ¶¶ 80-81.) Of course, as Defendants argue, the 2-out and 3-out plans are separate and Plaintiffs do not suggest otherwise. But, Wal-Mart's willingness to dramatically lower its 2-out prices, too, underscores the fact that three-firm competition was driving prices down.

Defendants now argue that the price cut on the 2-out plan is inconsequential because it is a different plan than the 3-out plan. (*Def. Mot*. at 12 n.2.) Not only was the 2-out plan Wal-Mart's most popular (*SAC* ¶ 80), but Defendants previously argued that the 2-out price cut was a direct competitive reaction when it suited them. (Dkt. 100 at 3-4.) They should not be heard to argue otherwise now.

**Netflix's profit margins**. Netflix's profit margins were declining during the period of three-firm competition and stopped declining when three-firm competition became two-firm competition.

(*SAC* ¶ 113.) Had three-firm competition continued, Netflix would have been forced to reduce its prices as market conditions would not allow it to maintain those profit margins. (*Id.*) Defendants request that the Court erroneously infer that such price decreases would not have been "sustainable." (*Def. Mot*. at 13). Defendants' request should not be accepted at this stage because it is directly contradicted by the SAC's express allegations that Netflix, Wal-Mart and Blockbuster had profit margins that "were such [that] all of them could have lowered prices further than the actual and anticipated prices actually charged and sustained such lower prices." (*SAC* ¶ 113.)

**Netflix's ability to lower prices**. Netflix had plenty of room to lower prices below $17.99. Its cost per subscriber for that plan was approximately $11. (*Id.* ¶ 62.) Netflix predicted that if Amazon entered this market, it would do so at a price of $15. (*Id.*) Given Amazon's target profit of 25%, this also translates into a projected cost of less than $12 for Amazon. (*Id.*) Blockbuster did lower its prices to $14.99, only to later raise them after Wal-Mart's exit.

**Netflix's prediction**. Netflix CEO Hastings predicted that two-firm competition would lead to higher profit margins. (*Id.* ¶ 93.) Such margins are the direct result of the higher prices under two-firm competition. He concluded that the "key issue is the number of major competitors." (*Id.*) This was an unqualified pronouncement that reduced competition would benefit Netflix.

**The nature of the market**. There is a fundamental difference between a market with two firms and a market with three firms. That difference translates into a price difference where, as here, competition is based on price. Indeed, Netflix specifically tied the October 14, 2004 price reduction to competition, including from Wal-Mart and Blockbuster. (*Id.* ¶ 65.)

**Wal-Mart is Wal-Mart**. The firm that exited was not some ordinary competitor. It was Wal-Mart, the world's largest retailer which has always made low prices the centerpiece of its strategy. Wal-Mart's low prices have had a significant effect on retailing in this country. It is reasonable to conclude they would have had at least some effect on Netflix.

Accordingly, Plaintiffs have more than sufficiently alleged that, absent the anti-competitive conduct, Netflix's prices would have been lower. Any requirement of further factual details or crediting of Defendants' alternative inferences cannot be squared with Rule 12(b)(6). Plaintiffs need

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page17 of 24

only allege facts which, taken as true, show that the challenged conduct was a material cause of Netflix's maintenance of its price at $17.99. Plaintiffs have done so.

**b. Blockbuster Would Have Met or Beaten Netflix's Lower Prices.**

Because Netflix's prices would have been lower, the "directness" factor under of the *AGC* test asks how directly those lower Netflix prices would have translated into lower Blockbuster prices. Plaintiffs have alleged a very direct link. As alleged in detail in the SAC, Blockbuster would not have charged more than market leader Netflix. Lower Netflix prices would have meant lower prices for Blockbuster subscribers.

To put this issue in context, as of early August 2005, Blockbuster's 3-out price was $14.99 and Netflix's was $17.99. Blockbuster then raised its price to match Netflix's price. Had Netflix's price instead been $15.99, for example, Blockbuster would have raised its price at most to $15.99. Thus, its subscribers would have saved $2 per month after August 2005 (the start of the Blockbuster class period). From that point forward, lower Netflix prices directly translate into lower Blockbuster prices. The question whether Netflix would have charged $15.99 or some other price below $17.99 goes to the amount of damages, but not the fact of antitrust injury and standing.

Contrary to Defendants' argument, connecting Blockbuster's prices to those of Netflix does not require any detailed inquiry into Blockbuster's strategies. On the contrary, Blockbuster had a policy, which it follows to this day, of not charging more than Netflix for comparable plans. (*SAC* ¶¶ 66, 113-14.) Indeed, their prices have closely tracked each other since August 2005. (*Id.* ¶¶ 116-17.) Given that Netflix is the market leader, this policy is hardly a surprise. One would not expect Blockbuster to charge $17.99 if Netflix had lowered its prices to $15.99, for example. Blockbuster entered the market with lower prices than Netflix. (*Id.* ¶ 59.) When Netflix dropped its prices to $17.99 on October 14, 2004, Blockbuster lowered its prices to $17.49 *the very next day*. (*Id.* ¶¶ 66.) The immediacy of that price response shows the clarity of Blockbuster's policy of not charging more than Netflix.

As these facts show, the injury to Blockbuster's subscribers does not depend on whether Blockbuster raised its prices because of Wal-Mart's exit or for some other reason. Even if Blockbuster abandoned the $14.99 price for entirely independent reasons, such as a desire to simply match

-14-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page18 of 24

Netflix's price or a realization that $14.99 was not sustainable in the long-run, the *amount* of Blockbuster's price increase would have been less had Netflix's prices been lower. Blockbuster would not have tested a $17.99 price, much less adopted such a price, had Netflix's price been $15.99, for example. (*Id.* ¶ 66.) Indeed, if Netflix's but-for price was $14.99 or lower, which is very possible, Blockbuster would not have raised its price at all.

Accordingly, Defendants' arguments about Blockbuster's motivation for raising its prices and whether that motivation is linked to Wal-Mart's exit are irrelevant to whether the Blockbuster Plaintiffs suffered some antitrust injury as a result of Defendants' anti-competitive conduct. Whatever Blockbuster's reasons for abandoning the $14.99 price, the crucial fact is that it would not have raised its price all the way to $17.99 had Netflix then had a lower price. Blockbuster would, at most, have matched that lower Netflix price, and the difference Plaintiffs paid between that lower price (*e.g.*, $15.99) and the actual price ($17.99) constitutes an overcharge – a direct antitrust injury.

**2. Plaintiffs' Allegations That Blockbuster Raised Its Prices Because Of Wal-Mart's Exit, Though Not Necessary, Further Strengthen Plaintiffs' Claims.**

As the foregoing shows, it is not necessary to show that Blockbuster abandoned its $14.99 price *because* of Wal-Mart's exit. Nonetheless, the connection between Wal-Mart's exit and Blockbuster's price increase supports Plaintiffs' claims in two ways.

First, the connection is relevant to damages. To the extent Blockbuster abandoned the $14.99 price because of Wal-Mart's exit, the but-for Blockbuster price may well be $14.99, indicating damages of $3 per month for subscribers to the 3-out plan.[4]

Second, the connection is relevant to showing the nature of price competition in this market. Defendants contend that online DVD plans compete against all sorts of video entertainment, such as movie theaters, cable television and others. Plaintiffs disagree: price moves in this market stem directly from changes in competition among the online DVD rental firms. (SAC ¶ 37.) For example, Blockbuster's decision to lower its price to $17.49 the day after Netflix adopted a $17.99 price was not

---

4 It is not necessary at this stage to prove the exact but-for price. The Blockbuster Plaintiffs have a claim so long as the but-for price is anything below $17.99, in the case of the 3-out plan.

HOWREY LLP

-15-

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page19 of 24

due to some incredibly coincidental price cut by HBO. Blockbuster changed its price because of competition among online DVD rental firms, and it said so. (*Id.* ¶ 66.) Likewise, Blockbuster's decision to raise its price above $14.99 as a result of Wal-Mart's exit is a further illustration of the fact that online DVD rental prices are a function of competition from other online DVD rental firms.

Plaintiffs have made specific allegations that directly address the deficiencies this Court found in the connection between Wal-Mart's exit and Blockbuster's price increase.

**Time gap**. This Court noted that a considerable amount of time elapsed between the May 19, 2005 announcement of Wal-Mart's exit and the August 9, 2005 announcement of Blockbuster's price increase. (*Order* at 11.) Plaintiffs now have alleged, based on specific facts obtained through discovery, that Blockbuster had decided to raise its price much sooner, by July 7, 2005. (*SAC* ¶ 109.) Whatever Blockbuster's motive for delaying the *announcement* of the price increase, less than two months elapsed between the announcement of Wal-Mart's exit and Blockbuster's decision to raise prices. Moreover, Blockbuster's decision came less than three weeks after Wal-Mart completed its exit. (*Id.*)

Rule 12(b)(6) does not permit the adverse inference that no business in Blockbuster's position would wait to decide to raise prices. Raising prices by 20% is a serious matter, especially for a company that had positioned itself as a low-price alternative to Netflix. (*Id.* ¶ 66.) As Netflix's own experience in raising prices shows, these decisions can take some time. (*Id.* ¶ 109.) Such a large price hike not only has important financial implications, but requires planning the marketing strategy. A finding that the chain of causation is broken whenever a short amount of time passes before a major corporate decision cannot be squared with the realities of how many companies operate.

Moreover, based on discovery subsequently received, Plaintiffs now allege that Blockbuster's *immediate* response to Wal-Mart's exit was to increase its prices to new subscribers who transferred to Blockbuster from Wal-Mart or Netflix. (*Id.* ¶ 106.) Whereas Blockbuster's regular subscribers were paying $14.99 for the 3-out plan, subscribers who transferred from Wal-Mart would pay $17.36 for their 3-out plan and those who transferred from Netflix would pay $17.99 for the 3-out. (*Id.* ¶¶ 68,

HOWREY LLP

-16-

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

106.) Thus, the same day Wal-Mart announced its exit Blockbuster announced a price for some subscribers and then announced its more broad-based price increases later.

**The test**. The significance of Blockbuster's test of a $17.99 price just one day before the announcement of Wal-Mart's exit is undercut by three new allegations. First, it was just a test, Blockbuster had not decided to actually adopt the new price. (*Id.* ¶ 103.) Indeed, this was just one of many tests. (*Id.* ¶ 104.) Second, Plaintiffs allege, based on specific facts, that Blockbuster routinely tested alternative prices: "We are a retail company; we test a lot of things." (*Id.* ¶ 104.) For Blockbuster, a price test was not a major event and simply is not tantamount to a decision to enact the tested price. Third, Defendants are not entitled to their preferred inference that Blockbuster decided to test the $17.99 price unaware of Wal-Mart's forthcoming announcement. Not only is that contrary to Rule 12(b)(6), but Plaintiffs allege specific facts showing that Blockbuster likely did know of Wal-Mart's plans. Wal-Mart made the decision nearly two months earlier and word certainly gets around in a market with only three firms. (*Id.* ¶ 102.) Netflix CEO Hastings was in frequent contact with Blockbuster and acted as a "mole" within Netflix. (*Id.* ¶ 48.) In addition, Wal-Mart had already contacted movie studios regarding its pending exit, (*id.* ¶ 102), and, given its business, Blockbuster surely was in frequent contact with those same studios.[5] Finally, it is unlikely that Blockbuster failed to catch the significance of Hastings' April 21, 2005 prediction that it was "likely" that this would become a "two-firm market." (*Id.* ¶ 93.) That prediction was made after Hastings already had a "handshake deal" with Wal-Mart to achieve exactly that two-firm market.

Defendants imply that Blockbuster would have chosen to test $17.99 even if Netflix was charging $16.99. Such an inference is directly contradicted by the detailed allegations of the SAC that Blockbuster would not charge more than Netflix.

**"Sustainable" prices**. Blockbuster stated that the $14.99 price was not sustainable. (*Order* at 12.) That statement is self-serving marketing, since Blockbuster might not admit that the real reason

---

[5] Indeed, Defendants note how common it is for executives in the movie business to run into each other at events such as a film festival. (*Def. Mot.* at 16.) Although they seek an inference that the business is rather casual in trying to explain certain meetings, they take the opposite position when an inference of strict confidentiality suits them. Nothing in Rule 12(b)(6) allows any of this doubletalk.

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page21 of 24

for the price increase was to take advantage of the drop in competition.[6] In any event, Plaintiffs now have specific factual allegations that prices well below $14.99 were sustainable. (*Id.* ¶ 62.) In addition, the possibility that $14.99 was not sustainable for Blockbuster, even if true, does not mean that $17.99 was the lowest sustainable price. Defendants simply are not entitled to that inference.

Contrary to Defendants' reading of the SAC, Plaintiffs do not allege there was "price collusion" between Netflix and Blockbuster. (*Def. Mot*. at 16-17.) Rather, Plaintiffs allege that the arrival of a two-firm market made it far more likely that Netflix and Blockbuster would adopt a more cooperative posture and, in fact, this happened. (*SAC* ¶ 113.)

**3. The Injuries To Blockbuster Subscribers Are Not Remote.**

As the foregoing shows, Defendants' arguments that Plaintiffs' injuries are too remote or derivative of other people's claims (*E.g., Def. Mot*. at 7) are off the mark. The link between Defendants' conduct and Blockbuster's prices is very direct. It would be surprising if Blockbuster's pricing was unaffected by the exit of one of its only two competitors.

Moreover, this is not an indirect purchaser scenario as in *In re Dynamic Random Access Memory (DRAM) Antitrust Litig*., 516 F. Supp. 2d 1072, 1085 (N.D. Cal. 2007), upon which Defendants rely. There are no other plaintiffs standing between the Blockbuster plaintiffs and the prices they paid directly to Blockbuster.

Defendants' reliance upon *Oregon Laborers-Employers Heath & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957 (9th Cir. 1999) and their argument that the Netflix class members are "more direct alleged victims" are off-base for the same reason. (*Def. Mot.* at 8.) The Netflix and Blockbuster subscribers are both "direct" victims at the same level in the distribution chain without any intervening purchasers between them and their respective online DVD suppliers. They are not seeking to allocate one pool of damages. They each have their own set of direct and distinct damages.

---

6 For example, Netflix lied to the public when it stated that the meetings with Wal-Mart began in January 2005 and it lied when it claimed that those meetings stemmed from Hastings' Christmas-time discovery that Wal-Mart has low prices. Given this, Blockbuster's self-serving public pronouncements should not be taken as the received truth either.

-18-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page22 of 24

*Oregon Laborers* illustrates what is meant by "more direct victims" in the antitrust context. In that case, insurers sued the major tobacco companies for the insurers' payments for treatment of their insured's smoking-related illnesses. The insurers' claims for recovery were entirely derivative of the medical harm to their insureds and also of the financial harm, since the insurers are responsible for a portion of the insureds' medical bills. *See* 185 F.3d at 963 ("[A]ll of plaintiffs' claims rely on alleged injury to smokers – without any injury to smokers, plaintiffs would not have incurred the additional [medical] expenses.") (emphasis in original). Here, the Blockbuster Plaintiffs are not downstream from the Netflix subscribers. Plaintiffs here are suing for their own losses incurred due to higher Blockbuster prices.

Finally, the directness of the injuries to the Blockbuster Plaintiffs is confirmed by at least two statements of Netflix CEO Reed Hastings. First, he predicted that profits would be higher in a two-firm market. (*SAC* ¶ 93.) Since he made that statement after knowing that Wal-Mart would exit, leaving Blockbuster as the only other competitor, that prediction meant Blockbuster's profits would be higher too. Of particular note is his statement that "[i]n terms of profitability[,] the key issue is the number of major competitors." (*Id.*) Second, when Blockbuster announced its price increase he wrote: "a pretty picture: BBI at $18 ***as planned***." (*Id.* ¶ 112 (emphasis added).) Defendants should not be heard to argue that a price hike is too remote when their CEO contemporaneously said that it was "planned."

**E. The Measure of Harm to Plaintiffs Is Not Speculative.**

This Court previously concluded the measure of injury was unduly speculative based upon the deficiencies found in the allegations regarding directness of injury. (*Order* at 13.) As explained above those deficiencies have been corrected. As in any case, the calculation of the precise measure of damages awaits the completion of discovery and expert analysis. But, the calculation will not be based on speculation. Accordingly, this factor now also weighs in favor of antitrust standing.

-19-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)

**F. The Balance Of Factors Favors The Blockbuster Plaintiffs' Standing.**

There has never been any doubt that two factors – the nature of the injury and the risk of duplicative recovery – favor standing here, or that the first of those two factors is of "tremendous significance." Since there is no need for complex apportionment, this factor also favors standing.

As set forth above, Plaintiffs have corrected the deficiencies identified by this Court regarding the directness of injury and speculative harm factors, and Plaintiffs have done so with detailed specific factual allegations. Accordingly, all five factors favor standing. Even if this Court finds the last two factors are a close call, which it should not given the new allegations, the existence of numerous factors that clearly favor standing means that the overall balance of factors strongly tips in favor of standing for the Blockbuster Plaintiffs. *American Ad Mgmt.*, 190 F.3d at 1055.

## V. CONCLUSION

For the foregoing reasons, Defendants' Rule 12(b)(6) Motion to Dismiss should be denied.

DATED: April 14, 2010

Respectfully Submitted,

/s/ Robert G. Abrams

Robert G. Abrams
Thomas A. Isaacson
Peter A. Barile III
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 783-0800
Fax: (202) 383-6610

Paul Alexander
HOWREY LLP
1950 University Avenue
East Palo Alto, CA 94303
Tel.: (650) 798-3500
Fax: (650) 798-3600

Emily L. Maxwell
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA 94105
Tel.: (415) 848-4947
Fax: (415) 848-4999

***Lead Class Counsel and Member of the Steering Committee for Plaintiffs in MDL No. 2029***

Case4:09-md-02029-PJH Document143 Filed04/14/10 Page24 of 24

Guido Saveri
R. Alexander Saveri
Melissa Shapiro
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Tel.: (415) 217-6810
Fax: (415) 217-6813

***Liaison Class Counsel and Member of the Steering Committee for Plaintiffs in MDL No. 2029***

Joseph J. Tabacco, Jr.
Christopher T. Heffelfinger
Todd A. Seaver
Matthew Ruan
BERMAN DEVALERIO
425 California Street, Suite 2100
San Francisco, CA 94104
Tel.: (415) 433-3200
Fax: (415) 433-6382

Manuel J. Dominguez
BERMAN DEVALERIO
4280 Professional Center Drive, Suite 350
Palm Beach Gardens, FL 33410
Tel: (561) 835-9400
Fax: (561) 835-0322

Eugene A. Spector
Jeffrey J. Corrigan
William G. Caldes
Theodore M. Lieverman
Jay S. Cohen
Jonathan M. Jagher
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel.: (215) 496-0300
Fax: (215) 496-6611

H. Laddie Montague, Jr.
Merrill G. Davidoff
David F. Sorensen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3010
Fax: (215) 875-4604

***Members of the Steering Committee for Plaintiffs in MDL No. 2029***

-21-

HOWREY LLP

BLOCKBUSTER SUBSCRIBERS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT (M:09-CV-2029 PJH)