UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: ONLINE DVD RENTAL
ANTITRUST LITIGATION
_____/

This Document Relates to:

Pierson v. Walmart.com USA LLC, et al.
(C 09-2163 PJH)
Levy, et al. v. Walmart.com USA LLC, et al.
(C 09-2296 PJH)
_____/

No. M 09-2029 PJH

**ORDER DENYING MOTION
TO DISMISS SECOND AMENDED
COMPLAINT**

Defendants' motion to dismiss the second amended complaint for lack of antitrust standing came on for hearing on May 5, 2010 before this court. Plaintiffs, individuals representing a putative class comprised of subscribers to the online DVD rental service of Blockbuster, Inc. ("Blockbuster"), appeared through their class counsel, Robert G. Abrams, Peter Barile, and Guido Saveri. Defendant Netflix, Inc. ("Netflix") appeared through its counsel, Jonathan M. Jacobson and Sarah Walsh. Defendants Walmart.com USA LLC ("Walmart.com") and Wal-Mart Stores, Inc. ("Wal-Mart Stores")(collectively "Wal-Mart") appeared through their counsel, Genevieve Vose. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby DENIES defendants' motion to dismiss, as follows.

**BACKGROUND**

This is the second go-round for the plaintiff class, as they attempt to persuade the court to answer a straightforward question in their favor: whether plaintiffs, who proceed against defendants Netflix and Wal-Mart based upon artificially inflated prices that plaintiffs purportedly paid to *non-defendant Blockbuster*, have antitrust standing.

A.  The First Motion to Dismiss

On December 1, 2009, the court answered this question in the negative, granting

defendants' earlier-filed motion to dismiss the first amended complaint, and dismissing the complaint with prejudice. See generally Dec. 1, 2009 Order Granting Motion to Dismiss ("Dismissal Order"). Plaintiffs had originally alleged that defendants Netflix and Wal-Mart had entered into an unlawful marketing agreement (the "Agreement"), with the purpose and effect of illegally dividing the markets for sales and online rentals of DVDs in the United States. Plaintiffs further alleged that, as a result of the Agreement, Wal-Mart exited the market for online DVD rentals, and Netflix was able to charge supracompetitive prices to its subscribers. See Complaint, ¶ 3. As a result, theorized plaintiffs, non-defendant Blockbuster – who was operating in a reduced two-firm market in the post-Agreement landscape – was able to meet Netflix's price and charge its own supracompetitive prices for online rental DVD programs. Id. at ¶ 6.

The court rejected the contention that this theory, and plaintiffs' corresponding allegations, were sufficient to confer antitrust standing, concluding that plaintiffs had failed to satisfy three of the standing factors identified in Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519 (1983)("AGC") – directness of the injury, speculative nature of the harm, and complexity in apportioning damages. The court specifically found that plaintiffs' allegations could not establish that Blockbuster's price increase in August 2005 was directly attributable to any unlawful agreement or conduct undertaken by Netflix or Wal-Mart. The court highlighted, among other things, the following deficiencies:

- plaintiffs failed to allege that Netflix increased its *own* 3-out subscription price in conjunction with or in response to the allegedly unlawful market allocation agreement;

- plaintiffs alleged that Netflix originally dropped the subscription price of its 3-out plan from $21.99 per month to $17.99 in October 2004 as part of its response to Blockbuster's entry into the market – i.e., well *before* Netflix was alleged to have "embarked upon [its] scheme that would result in the" market allocation agreement – and never raised it thereafter, making it impossible to infer that Netflix unlawfully raised its price to $17.99 or maintained it in response to the anticompetitive conduct alleged by plaintiffs, or that Blockbuster's own price increase to match Netflix's $17.99 price in August 2005 was itself an anticompetitive price hike in response to the unlawful agreement;

- that plaintiffs' allegations suggested that Blockbuster raised its price independently, and unilaterally, given Blockbuster's executive's statement that its $14.99 price was "not sustainable" and given that it began testing a $17.99 price in advance of the announcement of the unlawful agreement;
- and that the three month time lag between Wal-Mart's exit from the marketplace and Blockbuster's August 2005 price increase was too long to suggest a direct link.

See Dismissal Order at 10-12. The court then dismissed the complaint with prejudice, denying leave to amend on grounds that any amendment would be futile. See id. at 13.

On December 16, 2009, plaintiffs requested leave to seek reconsideration of the court's ruling granting dismissal, but only as to the court's dismissal with prejudice and denial of leave to amend. The plaintiffs argued that, in view of new facts learned via discovery, they could now allege a sufficiently direct and causal link between the conspiratorial conduct alleged to have been engaged in by Netflix and Wal-Mart, and Blockbuster's price increase. Plaintiffs' reconsideration arguments vowed that this new theory would no longer depend upon Wal-Mart's exit from the market, but rather on a more direct link between defendants' anticompetitive conduct and Blockbuster's eventual price increase.

The court granted plaintiffs' request for leave to seek reconsideration and for reconsideration itself, allowing plaintiffs to file a second amended complaint setting forth their new allegations. See Jan. 29, 2010 Order Granting Motion for Reconsideration and Leave to File Amended Complaint ("Order Granting Reconsideration") at 2-3. In so ruling, the court also noted, however, that plaintiffs "would be well-advised to pay particular attention to the legal viability of their new causation theory," and were "further reminded of the need to set forth allegations that demonstrate the directness of plaintiffs' injury with the level of particularity required under the standards previously noted and relied on by this court." See Order Granting Reconsideration at 3.

B. The Second Amended Complaint and Instant Motion to Dismiss

3

Plaintiffs filed the second amended complaint ("SAC") on March 30, 2010. In it, plaintiffs allege several purportedly new facts in support of a further evolved theory linking Blockbuster's price increase to defendants' allegedly anticompetitive conduct. This revised theory notwithstanding, defendants once again move to dismiss the amended complaint, for lack of antitrust standing.

## DISCUSSION

A.  Legal Standard

The applicable legal standard is well-established. A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint. Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8.

Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Specific facts are unnecessary – the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests. Erickson v. Pardus, 551 U.S. 89, 93 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). All allegations of material fact are taken as true. Id. at 94. However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations and quotations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level. Id.

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face. See id. at 558-59. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

4

the complaint has alleged-but it has not show[n] that the pleader is entitled to relief. Ashcroft v. Iqbal, __ U.S. __, 129 S.Ct. 1937, 1950 (2009).

In addition, when resolving a motion to dismiss for failure to state a claim, the court may not generally consider materials outside the pleadings. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). There are several exceptions to this rule. The court may consider a matter that is properly the subject of judicial notice, such as matters of public record. Id. at 689; see also Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir. 1986) (on a motion to dismiss, a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment). Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced by the complaint and accepted by all parties as authentic. See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002).

B.   Plaintiffs' Newly Revised Allegations

Plaintiffs' challenge, via the SAC, is to overcome previously identified hurdles to the successful establishment of antitrust standing. Defendants contend that the SAC continues to suffer from the same fundamental deficiency – i.e., the lack of any direct causal link between plaintiffs' injuries and defendants' conduct – that originally led the court to dismiss the first amended complaint. Plaintiffs, however, rely on their newly revised allegations to set forth an amended theory of conduct, injury, and causation that purports to address previously noted deficiencies and satisfy AGC requirements. That amended theory can generally be stated in two parts: (1) that Netflix's anticompetitive conduct, beginning as early as October 2004 and culminating in the May 19, 2005 Agreement, evidenced Netflix's conscious decision to pursue anticompetitive conduct and engage in artificial price maintenance instead of competing in the relevant market and inevitably lowering its price; and (2) that Blockbuster's prices were tied to Netflix's prices, and would have

consequentially been lower in the fall of 2005, in the absence of Netflix and Wal-Mart's anticompetitive conduct and Netflix's unlawful price maintenance.

In support of this theory, and their conclusion that antitrust injury has now been successfully alleged, plaintiffs' SAC now includes, among others, the following purportedly "new" allegations:

- that, after Blockbuster entered the online DVD market with a price of $19.99 and Netflix announced the lowering of its three-out plan from $21.99 per month to $17.99 on October 14, 2004, Netflix's stock price took a big drop, and Netflix attributed the price reduction to competition;

- that on October 15, 2004, after Blockbuster again signaled its intent to beat Netflix on price by lowering its price to $17.49, Netflix was motivated to begin anti-competitive discussions, and on October 17, 2004, sought Wal-Mart's CEO John Flemings out, in order to discuss an "alliance;"

- that despite Netflix's initial pressure, no alliance was reached, and Wal-Mart instead kept up the competitive pressure and lowered its prices in November 2004 to below that of Netflix and Blockbuster, causing Blockbuster to lower its price to $14.99 in December 2004;

- that during the whole of these price wars in 2004, Netflix avoided lowering its prices because it was consciously pursuing a different strategy – that of getting Wal-Mart to exit the marketplace;

- that ultimately, Netflix succeeded, and it reached a handshake deal with Wal-Mart pursuant to which Wal-Mart would exit the market on March 17, 2005, which agreement was publicly announced on May 19, 2005;

- that news of the deal between Netflix and Wal-Mart leaked and appeared to be known among the investment community in the days leading up to the announcement of the promotion agreement;

- that, had Netflix competed legally in the market throughout this whole time period, it would have been forced to lower its prices below $17.99, and further, that Netflix's ability to lower its prices is made obvious by the fact that its cost per subscriber for a three-out plan was approximately $11;

- that Blockbuster always priced at or below Netflix's prices, and made clear that it intended to compete with Netflix on price;

- that once Blockbuster was in a two-firm market, it was content merely to match Netflix's prices; and

- that Blockbuster decided to raise its price from $14.99 by early July 2005, three weeks after Wal-Mart's exit;

6

See SAC, ¶¶ 59, 62-66, 68-69, 70, 83-84, 79, 91, 93, 102, 109, 113-14, 117-18.[1]

At first blush, plaintiffs' revised allegations appear to present a point by point rebuttal to several of the deficiencies highlighted by the court in its previous order. The revised allegations no longer allege, for example, that Netflix's $17.99 price was set independently and in advance of defendants' anticompetitive conduct, but now state that the $17.99 price was instead an artificially maintained price, following Netflix's decision to pursue anticompetitive conduct. Similarly, plaintiffs no longer concede Blockbuster's early and independent decision to test a $17.99 price *before* the May 19, 2005 agreement was announced. Instead, they allege the existence of a handshake agreement in place in March 2005 (before Blockbuster tested its $17.99 price); that the purportedly unlawful agreement was leaked before it was officially announced; and that Blockbuster actually conducted numerous price tests (thereby lessening the significance of the May 2005 $17.99 price test). Equally significant, the amended complaint no longer reveals a three month time lag between Wal-Mart's exit from the market, and Blockbuster's August 2005 price increase, since plaintiffs now allege that Blockbuster decided to raise prices in July 2005, just a few short weeks after Wal-Mart exited the market, and since plaintiffs further allege that Blockbuster's immediate response to Wal-Mart's exit in June 2005 was to increase its price to any former Wal-Mart or Netflix customers.

Plaintiffs' revised allegations assert a theory of causal injury that is based on a premise that is distinct from that previously advanced: namely, Netflix's ability to convert a competitive price into a supracompetitive price by intentionally *refusing* to compete in an unrestrained market, while in pursuit of an anticompetitive agreement with a competitor (as opposed to setting a supracompetitive price as the immediate consequence of an anticompetitive agreement); and Blockbuster's reliance on Netflix pricing in setting its own prices.

---

[1] Also new to the SAC are allegations regarding Netflix's purported efforts to keep Amazon from entering the online DVD rental market, but these allegations are ultimately not critical to the present motion. See, e.g., SAC, ¶¶ 84, 86-89.

7

The question for the court, of course, is whether plaintiffs' revised theory satisfies the three standing requirements – i.e., directness of the injury, speculative nature of the harm, and complexity in apportioning damages – that plaintiffs' prior allegations failed to fulfill. The court has struggled, these past many weeks, to arrive at a ready answer to this question.

In particular, the court continues to be troubled by plaintiffs' ability to allege a sufficiently direct injury. For even if the court were to conclude that plaintiffs' revised allegations satisfactorily allege the first part of plaintiffs' two-part theory – i.e., that Netflix consciously decided to forego competition in pursuit of anticompetitive conduct, thereby intentionally failing to lower its price and engaging in artifical price maintenance – it is not immediately apparent that plaintiffs have plausibly alleged that Blockbuster's prices were tied to Netflix's prices, and would have consequently been lower in the fall of 2005, in the absence of Netflix and Wal-Mart's anticompetitive conduct.

This is because plaintiffs' allegations continue to rest upon the fundamental premise that defendants' anticompetitive conduct – even if begun much earlier than previously thought – led to higher prices for Netflix subscribers, which in turn led to higher prices for Blockbuster subscribers. As defendants point out, this is by definition an indirect injury. Furthermore, plaintiffs have not alleged any new fact to explain precisely how or why Blockbuster's prices were increased to meet Netflix's price post-agreement, as a direct response to defendants' purportedly unlawful conduct. Rather, plaintiffs seek to fill this void with the allegations that, as a matter of basic policy, Blockbuster always met or beat Netflix's price. See Mot. Dismiss Br. at 2:4-6; SAC, ¶¶ 66, 113-14. This allegation, however, tends to suggest the unilateral exercise of Blockbuster's business judgment in consistently and voluntarily deciding to track Netflix pricing – not that Blockbuster's decision to track Netflix pricing in August 2005 was specifically motivated by defendants' unlawful conduct. And indeed, the fact that Blockbuster's practice in meeting or beating Netflix's price was in evidence *prior* to the allegedly anticompetitive conduct undertaken by Netflix,

tends to cut against the conclusion that Blockbuster's decision to meet Netflix's price in the fall of 2005 was somehow a direct result of Netflix and/or Walmart's anticompetitive conduct. See e.g., SAC, ¶¶ 59, 66 (alleging Blockbuster's entry into the market and immediate and subsequent attempts to undercut Netflix's price reductions).

Similarly, while plaintiffs newly suggest that the purportedly unlawful agreement between Netflix and Wal-Mart may have "leaked" prior to May 19, 2005, plaintiffs never directly allege that Blockbuster itself was aware of the agreement, such that the court could reasonably infer that any decision to test or increase price to match that of Netflix, would have been precipitated by the defendants' unlawful conduct. And while plaintiffs have also revised their allegations to decrease the time lag between the announcement of the May 19, 2005 agreement and Blockbuster's decision to increase its subscription price to match Netflix, these allegations, of this decreased time lag do not directly respond to the question whether Blockbuster's decision to increase subscription price was directly caused by defendants' anticompetitive conduct.

In short, plaintiffs' revised allegations may very well target and address each individual deficiency highlighted by the court previously, and furthermore may go so far as to plead, in essence, a 'but for' causal link insofar as defendants' conduct and plaintiffs' injury is concerned (e.g., without Blockbuster's practice of meeting and/or exceeding Netflix's pricing, Blockbuster would not have sought to raise its $14.99 price to match Netflix's $17.99 price in August 2005). Nonetheless, the court continues to have doubts as to whether the allegations as a whole set forth a theory that provides a sufficiently direct link between defendants' allegedly anticompetitive conduct, and plaintiffs' injuries. For even if plaintiffs have adequately alleged a 'but for' link, it seems to the court that plaintiffs may have run headlong into the "conceptually more difficult question 'of which persons have sustained injuries too remote [from an antitrust violation] to give them standing to sue for damages under § 4.'" Blue Shield of Virginia v. McCready, 457 U.S. 465, 476 (1982). If, for example, the well-established practice of meeting or surpassing a competitor's price

9

1 were to give rise to the inference that any price increase undertaken pursuant to such a
2 practice is directly attributable to the conduct undertaken by competitors for causation
3 purposes – even when the competitors' conduct is allegedly unlawful – then the court is at
4 pains to imagine a situation in which a competitor's unlawful conduct *wouldn't* be deemed a
5 material and direct cause of a co-competitor's price increase for purposes of umbrella
6 liability standing. As the McCready court noted, although an antitrust violation "may be
7 expected to cause ripples of harm to flow through the Nation's economy," there is
8 nonetheless "a point beyond which the wrongdoer should not be held liable." See 457 U.S.
9 at 477. Query whether plaintiffs are beyond that point here.

10 The court's uneasiness with plaintiffs' revised theory, and its ability to satisfy the
11 'directness' standard set forth in AGC, is further buttressed by the fact that despite the
12 court's admonition to plaintiffs in its previous order, plaintiffs have not come forward with
13 any legal authority to support their theory. The court recognizes the possibility that such
14 authorities may not exist.

15 Ultimately, however, the court's significant reservations notwithstanding, the court
16 concludes that plaintiffs' theory of injury is nonetheless sufficiently 'direct' (albeit minimally
17 direct) to satisfy AGC standards, and to permit plaintiffs to proceed past the pleading stage.
18 There is, after all, no case law directly on point with the present factual scenario that has
19 been advanced by either party dictating the court's conclusion. And it is at least possible
20 that an evidentiary record in the action would permit plaintiffs to flesh out the allegations
21 currently pled, such that a more direct causal link between defendants' conduct and
22 plaintiffs' injury might be stated. Discovery may, for example, prove the precise nature of
23 Blockbuster's pricing in relation to Netflix's, or may demonstrate Blockbuster's awareness
24 of the purportedly unlawful market agreement well prior to the agreement's public
25 announcement, as well as the timing and substance of Blockbuster's response thereto –
26 such that the court could conclude not only that defendants' anticompetitive conduct was
27 not only the direct cause of Blockbuster's eventual price hike, but also that plaintiffs are
28

within the realm of injured parties for which defendants should justly be held responsible.

Likewise, the remaining factors implicating the speculative nature of plaintiffs' injury and harm, as well as the complexity in apportioning damages, will likely rise or fall upon the eventual outcome in connection with the 'directness of the injury' factor. Thus, these factors, too, justify an order allowing plaintiffs' action to go forward at this time.

In so ruling, the court emphasizes that it continues to have strong doubts about plaintiffs' ultimate ability to *prove* the directness of their injury. Nonetheless, the court would prefer to have a clear evidentiary picture painted before it, in order to ascertain the actual viability of plaintiffs' claims. At this juncture, however, plaintiffs' revised allegations and the state of the cited law are simply too uncertain to allow the court to determine with confidence that plaintiffs have failed to meet the 'plausibility' standard contemplated by Twombly. See 550 U.S. at 558-59. Accordingly, defendants' motion to dismiss the second amended complaint is DENIED.

The court will permit defendants to file an early summary judgment motion limited to antitrust standing should discovery result in an evidentiary record which would enable the court to answer some of the questions raised above. The parties will still be permitted to file motions for summary judgment at the close of discovery, as provided in the pretrial order.

C.   Conclusion

For the foregoing reasons, defendants' motion to dismiss the second amended complaint is DENIED.

**IT IS SO ORDERED.**

Dated: July 6, 2010

_____
PHYLLIS J. HAMILTON
United States District Judge