JONATHAN M. JACOBSON, State Bar No. 1350495 (N.Y.)
DAVID H. REICHENBERG, State Bar No. 4477477 (N.Y.)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Tel: (212) 999-5800
Fax: (212) 999-5899
Email: jjacobson@wsgr.com

KEITH E. EGGLETON, State Bar No. 159842
MAURA L. REES, State Bar No. 191698
DYLAN J. LIDDIARD, State Bar No. 203055
ANTHONY J WEIBELL, State Bar No. 238850
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Fax: (650) 565-5100
Email: dliddiard@wsgr.com

*Attorneys for Defendant Netflix, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE ONLINE DVD RENTAL ANTITRUST LITIGATION<br><br>This document relates to:<br><br>All Actions | Master File No.: 4:09-md-2029 PJH (JCS)<br>MDL No. 2029<br><br>Hon. Phyllis J. Hamilton<br><br>**NETFLIX'S ADMINISTRATIVE MOTION FOR LEAVE TO SUBMIT STATEMENT OF RECENT DECISION** |

Pursuant to Civil Local Rule 7-11, Netflix, Inc. respectfully submits this administrative request for leave to file the Statement of Recent Decision submitted herewith as Attachment A. After a hearing has been held on a matter pending before the Court, a party may "submit additional authority upon obtaining leave of court" by a "motion brought under [Local] Rule 7-11." *Michael Taylor Designs, Inc. v. Travelers Prop. Cas. Co. of Am.*, 761 F. Supp. 2d 904, 909 (N.D. Cal. 2011). Such a motion is proper if it concerns "a highly persuasive decision on an issue of particular importance . . . not otherwise cumulative of the cases that have already been submitted." *Id.*

The "highly persuasive decision" here was issued, after argument, by the Court of Appeals for the First Circuit. *Sterling Merch., Inc. v. Nestle, S.A.*, --- F.3d ----, No. 10-1925, 2011 WL 3849828, at *8-9 (1st Cir. Sep. 1, 2011). In *Sterling*, the largest ice cream distributor in Puerto Rico merged with its number one competitor, resulting in a combined market share after the merger of 85%. The First Circuit upheld summary judgment for the defendants because there was no evidence of any increase in price or decrease in output after the merger and, therefore, no antitrust injury to the plaintiff. *Id.* ("Injury to competition is 'usually measured by a reduction in output and an increase in prices in the relevant market'"; "Sterling failed to provide evidence that consumer prices increased during the relevant period. In fact, the evidence suggests that, if anything, consumer prices *decreased* during the relevant period. . . . The evidence regarding output is similar. Sterling did not set forth any evidence from which an inference can be drawn that there was a reduction in output within the relevant market during the relevant period."). The decision is relevant to the points made in Netflix's motion for summary judgment, ECF No. 386 at 12, 15-16, and its reply brief, ECF No. 461 at 9-13.

Dated: September 15, 2011

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION

By: /s/ Jonathan M. Jacobson
     Jonathan M. Jacobson

*Attorneys for Defendant Netflix, Inc.*

**ATTACHMENT A**

1  JONATHAN M. JACOBSON, State Bar No. 1350495 (N.Y.)
   DAVID H. REICHENBERG, State Bar No. 4477477 (N.Y.)
2  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
3  1301 Avenue of the Americas, 40th Floor
   New York, New York 10019
4  Tel:  (212) 999-5800
   Fax:  (212) 999-5899
5  Email:  jjacobson@wsgr.com

6  KEITH E. EGGLETON, State Bar No. 159842
   MAURA L. REES, State Bar No. 191698
7  DYLAN J. LIDDIARD, State Bar No. 203055
   ANTHONY J WEIBELL, State Bar No. 238850
8  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
9  650 Page Mill Road
   Palo Alto, CA 94304
10 Telephone: (650) 493-9300
   Fax:  (650) 565-5100
11 Email: dliddiard@wsgr.com

12 *Attorneys for Defendant Netflix, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE ONLINE DVD RENTAL ANTITRUST LITIGATION<br><br>This document relates to:<br><br>All Actions | Master File No.: 4:09-md-2029 PJH (JCS)<br>MDL No. 2029<br><br>Hon. Phyllis J. Hamilton<br><br>**NETFLIX'S STATEMENT OF RECENT DECISION** |

NETFLIX'S STMT. OF RECENT DECISION
CASE NO. 09-MD-2029 PJH (JCS)

Netflix, Inc. files this Statement to alert the Court to the decision of the Court of Appeals for the First Circuit, rendered after oral argument on Netflix's motion for summary judgment, in *Sterling Merch., Inc. v. Nestle, S.A.*, --- F.3d ----, No. 10-1925, 2011 WL 3849828 (1st Cir. Sep. 1, 2011) (copy attached). The case involved the merger of the largest ice cream distributor in Puerto Rico and its number one competitor, resulting in a combined market share after the merger of 85%. The First Circuit upheld summary judgment for the defendants based on a lack of antitrust injury, as there was no evidence of any increase in price or decrease in output after the merger. The discussion at pp. 8-9 of the opinion is relevant to the points raised at pp. 12, 15-16 of Netflix's Motion for Summary Judgment, ECF No. 386, and pp. 9-13 of Netflix's Reply Brief, ECF No. 461.

Dated: September 15, 2011

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION

By: /s/ Jonathan M. Jacobson
    Jonathan M. Jacobson

*Attorneys for Defendant Netflix, Inc.*

--- F.3d ----, 2011 WL 3849828 (C.A.1 (Puerto Rico))
**(Cite as: 2011 WL 3849828 (C.A.1 (Puerto Rico)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.
STERLING MERCHANDISING, INC., Plaintiff, Appellant,
v.
NESTLÉ, S.A., Payco Foods Corporation, and Nestlé Puerto Rico, Inc., Defendants, Appellees.

No. 10–1925.
Heard June 6, 2011.
Decided Sept. 1, 2011.

**Background:** Ice cream distributor brought action against world's largest ice cream manufacturer, holding corporation that acquired manufacturer of brand which plaintiff had the exclusive rights to distribute in Puerto Rico, Puerto Rico marketing subsidiary, and competing distributor alleging antitrust violations and injury stemming from merger of two local ice cream distributors and several subsequent business practices, and raising claims for conspiracy to monopolize and unlawful restraint of trade and monopolization in violation of Sherman Act, exclusive dealing in violation of Clayton Act, and unlawful restraint of trade, monopolization and attempted monopolization in violation of Puerto Rico Anti-Monopoly Act. The United States District Court for the District of Puerto Rico, Salvador E. Casellas, Senior Judge, 724 F.Supp.2d 245, granted summary judgment for defendant. Plaintiff appealed.

**Holdings:** The Court of Appeals, Lynch, Chief Circuit Judge, held that:
(1) plaintiff did not suffer antitrust injury from merger and competitor's use of exclusive contracts;
(2) merger and use of exclusive contracts did not violate antitrust provisions under rule of reason calculus;
(3) merger and corporate parent's control of brand ice cream that constituted plaintiff's largest product line did not result in monopoly; and
(4) merger and corporate parent's control of brand ice cream that constituted plaintiff's largest product line did not create dangerous probability that such conduct would result in monopoly power, and thus such conduct did not constitute attempted monopolization.

Affirmed.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ⚷964**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk964 k. Competitors. Most Cited Cases

Merger of two competing local ice cream distributors with combined market share of 85% and their use of exclusive contracts did not have adverse effects on competition, and thus plaintiff ice cream distributor did not suffer antitrust injury from that conduct, since market did not suffer reduction in output or increase in consumer prices; although plaintiff had adopted strategy of reducing prices in order to entice retailers to break away from competitor's exclusive contracts, plaintiff's sales, profits, and market share had increased during relevant period. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[2] Antitrust and Trade Regulation 29T ⚷976**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk973 Evidence
                29Tk976 k. Presumptions and Burden of Proof. Most Cited Cases

The plaintiff bears the burden of proving antitrust injury. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[3]** Antitrust and Trade Regulation 29T ⚷ 963(1)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases

Antitrust injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful; the injury should be the type of loss that the claimed violations would be likely to cause and therefore should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[4]** Antitrust and Trade Regulation 29T ⚷ 964

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk964 k. Competitors. Most Cited Cases

A competitor may suffer injury even when there is no injury to competition or to consumers, and so lack standing under the Sherman Act; even if a competitor is hurt because the merger of its rivals makes them more efficient or able to compete more aggressively, that harm is not an antitrust violation, and the competitor lacks standing. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[5]** Antitrust and Trade Regulation 29T ⚷ 963(1)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases

Under the Sherman Act, injury to competition is usually measured by a reduction in output and an increase in prices in the relevant market. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[6]** Antitrust and Trade Regulation 29T ⚷ 529

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk527 Purpose of Antitrust Regulation
                29Tk529 k. Protection of Competition Rather Than Competitors. Most Cited Cases

Antitrust laws are concerned with protecting against impairments to a market's competitiveness and not impairments to any one market actor. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[7]** Antitrust and Trade Regulation 29T ⚷ 983

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk982 Damages and Other Relief
                29Tk983 k. In General. Most Cited Cases

An antitrust plaintiff's post-violation successes do not necessarily preclude compensation for damages proximately caused by an antitrust violation. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[8]** Antitrust and Trade Regulation 29T ⚷964

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk964 k. Competitors. Most Cited Cases

    Merger of two competing local ice cream distributors with combined market share of 85 percent and their use of exclusive contracts did not violate antitrust provisions under rule of reason calculus, and thus plaintiff could not demonstrate antitrust injury, even if such conduct had increased consumer prices or reduced output, since competitor's rates of market foreclosure through exclusivity arrangements with retailers were around 30 percent or less, they were almost all of one or two year duration and there was turnover, and there were other avenues of distribution available. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[9]** Antitrust and Trade Regulation 29T ⚷564

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk562 Refusals to Deal
                29Tk564 k. Exclusive Dealing Arrangements/Agreements/Distributorships. Most Cited Cases

    Because vertical exclusive dealing agreements can achieve legitimate economic benefits, such as reduced cost, stable long-term supply, an predictable prices, there is no presumption under antitrust law against such agreements; given their capacity to enable markets to operate more efficiently and benefit consumers, such agreements are not subject to per se treatment, but are instead subject to rule of reason analysis. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[10]** Antitrust and Trade Regulation 29T ⚷535

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk532 Judicially Created Tests of Legality
                29Tk535 k. Rule of Reason. Most Cited Cases

    The rule of reason antitrust calculus requires that a plaintiff make a burdensome showing that (1) the agreements in question involved the exercise of power in a particular economic market, (2) that this exercise impaired the competitiveness of the market, and (3) that those impairments outweighed efficiencies or other economic benefits. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[11]** Antitrust and Trade Regulation 29T ⚷564

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk562 Refusals to Deal
                29Tk564 k. Exclusive Dealing Arrangements/Agreements/Distributorships. Most Cited Cases

    As a practical matter, in applying the rule of reason antitrust calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and high numbers do not guarantee success for an antitrust claim. Sherman Act, § 1, 15 U.S.C.A. § 1; Clayton Act, § 1, 15 U.S.C.A. § 12.

**[12]** Antitrust and Trade Regulation 29T ⚷677

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(E) Particular Industries or Businesses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

29Tk677 k. Food and Beverages; Restaurants. Most Cited Cases

Merger of two competing local ice cream distributors with combined market share of 85 percent, coupled with their corporate parent's control of brand ice cream that constituted plaintiff's largest product line, did not result in monopoly in violation of Sherman Act, where defendant's own market share was decreasing, plaintiff's market share was rising steadily, consumer prices had not increased, and there were successful new entries into market. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[13] Antitrust and Trade Regulation 29T 641**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(C) Market Power; Market Share
            29Tk641 k. In General. Most Cited Cases

Whether a defendant has monopoly power in violation of the Sherman Act depends on the defendant's ability to lessen or destroy competition in the relevant market. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[14] Antitrust and Trade Regulation 29T 713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases

**Antitrust and Trade Regulation 29T 714**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk714 k. Chance of Success in the Relevant Market. Most Cited Cases

**Antitrust and Trade Regulation 29T 715**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk715 k. Intent. Most Cited Cases

On an attempted monopolization claim, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[15] Antitrust and Trade Regulation 29T 727**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(B) Particular Industries or Businesses
            29Tk727 k. Food and Beverages; Restaurants. Most Cited Cases

Merger of two competing local ice cream distributors with combined market share of 85 percent, coupled with their corporate parent's control of brand ice cream that constituted plaintiff's largest product line, did not create dangerous probability that such conduct would result in monopoly power, and thus such conduct did not constitute attempted monopolization, where, more than two years after that conduct, defendant's own market share was decreasing, plaintiff's market share was rising steadily, consumer prices had not increased, and there were successful new entries into market. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[16] Federal Civil Procedure 170A 1278**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases

District court did not abuse its discretion on motion for summary judgment in striking untimely sections of expert's report. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Appeal from the United States District Court for the District of Puerto Rico, Salvador E. Casellas, U.S. District Judge.Daniel L. Goldberg, with whom Alicia L. Downey, Bingham McCutchen LLP, Jeffrey M. Williams, David C. Indiano, Seth A. Erbe, Indiano & Williams, PSC, Kevin J. O'Connor, David J. Gilles, Godfrey & Kahn, SC, and Javier A. Morales–Ramos were on brief, for appellant.

Carmine R. Zarlenga, with whom Mayer Brown LLP, Wm. Bradford Reynolds, Erik T. Koons, Howrey LLP, Luis A. Oliver, Roberto A. Cámara–Fuertes, and Fiddler González & Rodríguez, PSC were on brief, for appellees.

Before LYNCH, Chief Judge, LIPEZ and THOMPSON, Circuit Judges.

LYNCH, Chief Judge.

**\*1** Sterling Merchandising, Inc., sued Nestlé Puerto Rico, Inc. (Nestlé PR), and a group of Nestlé corporations including Nestlé, S.A., Nestlé Holdings, Inc. and Payco Foods Corporation (Payco). The suit alleges various federal Clayton Act, 15 U.S.C. §§ 12–27, and Sherman Act, 15 U.S.C. §§ 1–7, antitrust violations and pendent Puerto Rico law claims stemming from Nestlé PR's 2003 merger with Payco and later activities. Payco had been both Sterling's and Nestlé PR's competitor in the Puerto Rico ice cream distribution market.

The district court granted summary judgment on all of the federal antitrust claims on the grounds that Sterling lacked standing because its evidence failed to demonstrate, inter alia, that it had suffered a cognizable antitrust injury. *See Sterling Merch., Inc. v. Nestlé, S.A.,* 724 F.Supp.2d 245 (D.P.R.2010). As an alternative holding, the district court also granted summary judgment on the merits of Sterling's antitrust causes of action. *Id.* The pendent claims were then dismissed. Sterling appeals. We affirm on the ground of Sterling's lack of standing, particularly its failure to show antitrust injury.

I.

Nestlé, S.A. is the largest ice cream manufacturer in the world and operates in Puerto Rico through its sales and marketing subsidiary, Nestlé PR. Nestlé PR entered the ice cream distribution market in 1998. After Nestlé PR merged with Payco, another ice cream distributor, in June 2003, Nestlé PR and Sterling were the two largest ice cream distributors in Puerto Rico, though there were several other distributors and some retailers bypassed Puerto Rico distributors altogether.

Sterling, the smaller distributor, sued the larger, Nestlé PR, alleging Nestlé PR engaged in anticompetitive practices from June 2003 through at least October 2009, when the evidence closed.

A. *The Pre–2003 Merger Ice Cream Distribution Market in Puerto Rico*

Sterling was founded in 1993 as a Puerto Rico ice cream distributor. It immediately became the island-wide exclusive distributor of Edy's brand ice cream, the most popular brand in Puerto Rico. Other distributors in the ice cream market included Payco Foods Corporation, and Mantecados Nevada, Inc. In 1998, five years after Sterling's formation, Nestlé PR joined the distribution market by buying Mantecados Nevada's assets.

From 1998 until the 2003 merger of Payco and Nestlé PR, the ice cream distribution market in Puerto Rico was competitive, and neither Payco, Nestlé PR, nor Sterling dominated the market. Sterling maintained Edy's as its flagship brand, which Sterling received from the Dreyer's ice cream manufacturing company. In the late 1990s, Dreyer's began giving Sterling a per-unit discount, tying the discount to Sterling's previous-year sales. Before the merger at issue, Sterling and Dreyer's negotiated a $0.75 per unit promotional support for Edy's. Sterling says this was done to improve its position in competing with Payco and Nestlé PR/Nevada. In 2003, Dreyer's also assigned to Sterling its new "Skinny Cow" products. Despite the competitive market and its exclusive distribution rights to Edy's, Sterling's financial performance declined from 2001 until 2003. During that period, Sterling's sales

dropped from $8.07 million to $7.01 million.

**\*2** Nestlé PR also suffered from poor financial performance before its 2003 merger. It had roughly $8 million in losses as of May 2002, and sought ways to improve its financial outlook. It contemplated merger, including with Sterling, as a route to profitability, and eventually did merge with Payco.

B. *The 2003 Nestlé PR/Payco Merger and the Separate Nestlé Acquisition of Dreyer's*

In June 2003, Nestlé PR acquired 50 percent of Payco, which was only in the distribution business. Nestlé did not acquire the remaining 50 percent of Payco's shares until September 2005. The merger was reviewed by the Puerto Rico Office of Monopolistic Affairs (PROMA), which approved the merger conditioned on particular stipulations, none of which is alleged to have been subsequently breached, and which continue to be effective. For example, one stipulation is that Nestlé may not transfer Edy's to another distributor without the approval of PROMA unless Sterling has, in the interim, acquired distribution rights to either Breyer's or Blue Bunny ice cream.

Separately, but also in June 2003, Nestlé, S.A., Nestlé PR's parent, acquired a controlling interest in Dreyer's, the manufacturer of Edy's brand ice cream products. Nestlé, S.A. acquired 100 percent ownership of Dreyer's in January 2006. Sterling has remained Edy's exclusive distributor despite Nestlé, S.A.'s acquisition of Dreyer's. The end result is that Nestlé, S.A. manufactures Edy's, which is the most lucrative of Sterling's distribution products and its flagship brand, while Nestlé PR, Nestlé, S.A.'s subsidiary, is Sterling's largest competitor at the distribution level.

C. *The Post–Merger Market*

The merger of Nestlé PR and Payco appears to have had significant costs to the defendant merged companies. Immediately after the 2003 merger, the merged Nestlé PR (including Payco) had an 85 percent market share in the ice cream distribution market; that share fell to 70 percent by 2007. The merged entities have also lost a number of their major exclusive arrangement retail customers to Sterling.

Shortly after the 2003 merger, for example, Sterling acquired exclusive rights to distribute ice cream products to Puerto Rico retail customers Grande and Pitusa, both of which were Payco customers prior to the merger. In 2007, Supermercados Econo, Inc., the largest retail seller of ice cream in Puerto Rico and formerly a retail customer of Payco, also signed exclusivity agreements with Sterling and others. Supermercados Econo's agreements have resulted in the merged Nestlé PR losing its sales with Econo stores. Further, the merger itself caused at least one of Payco's product lines, Wells' Dairy Inc.'s Blue Bunny brand, to terminate its distribution agreement with the merged Nestlé PR/Payco on the grounds that the merger constituted a material breach of the Blue Bunny distribution agreement and would, in Wells' Dairy Inc.'s view, negatively affect the distribution of Blue Bunny products.

**\*3** As the district court found, "some products distributed by Nestlé PR/Payco lost market share and access to important locations," and during the first six months of joint Nestlé PR/Payco operations the merged company lost $5 million in revenue to Sterling and other competitors. *Id.* at 260. That trend has continued beyond the initial six-month period following the merger.

By contrast, Sterling's market share and sales, which were stagnant before the Nestlé PR/Payco merger, have significantly improved since the merger. Before the merger, Sterling's net sales had declined from $8.07 million in 2001 to $7.59 million in 2002, and to $7.01 million in 2003. After the merger of its competitors, Sterling's sales rose year over year from 2003 through 2008, at an average of 11 percent a year. Sterling's profits and operating revenue rose commensurately with sales.

Both before and after the merger, Sterling acquired distribution rights to other retailers and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

rights to distribute other brands, including Good Humor, J & J Snacks, Rich's Ice Cream, and Turkey Hill. Puerto Rico is not a market where only a small number of brands are sold. Rather, as Sterling's acquisitions of distribution rights to new brands demonstrate, there are a number of manufacturers of ice cream available to distributors in Puerto Rico. And during this period, on Sterling's own evidence, the overall sales of ice cream products in dollar terms increased in Puerto Rico.

Sterling put only limited evidence into the record of its market share, but its expert did acknowledge that "[i]t's grown over the 2003 to the present" time period. The record evidence shows that Sterling's share of the market has risen from 14.7 percent in 2003 to more than 22 percent in 2008. This data also shows a steady increase in Sterling's market share during the entire period of alleged monopolistic behavior by defendants.

Sterling's strong financial performance has led it to increase the size of its facilities and upgrade. Since the 2003 Nestlé PR/Payco merger, it has constructed a new warehouse with twice the square footage of its previous warehouse. Due both to the increased size of the facility and to technology upgrades, the new warehouse could increase Sterling's distribution capacity by as much as eight times over the previous warehouse.

Sterling has maintained its exclusive distribution agreement with Edy's after both Nestlé PR's merger with Payco, and Nestlé, S.A.'s acquisition of Dreyer's, Edy's manufacturer. In 2004, Dreyer's (already having been acquired by Nestlé, S.A.) reduced Sterling's per-unit discount from $0.75 to $0.60, citing increased costs of raw materials. Also in 2004, Dreyer's took the line of "Skinny Cow" products from Sterling, but not the Edy's brand, and now distributes the Skinny Cow line through Nestlé PR.

Faced with the obvious problem that its growing success after the merger makes it difficult to show injury to itself, Sterling alleged that in a but–for–2003–merger world, it would have thrived even more than it did. Sterling presented a two-part injury and damages theory to explain how it would have been even better off absent Nestlé PR's allegedly anticompetitive behavior.

**\*4** First, it alleged that Nestlé PR's post-merger exclusivity agreements with a large number of grocery stores, by foreclosing Sterling from those stores, cost it $21–29 million in sales it otherwise would have made. Second, Sterling argued that absent this market foreclosure, it would have earned higher profits on those sales it actually made because its increased market share would have allowed it to be a more efficient operation. Sterling also alleged it lost sales when Dreyer's took the "Skinny Cow" product line away from Sterling and assigned it to Payco a year after the Nestlé PR/Payco merger, and lost profits on actual sales when Dreyer's reduced its per-unit discount on Edy's products. These allegations are not supported by Sterling's expert's damages model, which does not specifically discuss damages from these alleged violations.

II.

The district court granted summary judgment on all counts largely because it found Sterling, on the undisputed evidence, had not demonstrated any antitrust injury.

As to injury to competition during the post-merger period, the district court concluded the Puerto Rico ice cream distribution market had in fact expanded. *Id.* The court found no evidence that the Nestlé PR/Payco merger or the merged companies' activities had resulted in restricted output. Nor did the court find any evidence that prices to consumers had in fact been raised in this period, much less that the raise could be tied to illegal anticompetitive behavior. *Id.* The court noted that no price study had been done by Sterling's experts, and that what little information there was available regarding pricing showed that consumer prices on some products had in fact decreased during the relevant period. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The district court found that Sterling's claims of any injury to itself "either by [Nestlé PR's] exclusives or by product price increases" were severely undermined by its "increased profits, sales, and market share" in the post-merger period. *Id.* at 259.

The court concluded that in light of these facts, Sterling could not show that any antitrust injury resulted from Nestlé PR/Payco's behavior.

The district court also rejected Sterling's damages model. *Id.* at 262. That model attempted to extrapolate from Sterling's 42–50 percent market share in two small slivers of the market to the conclusion that Sterling would have had a 42–50 percent market share throughout Puerto Rico absent Nestlé PR's purportedly anticompetitive actions. The court held that the model failed to meet Sterling's burden of proving damages for two reasons. First, the model adopted sub-markets with *no* exclusive agreements whatsoever as the benchmark for comparison, but this was an inaccurate point of comparison as exclusivity agreements are not per se illegal and have long been a lawful part of the ice cream distribution market in Puerto Rico. *Id.* at 260–62. Second, Sterling's market share was not anywhere near 42–50 percent before the merger, "and it is unrealistic to posit that the company's sales and market presence would have grown fourfold had the Nestlé PR/Payco merger never occurred." *Id.* at 262.

**\*5** The court further concluded that even had Sterling shown any injury to itself, it had not shown any antitrust injury, that is, that it was injured by anticompetitive activity and that its injury was "sufficiently direct, nonspeculative, and measurable to the extent that causality is not in doubt." *Id.* at 258. The court found that Sterling failed to demonstrate that any of the allegedly anticompetitive activity charged by Sterling—purportedly illegal use of exclusivity agreements to excessively foreclose the market, a price squeeze from reducing Dreyer's per-unit discount to Sterling, and allegedly illegal foreclosure from distribution contracts for new Dreyer's products-had been proven to injure Sterling.

As to exclusivity contracts, the district court found that they had been used in Puerto Rico since the 1990s, that Nestlé PR's reliance on them had actually decreased in the years after the 2003 merger,[FN1] and that the agreements themselves did not have any anticompetitive hallmarks such as long duration, below-cost pricing, or excessive foreclosure of the market. *Id.* at 260–61, 264–66. The court noted that in the post-merger period, Sterling had acquired new distribution rights to new retail markets to which, before the merger, either Nestlé PR or Payco had exclusive access. The court also observed that the entry of additional distributors to the market since the 2003 merger indicated that Nestlé PR's exclusivity contracts have not served to impair the competitive structure of the market. *Id.* at 264.

As to Sterling's claims of a price squeeze after Nestlé PR acquired Dreyer's, the manufacturer of Edy's, the district court found that while Sterling's concerns were "legitimate from a business point of view, they do not involve any overt anticompetitive act" because the per-unit cost to Sterling had not "significantly increased." *Id.* at 261. It further reasoned that sales volume had increased and consumer prices stayed "stable," "strongly suggesting that the competitive structure of the market has not been harmed, thus precluding antitrust injury." *Id.*

As to the allegations that new Nestlé PR/Payco products had been denied to Sterling, the district court found Sterling could not show any "tangible damages" because it had expanded its sales and increased its market share following the merger despite the fact that it "was not in rapid expansion before the merger." *Id.* The court further reasoned that, in any event, Nestlé PR had no legal duty to offer its brands, such as the "Skinny Cow" line, to Sterling. *Id.* at 270. It also observed that Sterling had not been terminated as a distributor of Edy's brand ice cream even after Nestlé PR acquired Dreyer's and became Edy's manufacturer. *Id.* at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

271–72. Nor had Nestlé PR taken "any steps to make distributing Edy's unprofitable for Sterling." *Id.* at 272.

Finally, the court also rejected Sterling's monopolization and attempted monopolization claims under § 2 of the Sherman Act on the merits because Sterling had failed to show, as it must, either that Nestlé PR wielded monopoly power, or that there was a "dangerous probability" that Nestlé PR would acquire such power. *Id.* at 266–72.

### III.

***6** Our review of the grant of summary judgment is de novo, taking all facts and reasonable inferences in the light most favorable to Sterling, the nonmoving party. *See White v. R.M. Packer Co.,* 635 F.3d 571, 575 (1st Cir.2011).

[1] Sterling argues that its evidence sufficed to show that Nestlé PR has put a "stranglehold" on the Puerto Rico ice cream distribution market by: (1) acquiring its former competitor, Payco; (2) entering into "strategically deployed exclusivity contracts" that lock up lucrative and geographically efficient grocery stores albeit without foreclosing more than 30 percent of the market; and (3) acquiring Dreyer's, the manufacturer of Sterling's star product line, and causing Dreyer's to reduce from 75 cents to 60 cents the discount it once gave Sterling on its wholesale price. Sterling argues these practices have "harmed interbrand competition" and also "injured Sterling by foreclosing it from sales it would have made in the absence of exclusive dealing contracts and increasing Sterling's input and operational costs" by reducing the wholesale discount it once received and "forcing route structure inefficiencies."

Sterling insists it has demonstrated antitrust injury because it would have done even better for itself than it has were it not for the merger, the removal of a portion of Dreyer's wholesale discounts on Edy's products, and Nestlé PR's post-merger exclusivity arrangements. Sterling argues that in such a but-for world, purchasers would have been offered more choices in more locations at more competitive prices, and Sterling would have gained more market share. Sterling also argues that it would have been able to use more efficient delivery routes, thereby lowering its per-unit costs.[FN2] Sterling attributes its actual increased sales to the fact that Wells' Dairy Inc.'s Blue Bunny product and distribution line was "driven out" of the market after the Nestlé PR/Payco merger, which has benefitted Sterling in the short term.[FN3]

Nestlé PR responds that Sterling has failed to show either that it had suffered any injury or that Nestlé PR's allegedly anticompetitive actions had caused such injury. Nestlé PR cites the lack of evidence of injury to competition or consumers, Sterling's post–2003 financial performance, the evidence of Sterling's entry into outlets previously controlled by Payco, the merged Nestlé PR's declining use of exclusivity agreements, and the unrealistic and speculative economic forecast Sterling used as its but-for scenario.

Nestlé PR also argues that whatever Sterling might show about the effect of Nestlé PR's actions on Sterling, the case law requires Sterling to show that its loss comes from acts that reduce output and/or raise prices to consumers. *Sullivan v. Nat'l Football League,* 34 F.3d 1091, 1096–97 (1st Cir.1994). Nestlé PR points out that while Sterling claims in its amended complaint that consumers saw "increased retail prices and constricted retail options," it never actually produced evidence to support either reduced output or increased prices to consumers. Sterling's expert, Dr. Overstreet, acknowledged in testimony that he had done no analysis of consumer pricing, or of any potential causes of any increased prices, preventing Sterling from proving that any increased price either existed or resulted from anticompetitive conduct by Nestlé PR. Nor did Sterling produce any evidence of reduced output. In fact, Nestlé argues, there was evidence to the contrary of increased output and reduced prices.

***7** The Supreme Court has articulated a six-

factor test that governs whether a plaintiff has standing to bring an antitrust action. The relevant factors are:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*RSA Media, Inc. v. AK Media Grp., Inc.,* 260 F.3d 10, 14 (1st Cir.2001) (quoting *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 10 (1st Cir.1999)); *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). "Although we technically balance the six factors to determine if standing is appropriate, this Court has emphasized the causation requirement." *RSA Media,* 260 F.3d at 14 (citation omitted). Additionally, "the absence of 'antitrust injury' will generally defeat standing." *Id.* Sterling has not satisfied these tests and particularly has not shown antitrust injury.

[2][3] The plaintiff bears the burden of proving antitrust injury. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* The injury should be "the type of loss that the claimed violations ... would be likely to cause," *id.* (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)), and should therefore "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," *id.* Plaintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause *to competition.*

[4] A competitor may suffer injury even when there is no injury to competition or to consumers, and so lack standing. Even if a competitor is hurt because the merger of its rivals makes them more efficient or able to compete more aggressively, that harm is not an antitrust violation, and the competitor lacks standing. *See* 2 Areeda & Hovenkamp, *Antitrust Law,* ¶ 348a, at 387 (2d. ed.2000). Further, unlike consumers, competitors have incentives to bring antitrust suits for purposes which are anticompetitive, for example to induce the defendant competitor to moderate their competition. *Id.* As a result, there is reason for courts to be "properly skeptical of many rivals' suits, particularly when the practices are not obviously 'exclusionary.' " *Id.*

**\*8** [5] Injury to competition is "usually measured by a *reduction in output* and an *increase in prices* in the relevant market." *Sullivan,* 34 F.3d at 1097 (emphasis in original); *see also Stamatakis Indus., Inc. v. King,* 965 F.2d 469, 471 (7th Cir.1992) ("The [Supreme Court's] antitrust injury doctrine ... 'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.' " (quoting *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,* 961 F.2d 667, 670 (7th Cir.1992))).

The overriding theme of Sterling's case is that, as a result of its merger with Payco, Nestlé PR has monopoly power in the Puerto Rico ice cream distribution market, and has exercised that power. What the undisputed facts demonstrate is that, together, Payco and Nestlé PR had an 85 percent share of the distribution market at the time of their 2003 merger, but that the market share of the merged entity has since fallen to 70 percent. This was not surprising; Nestlé PR's ice cream distribution division had been suffering heavy losses, and hoped the merger would give it viable ice cream distribution business. Still, a 70 percent market share is considerable. Nonetheless, we conclude, as did the district court, that Sterling has not shown

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the market has suffered a reduction in output or an increase in consumer prices. It has not shown an impairment of competition or antitrust injury from the sum of its theories.

Sterling failed to provide evidence that consumer prices increased during the relevant period. Its main economic expert, Dr. Overstreet, asserted, without evidentiary support, that Nestlé PR's acquisition of Payco allowed it to "maintain prices above ... levels that likely would be found in a more competitive market." Dr. Overstreet testified, however, that he did not undertake an analysis of consumer ice cream prices in Puerto Rico, and he stated that there is "probably some dearth of consistent and reliable information about it." Sterling's attempt to show increased prices to consumers was unsupported by basic evidence such as price studies for the Puerto Rico ice cream market, and is unavailing.[FN4]

In fact, the evidence suggests that, if anything, consumer prices *decreased* during the relevant period. Evidence suggests that both Sterling and Blue Bunny adopted a strategy of reducing prices in order to entice retailers to break away from [Nestlé PR's] exclusive contracts. While there was no evidence offered of what happened to retail prices islandwide, there is reason to believe consumers benefitted from these price wars. And independent evidence at least shows that, in some supermarkets, the retail cost of Edy's was lowered. Further, the evidence is that, while inflation in Puerto Rico averaged 11.9 percent annually between 2003 and 2007, the consumer prices for both Blue Bunny and Edy's ice cream were lower in 2007 than they were in 2001.

The evidence regarding output is similar. Sterling did not set forth any evidence from which an inference can be drawn that there was a reduction in output within the relevant market during the relevant period, let alone a reduction attributable to Nestlé PR's alleged violations, or that Sterling consumers were "forced to choose between less preferred brands or visit [ ] another store" as a result of anti-competitive actions.

**\*9** [6][7] The lack of evidence of antitrust injury in the form of either increased consumer prices or reduced output is consistent with the lack of evidence that Sterling itself has been negatively affected by Nestlé PR's purported violations. It is axiomatic that antitrust laws are concerned with protecting against impairments to a market's competitiveness and not impairments to any one market actor. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). It is also true that "an antitrust plaintiff's post-violation successes do not necessarily preclude compensation for damages proximately caused by an antitrust violation." *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 436 (5th Cir.1985). Nonetheless, that Sterling's sales, profits, and market share have increased during the relevant period provides further indication that no antitrust injury exists here.[FN5]

[8] Sterling tries to sidestep these deficiencies by arguing that the types of harm it alleges suffice as alternatives to the classic evidence of antitrust injuries. However, the cases Sterling cites as recognizing alternate types of antitrust injuries actually discuss behavior that would obviously result in higher prices and lower output. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.,* 190 F.3d 775, 778–79 (7th Cir.1999) (total *denial* of an essential input, *in service of* a cartel that would raise prices and reduce output); *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 12–15 (1st Cir.1979) (*termination* of an exclusive distributorship by competitors who had conspired to divide a retail market between them, which is per se illegal behavior designed to raise prices and reduce output). This case is nothing like the cases cited.

Even had Sterling made an adequate showing of harms to competition through increased consumer prices or reduced output, Sterling would have to show those market impairments were the result of antitrust violations in order to demonstrate antitrust injury. But Sterling has failed to show that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

any of Nestlé PR's conduct violates antitrust provisions.

[9] We first reject Sterling's argument that Nestlé PR's exclusive dealing agreements have impaired competition in the market or caused any injury to Sterling. Because vertical exclusive dealing agreements "can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices), no presumption against such agreements exists today." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57, 65 (1st Cir.2004). Given their capacity to enable markets to operate more efficiently and benefit consumers, such agreements are not subject to per se treatment, but are instead subject to rule of reason analysis. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Stop & Shop Supermarket,* 373 F.3d at 62; 11 Areeda & Hovenkamp, *Antitrust Law,* ¶¶ 1802–07 (2d. ed.2005). "Indeed, courts tend to be skeptical of such claims because it is not in the long-term interest of the company that grants the 'exclusive deal' to drive out of business competitors of the grantee ." *Stop & Shop Supermarket,* 373 F.3d at 66.

**\*10** [10] The rule of reason calculus requires that Sterling make a burdensome showing that (1) the agreements in question involved the exercise of power in a particular economic market, (2) that this exercise impaired the competitiveness of the market, and (3) that those impairments "outweighed efficiencies or other economic benefits." *Id.* at 61. Sterling's argument fails under this test for a number of reasons.

[11] As a practical matter, in applying the rule of reason calculus to exclusive dealing arrangements, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent," and while high numbers do not guarantee success for an antitrust claim, "low numbers make dismissal easy." *Id.* at 68. It is undisputed that Nestlé PR/ Payco's rates of market foreclosure through exclusivity arrangements with Puerto Rico retailers rose to a high of 30.8 percent for a single year, 2005, and have otherwise remained below 30 percent.

Significantly, the Nestlé PR/Payco agreements are almost all of one or two year duration, and there is turnover. "Short contract terms and low switching costs generally allay most fears of injury to competition." 11 Areeda & Hovenkamp, *Antitrust Law,* ¶ 1802, at 94. Sterling points to Nestlé PR's five-year, 90 percent exclusive contract with Ralph's as support for its claim. But that agreement is not entirely exclusive; it allows other distributors at least limited access. In any event, its duration is aberrational, and is on its own insufficient to sustain Sterling's claim.

"It is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition in a properly defined relevant market." *Stop & Shop Supermarket,* 373 F.3d at 69. Sterling has not shown that Nestlé PR's exclusive agreements have yielded adverse effects on competition. Sterling and Nestlé PR and other distributors compete to obtain such exclusivity agreements with retail vendors; such agreements have been present in the Puerto Rico market since at least the 1990s. Sterling was able to win over several of Nestlé PR's largest customers, including the large chains Grande and Pitusa, and in 2007, the largest retail seller of ice cream, Supermercados Econo, Inc., switched distributors and defendants lost all of their sales in those stores. It is also significant that there are other avenues of distribution available, and new competitors entering the market. And, as noted, Sterling's own market share has increased during the relevant market period.

There is no evidence that the challenged exclusivity agreements impair competition, nor that any such impairment outweighs gained market efficiencies. *See E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n,* 357 F.3d 1, 9 (1st Cir.2004) (rejecting distributor's antitrust claim regarding competitor's exclusive agreements because distributor failed to show "that so many potential outlets are foreclosed to it or other competitors by

long-term exclusive dealing contracts or other tactics that survival or new entry is infeasible").

**\*11** As to Dreyer's price support for Edy's, Sterling provides no authority supporting its argument that Dreyer's was required to maintain Sterling's $0.75 per-unit discount in perpetuity simply because Dreyer's had been purchased by Nestlé, S.A. There is no basis to conclude that Dreyer's would have continued the discount in perpetuity, whether or not it was acquired by Nestlé. Sterling attempts to analogize its case to *JTC Petroleum* to impose a stricter duty on Dreyer's now that it is a Nestlé subsidiary. But in that case the defendant successfully prevented the plaintiff's suppliers from selling it *any* of the needed input. See *JTC Petroleum,* 190 F.3d at 778–79. The $0.15 reduction in Sterling's discount is hardly analogous. Dreyer's stated legitimate business reasons not to continue this temporary arrangement. And as the district court pointed out, the net present price of Edy's to Sterling is 10 percent less than it was in 2000, despite an annual inflation rate that averaged 11.9 percent between 2003 and 2007.

Further, we have previously noted that "once a firm [like Nestlé PR] has integrated vertically into distribution by acquiring one or more existing distributors [like Payco], it may reduce costs by dealing only with its wholly-owned distributors. A distributor terminated for this reason might certainly suffer injury-in-fact, but it would not suffer antitrust injury as long as there were alternative sources of the product." FN6 *Serpa Corp.,* 199 F.3d at 11. (quoting 2 Areeda & Hovenkamp, *Antitrust Law* ¶ 381c, at 114 (Supp.1999)) (internal quotation marks omitted). Given that, it is difficult to conceive how it could be illegal for Dreyer's to reduce a negotiated $0.75 per-unit discount to $0.60. This rationale disposes of Sterling's next argument as well: there is no antitrust violation lurking in Nestlé, S.A.'s reassignment of certain Dreyer's product lines from Sterling to Nestlé PR.

[12] Our conclusion that Sterling has failed to show it has suffered the requisite injury to maintain this suit also encompasses its monopolization and attempted monopolization claims under § 2 of the Sherman Act.

To prevail on its monopolization claim, Sterling must show that Nestlé PR (1) has monopoly power in the Puerto Rico ice cream distribution market, and (2) "has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 195 (1st Cir.1996) (quoting Hovenkamp, *Federal Antitrust* § 6.4a (1994)) (internal quotation marks omitted).

[13] Whether a defendant has monopoly power depends on the defendant's "ability to lessen or destroy competition" in the relevant market. *Id.* at 196 (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)). Despite Nestlé PR's significant market share, Sterling has failed to demonstrate Nestlé PR has such an ability, or that it has engaged in impermissible practices causing the required injury. If anything, the undisputed facts—that Nestlé PR's own market share is decreasing, that Sterling's market share is steadily on the rise, and that consumer prices have not increased—evidence the opposite conclusion.

**\*12** Sterling nonetheless argues there are high barriers to entry which enhance Nestlé PR's ability to engage in market foreclosure. Although distribution businesses do not commonly involve high barriers to entry, Sterling says many exist here, including: the cost of establishing a Direct Store Delivery system; the substantial capital required to purchase trucks and freezers, particularly because ice cream products must be kept at minus 20 degrees Fahrenheit; and the difficulty of establishing route density. Sterling acknowledges that there have been new entries to distribution of ice cream in Puerto Rico, but says the new businesses, such as Palm Industries, Inc., are not successful.

However, there is other evidence of successful

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

new entries. As the district court noted, Gianni New York, LLC, has entered the market since Nestlé PR's 2003 merger with Payco, distributing to Supermercados Amigo, Inc., one of the largest supermarket chains in Puerto Rico, as well as to two other large chains, Wal–Mart and Supermercados SuperMax. Also, retailers can import ice cream products directly from the United States, bypassing distributors. Both the United States military bases in Puerto Rico and Supermercados Econo, Inc. have adopted that practice. And some suppliers of ice cream in Puerto Rico have their own distribution operation, helping to ensure consumer access and choice.

[14][15] Regarding the attempted monopolization claim, Sterling "must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884. Sterling alleges that Nestlé PR's market share, coupled with its corporate parent's control of Edy's brand ice cream, Sterling's largest product line, create a dangerous probability that it will achieve monopoly power. But where a plaintiff remains profitable and in fact has expanded its market share since the allegedly anticompetitive conduct has begun, it faces an uphill battle in proving such a dangerous probability exists. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.,* 133 F.3d 103, 110 (1st Cir.1997) (rejecting attempt to monopolize claim on basis of plaintiff's strong financial performance).

Under our circuit law, attempted monopolization claims are "presumptively implausible" where, as is the case here, "the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share." *Id.* (quoting Areeda & Hovenkamp, 3A *Antitrust Law* ¶ 807f, at 360–61). That rule applies here. More than six years have passed since the Nestlé PR/Payco merger, and Sterling has been unable to establish any injury to itself or the competitiveness of the market.[FN7]

[16] We add that there was no abuse of discretion in the district court's striking of untimely sections of Sterling's expert's report. *See Macaulay v. Anas,* 321 F.3d 45, 51–53 (1st Cir.2003) (finding no abuse of discretion where district court excluded "supplemental" expert report after close of lengthy discovery period).

IV.

***13** Summary judgment was properly granted. We affirm.

> FN1. Rates of market foreclosure by Payco exclusive accounts rose from 28.2 percent in 2004 to 30.8 percent in 2005, but declined to 29.4 percent in 2006 and 19.5 percent in 2007; the agreements were mostly for one to two years. Sterling argued that foreclosure rates were higher than these figures in certain sub-regions of Puerto Rico. The district court rejected this attempt at "gerrymandering of markets ... to artificially show high levels of foreclosure" given that Sterling had identified the relevant market as the entirety of Puerto Rico in its complaint. *Sterling Merch., Inc. v. Nestlé, S.A.,* 724 F.Supp.2d 245, 265 (D.P.R.2010).

> FN2. Sterling also claims that Nestlé PR's post-merger exclusivity agreements were "unremunerative," but Sterling does not develop the argument or cite to evidence to support this allusion to predatory pricing, and did not adequately raise this argument to the district court.

> FN3. Sterling also attributes its financial performance to the fact that the pendency of both this litigation and an investigation of Nestlé by the Department of Justice has caused Nestlé PR and its subsidiaries to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"restrain themselves from unleashing the full brunt of their power to completely destroy competition."

At oral argument, Sterling raised for the first time the argument that the real danger of Nestlé PR's conduct is the injury that might come to pass in the future, whether or not it has suffered injury now, such as to entitle it to injunctive relief. No such argument was raised in the appellate briefs or in the district court. We decline to address this new argument that Sterling need not show antitrust injury to obtain injunctive relief. This argument has been doubly waived. *See Cortés–Rivera v. Dep't of Corr. & Rehab.,* 626 F.3d 21, 27 (1st Cir.2010).

FN4. At oral argument, Sterling pointed for the first time to evidence that purportedly shows consumer ice cream prices in Puerto Rico increased during the relevant period. Sterling had not cited these documents in its appellate brief. In any event, they do not show consumer prices increased. Sterling points to deposition testimony of its president, which indicates that Sterling had, at one time in 2006, increased prices by 15 percent to some of its retailers. But Sterling's president explicitly stated that the increase was limited, and that he "held pricing back at key retailers through 'roll backs.' " In any case, there is no evidence that the limited number of price increases to *retailers* were ever passed on to *consumers.* Sterling also points to a July 24, 2003 email from a Payco officer that opaquely refers to aligning Nestlé PR prices with Payco prices following the 2003 merger, but this evidence does not show such a price increase actually occurred, and again speaks only to prices to retailers, not consumers. The only evidence Sterling cites that actually relates to consumer prices is a chart detailing pricing of various ice cream brands at Econo supermarkets from June 2003 until August 2006. But that chart shows consumer prices remained relatively constant during the three year period.

FN5. Despite its increased sales, profits, and market share, Sterling argues it suffered damages because it would have earned far more were it not for Nestlé PR's exclusive agreements. It points to its 42 percent and 50 percent market share in retail stores that have no exclusive agreements as plausible benchmarks for what its market-wide performance would be in the absence of exclusive agreements. But this damages model assumes that the proper "but-for" market is one without *any* exclusive agreements. That assumption is erroneous, as these agreements are often efficient and pro-competitive, have been in use in Puerto Rico since before the merger, and, as discussed below, are not illegal in this case. In a market devoid of any exclusivity agreements, Sterling may perform better, but Sterling is not entitled to such a market.

FN6. Alternative sources exist here. The parent company of Nestlé PR is Nestlé, S.A. The major competitor of Nestlé, S.A. on the manufacturing level is Unilever, which has used Sterling as a distributor in Puerto Rico during some of the time period at issue.

We note that the Puerto Rico Office of Monopolistic Affairs (PROMA) approved the 2003 Nestlé PR/Payco merger upon Nestlé PR's agreement to seek PROMA's approval before transferring the distribution rights to *Edy's* ice cream (but not any other Dreyer's brand) from Sterling to another competitor unless Sterling had, in the interim, acquired dis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 3849828 (C.A.1 (Puerto Rico))
**(Cite as: 2011 WL 3849828 (C.A.1 (Puerto Rico)))**

tribution rights to either Breyer's or Blue Bunny ice cream.

FN7. Given our conclusions, we need not consider the statements of Nestlé PR's officers that Sterling argues evidences Nestlé PR's specific intent to monopolize.

C.A.1 (Puerto Rico),2011.
Sterling Merchandising, Inc. v. Nestle, S.A.
--- F.3d ----, 2011 WL 3849828 (C.A.1 (Puerto Rico))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.