THEODORE H. FRANK (SBN 196332)
Email: tfrank@gmail.com
1718 M Street NW
No. 236
Washington, DC 20036
Voice: (703) 203-3848

*In pro per*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In Re Online DVD Rental Antitrust Litigation | Case No. 4:09-md-2029 PJH |
| | **OBJECTION TO PROPOSED SETTLEMENT** |
| | Hon. Phyllis J. Hamilton |
| | Date:        March 14, 2012<br>Time:        9:00 a.m.<br>Courtroom:  3, 4th Floor |
| Theodore H. Frank,<br>    *Objector*. | **CLASS ACTION** |

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................II

TABLE OF AUTHORITIES.......................................................................................IV

INTRODUCTION .......................................................................................................1

I.      THE OBJECTOR IS A MEMBER OF THE CLASS. ...................................1

II.     THE COURT HAS A FIDUCIARY DUTY TO THE UNREPRESENTED MEMBERS
        OF THIS CLASS...............................................................................................2

III.    THIS COUPON SETTLEMENT VIOLATES FEDERAL LAW. .................4

        A.      This Settlement's "Gift Cards" Are Coupons.....................................4

        B.      As a Matter of Policy, The Gift-Card Coupons Are Inherently Problematic. ...................5

        C.      As a Matter of Law, the Settlement's Fee Request Cannot Pass the Test of 28
                U.S.C. § 1712 (a). ......................................................................7

        D.      Based on the Limited Information the Settling Parties Have Supplied, the Best
                Inference Is That Class Counsel Has Vastly Overpaid Itself and Vastly
                Overestimated the Coupons' Real Value. .............................................9

IV.     THE CONTINGENT ARBITRATION PROVISION CREATES NOTICE PROBLEMS
        FOR THE CLASS. .............................................................................11

V.      THIS COURT'S VALUATION OF THE SETTLEMENT SHOULD NOT INCLUDE
        THE COSTS OF NOTICE AND ADMINISTRATION, BECAUSE THEY DO NOT
        PRIMARILY BENEFIT THE CLASS...........................................................12

VI.     THE SETTLING PARTIES INDUCED THIS COURT TO PRELIMINARILY
        APPROVE THE SETTLEMENT THROUGH MATERIALLY INACCURATE
        STATEMENTS TO THIS COURT ABOUT THE ESSENTIAL TERMS OF THE
        AGREEMENT. ...................................................................................15

VII.    THE ATTORNEYS' FEES THIS SETTLEMENT CONTEMPLATES ARE
        EXCESSIVE. ......................................................................................16

VIII.   THIS COURT SHOULD APPLY THE ALI PRINCIPLES IN DETERMINING THE
        FAIRNESS OF THIS SETTLEMENT...........................................................18

        A.      The ALI Principles Are Consistent with *Churchill Village*. .............................19

        B.      As a Matter of Policy, the Court Should Not Infer Settlement Approval from a
                Low Number of Objectors, Especially Because the Parties Have Artificially
                Reduced the Number of Objections. .................................................19

IX.   THIS OBJECTION ARGUES THAT THE CLASS'S SHARE OF THE SETTLEMENT IS TOO SMALL, NOT THAT THE TOTAL VALUE OF THE SETTLEMENT IS INSUFFICIENTLY LARGE. ................................................................................... 22

X.   THIS OBJECTION IS BROUGHT IN GOOD FAITH. ............................................. 23

CONCLUSION .................................................................................................................... 24

**TABLE OF AUTHORITIES**

**Cases**

*Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*,
 52 F.R.D. 373 (D. Kan. 1971)........................................................................... 21

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ....................................2, 3, 13

*Bachman v. A.G. Edwards*, Civ. No. 22052-01266-03 (Cir. Ct., City of St. Louis, May 21,
 2010), *aff'd* 344 S.W.3d 260 (Mo. Ct. App. 2011) .......................................... 5

*Besinga v. United States*, 923 F.2d 133 (9th Cir. 1991)...................................... 13

*Boone v. Philadelphia*, 688 F. Supp. 2d 693 (E.D. Pa. 2009) ............................ 15

*Churchill Village v. General Elec.*, 361 F.3d 566 (9th Cir. 2004) ....................18, 19

*Coppolino v. Total Call Intern., Inc.*, 588 F. Supp. 2d 594 (D. N.J. 2008).......... 13

*Create-A-Card, Inc. v. Intuit, Inc.,* No. C 07-06452 WHA, 2009 WL 3073920 (N.D. Cal.
 Sept. 22, 2009) ..........................................................................................8, 14, 17

*Dewey v. Volkswagen*,
 728 F. Supp. 2d 546 (D. N.J. 2010), *appeal pending*, No. 10-3618 (3d Cir.) .................................. 15

*Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401 (9th Cir. 1989). ...................................... 2, 4

*Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439 (W.D. Pa. 2007) ............................................... 20

*Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292 (S.D. Fla. 2007)............................... 6, 7

*Fleury v. Richemont North Am., Inc.*, No. C-05-4525-EMC, 2008 WL 3287154 (N.D. Cal.
 Aug. 6, 2008) ...............................................................................................5-6

*Ford Explorer Cases*, J.C.C.P Nos. 4266 & 4270 (Cal. Sup. Ct., Sacramento County
 2008).................................................................................................................. 7

*Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) .............................. 20

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)....................................................... 3, 16

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ..................3, 9, 16-17, 22, 23

*In re Classmates.com Consolidated Litig.*, No. 09-cv-0045-RAJ (W.D. Wash 2011) .......................... 22

*In re Diet Drugs Prods. Liab. Litig.,* 385 F.3d 386 (3d Cir. 2004) ........................................ 12

*In re Gen. Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979) ...................... 20

*In re Gen.Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768 (3d.
 Cir. 1995).....................................................................................................2, 4, 20, 21

*In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011)................................................................................................5, 14, 17

*In re Magsafe Apple Power Adapter Litig.*, No. 09-01911-JW (N.D. Cal. 2012), *available at* https:// www.adaptersettlement.com/default.aspx ........................................ 10

*In re Motor Fuel Temperature Sales Practices Litig.*, No. 2:07-md-01840-KHV-JPO, Order (Dkt. No. 3019) (D. Kan. Nov. 10, 2011)..................................................21-22

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998)........................ 14

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010)................................................ 2

*In re Relafen Antitrust Litig.*, 360 F.Supp.2d 166 (D. Mass. 2005)................................................ 2, 3

*In re Wash. Pub. Power Supply Sys. Secs. Litig.,* 19 F.3d 1291 (9th Cir. 1994)................................... 17

*Kealoha v. Castle,* 210 U.S. 149 (1908)................................................................................................ 12

*Kirchoff v. Flynn,* 786 F.2d 320 (7th Cir. 1986)..................................................................................... 8

*Kramer v. Autobytel Inc.*, No. 10-cv-2722-CW (N.D. Cal. 2012), *available at* http://www.textadclass.com ................................................................................................ 10

*Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414 (D.D.C. 2005)................................................... 20

*Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) ............................................7-8

*Lucas v. Kmart Corp.,*  234 F.R.D. 688 (D. Colo. 2006) ........................................................................ 15

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987)................................................................................................................................ 20

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003).......................................................................... 18, 19, 21

*Nilsen v. York County,* 400 F.Supp.2d 266 (D. Me. 2005)..................................................................... 19

*Palamara v. Kings Family Restaurants*, No. 07-cv-317, 2008 WL 1818453 (W.D. Pa. Apr. 22, 2008))................................................................................................................... 15

*Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292 (M.D. Pa. 1995) ...................................... 20

*Powers v. Eichen,* 229 F.3d 1249 (9th Cir. 2000) ................................................................................. 17

*Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277 (7th Cir. 2002) ...................................................... 2, 3

*Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157 F. Supp. 2d 561 (E.D. Pa. 2001)..................14, 15

*Silber v. Mabon,* 957 F.2d 697 (9th Cir. 1992).................................................................................... 2, 4

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990)............................ 9, 17

*Sobel v. Hertz*, No. 3:06-CV-00545-LRH-RAM, 2011 U.S. Dist. LEXIS 68984 (D. Nev. Jun. 27, 2011)................................................................................................................. 5, 18

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)................................................ 3, 4, 13, 17, 22, 23

*Synfuel Tech. v. DHL Express*, 463 F.3d 646 (7th Cir. 2006) .................................................5, 6, 7

*Torrisi v. Tucson Elec. Co.*, 8 F.3d 1370 (9th Cir. 1993)..............................................12, 17

*True v. American Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ....................................... *passim*

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. 2002) .................................................... 3

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005)................................. 8, 14

*Weeks v. Kellogg Co.*, No. CV-09-08102 (MMM)(RZx) (C.D. Cal. 2011), *available at* http://www.cerealadvertisingsettlement.com/index .................................................. 10

*Young v. Polo Retail, LLC*, No. C-0204546-VRW, 2007 WL 951821 (N.D. Cal. Mar. 28, 2007)................................................................................................................15, 16

*Zeller v. E. & J. Gallo Winer, et al., and Constellation Brands, Inc., et al.*, No. BC432711 (Super. Ct. Cal. Los Angeles County 2012), *available at* http://www.frenchpinotnoirsettlement.com .................................................. 10

**Rules and Statutes**

28 U.S.C. §1711, note 2(a)(3)(A) ............................................................................... 6, 8

28 U.S.C. §1712(a) ..................................................................................... 4, 7, 8, 9, 10

28 U.S.C. §1713 ...................................................................................................... 13

Fed. R. Civ. Proc. 23(a)(4) ..................................................................................... 3, 13

Fed. R. Civ. Proc. 23(e) .......................................................................................2, 3, 12

Fed. R. Civ. Proc. 23(e)(5) ......................................................................................... 22

Notes of Advisory Committee on 2003 Amendments to Rule 23(h)..................................... 15

**Other Authorities**

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, comment a.................................................................................................19, 21

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(a) (2010) ...................................................................................................... 18-19

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(b) (2010) .............................................................................................................. 19

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ........................................................................................................... 2, 4

Brunet, Edward, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403 (2003)........................................................ 23

Clifford, Stephanie, "Gift Cards With Bells and Whistles" N.Y. TIMES (Dec. 10, 2010). ....................... 6

Eisenberg, Theodore & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004)...................... 21

Federal Judicial Center, *Manual for Complex Litigation* § 21.71(4th ed. 2008)...................................... 8

Ford, Henry, MY LIFE AND WORK (1922). ...................................................................................... 16

Frankel, Allison, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010). ................................................................................. 23

Jones, Ashby "A Litigator Fights Class-Action Suits" WALL ST. J. (Oct. 31, 2011). ............................ 23

Leslie, Christopher R., *The Need to Study Coupon Settlements in Class Action Litigation*, 18 GEO. J. LEGAL ETHICS 1395 (2005)............................................................................ 5, 7

Leslie, Christopher R., *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71 (2007)........................................................... 20

McMillan, Graeme "Why Walmart's Netflix Settlement Is Worthless (Twice Over)," TIME (Nov. 29, 2011), *available at* http://techland.time.com/2011/11/29/why-walmarts-netflix-settlement-is-worthless-in-two-ways .............................................................. 7

S. Rep. 109-14 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3................................................................ 5

Silver, Charles, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TUL. L. REV. 1809 (2000) ............................................................................................. 8

Tharn, James & Brian Blockovich, *Coupons and the Class Action Fairness Act,* 18 GEO. J. LEGAL. ETHICS 1443 (2005)........................................................................................... 7

Zahorsky, Rachel M., "Unsettling Advocate," ABA J. (Apr. 2010) ...................................................... 23

**INTRODUCTION**

This coupon settlement violates federal law. The Class Action Fairness Act requires that attorneys' fees cannot be awarded until the value that class members receive from the coupons they redeem is known; this settlement turns that rule on its head by compensating class counsel before the class it represents even receives their coupons. Although the advocates of this settlement have claimed that class members may choose between coupons and cash, the settlement encourages the distribution of coupons by making the request for cash more difficult and expensive. Although the settlement contains a binding arbitration clause that could shrink or eliminate the promised compensation to the class (although not the compensation to the attorneys), the class was never informed the class of this possibility by the Class Notice. The settlement's advocates have induced this court to grant this settlement preliminary approval, but class counsel's advocacy rests on multiple pleadings that are materially false. And even if this collection of improprieties were somehow cured, significantly more than a third of the value of the settlement will go into class counsel's pockets as fees and costs, which makes a mockery of the Ninth Circuit's 25% benchmark. In short, this settlement benefits class counsel at the expense of its clients, and this Court should reject it.

This is not a claim that the parties have colluded; this is not a claim that the total value of the settlement package is too small relative to the value of the litigation. It is an objection that the class members are being underpaid relative to the attorneys in violation of Rule 23(e), CAFA, and Ninth Circuit law.

**I.      The Objector is a Member of the Class.**

Objector Theodore H. Frank's business address is 1718 M Street NW, #236, Washington, DC 20036 and phone number is (703) 203-3848. He has been a paying member of Netflix at his Arlington, VA home address continuously since approximately March 20, 2009; he is therefore a member of the class and therefore has standing to object to the settlement. (Frank is a member of the California bar who has successfully argued in the Ninth Circuit multiple times regarding class action settlements.)

Below, he explains why the settlement is, in his judgment, objectionable and not in the best interest of the class. He intends to appear and to represent himself at the fairness hearing, and he reserves

1  the right to cross-examine any witnesses who testify at the hearing in support of settlement approval.

2  **II.      The Court Has a Fiduciary Duty to the Unrepresented Members of This Class.**

3         A district court must act as a "fiduciary for the class," "with 'a jealous regard' " for the rights and

4  interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994–95 (9th Cir. 2010)

5  (quoting *In re Washington Pub. Power Supply Sys. Lit.,* 19 F.3d 1291, 1302 (9th Cir. 1994)). "Both the

6  United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties

7  and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication

8  and settlement of a class action suit." *In re Relafen Antitrust Litig.,* 360 F.Supp.2d 166, 192–94 (D. Mass.

9  2005), citing *inter alia Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e)

10 protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-

11 interested class 'representatives.'"); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir.

12 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed

13 settlements of class actions" prior to settlement).

14        "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights

15 of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to

16 be fair, reasonable and adequate." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*

17 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123

18 (8th Cir. 1975)). "A trial court has a continuing duty in a class action case to scrutinize the class attorney

19 to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte,

20 Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class representative and the courts have a

21 duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir.

22 1992). *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989) ("The

23 district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent

24 class members").

25        There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement

26 bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D.

27 Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord* American Law

28 Institute, Principles of the Law of Aggregate Litig. § 3.05(c) (2010) ("*ALI Principles*").

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *Bluetooth*, 654 F.3d at 948 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)). "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052 (9th Cir. 2002) (quoting *In Re Washington Public Power Supply Syst. Lit.,* 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Vizcaino*, 290 F. 3d at 1052. The United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *Relafen*, 360 F. Supp. at 192-94 (*citing inter alia Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'")); *see also Reynolds,* 288 F.3d at 279-80 ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F. 3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975)). *See also Riker v. Gibbons,* 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber,* 957 F.2d at 701. *Accord Diaz,* 876 F.2d 1401, 1408 (9th Cir. 1989).

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2009)). *Accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ("*ALI Principles*").

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003).

## III.   This Coupon Settlement Violates Federal Law.

This settlement supplies "gift cards" to class members which are, in operation, identical to coupons. Although the Class Notice offers class members a "Wal-Mart gift card" (§ 11), class members who try to use the gift card when shopping at Walmart will be disappointed to discover that it is only "redeemable for purchase at Walmart.com." Settlement Agreement, § 2.21. Coupon settlements are disfavored both by considerations of policy and by black-letter federal law. In this case, the coupon settlement flunks the test that 28 U.S.C. § 1712(a) imposes; in addition, the settlement's structure creates a conflict between class counsel and clients that cannot be resolved.

### A.   This Settlement's "Gift Cards" Are Coupons.

Several factors have contributed to a decline in what are called "coupon settlements" over the last several years; one factor is that such settlements are now officially disfavored by federal law. When Congress passed the Class Action Fairness Act in 2005, it envisioned that coupon settlements would face a harsher level of scrutiny. The Senate Judiciary Committee Report on the Act is a blunt reminder of legislative goals:

> [W]here [coupon] settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting [Section 1712(e)'s requirement of a written determination that the settlement is fair, reasonable and

> adequate], it is the intent of the Committee to incorporate that line of recent federal court precedents in which proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members.

S. Rep. 109-14, at 31 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 32. The settling parties' proposal is far from the first attempt to provide a cosmetic solution to the coupon problem.[1] Although the proposed settlement carefully avoids calling a gift card a "coupon," the gift cards are identical in operation to that disfavored instrument: that is, the only way to benefit from a gift card is to use it to buy something. To state the obvious, it is perfectly accurate to call the gift cards in the settlement agreement "coupons." *See Synfuel Tech. v. DHL Express*, 463 F.3d 646, 654 (7th Cir. 2006) ("a discount on a proposed purchase" is a coupon); *Fleury v. Richemont North Am., Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008) (a coupon settlement is one where the relief constitutes "a discount on another product or service offered by the defendant in the lawsuit"). *Accord True,* 749 F. Supp. 2d at 1069-70; Christopher R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*, 18 GEO. J. LEGAL ETHICS 1395, 1396 (2005). The gift cards this settlement contemplates are not fungible in the way cash is; rather, they can only be used to reduce the price of a limited set of goods on the defendant's website which class members, in order to benefit from the gift card, must use. Another name for such instruments is "coupons." The lawyers who draft these settlements surely know what a coupon is; they surely know consumers would rather have fungible cash than specialized coupons (how could anyone not?); and their resort to euphemism suggests an awareness that, because of the unique characteristics of coupons, settlements that rely on them are inherently problematic.

**B. As a Matter of Policy, The Gift-Card Coupons Are Inherently Problematic.**

Under the Class Action Fairness Act, courts must give heightened scrutiny to coupon settlements.

---

[1] Other proposed class action settlements have offered "rebates," "vouchers," "e-credits," and "certificates" (*see, e.g., True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010); *Bachman v. A.G. Edwards,* Civ. No. 22052-01266-03 (Cir. Ct., City of St. Louis, May 21, 2010), *aff'd* 344 S.W.3d 260 (Mo. Ct. App. 2011); *In re HP Inkjet Litig.,* No. 5:05-cv-3580, 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011); *Sobel v. Hertz Corp.,* No. 3:06-cv-00545-LRH, 2011 U.S. Dist. LEXIS 68984 (D.Nev. Jun. 27, 2011)). But the problem with coupon settlements is not just semantic, but substantive. Regrettably, an unfair settlement agreement, like an unpublishably bad novel, cannot be repaired by resort to the thesaurus.

*Synfuel Tech.,* 463 F.3d at 654; *True*, 749 F. Supp. 2d at 1069; *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007). Coupon settlements are problematic because: (1) they often do not provide meaningful compensation to class members; (2) they often fail to disgorge ill-gotten gains from the defendant; and (3) they often require class members to do future business with the defendant in order to receive compensation. *See Figueroa,* 517 F. Supp. 2d at 1302; *True*, 749 F. Supp. 2d at 1069. The gift cards at issue exhibit all three problems.

Courts "have generally rejected the idea that the face value of coupons or rebates should be used for settlement valuation purposes." *True*, 749 F. Supp. 2d at 1075. "Compensation in kind is worth less than cash of the same nominal value." *Id.* (*quoting Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 390 (C.D. Cal. 2007) (*quoting In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001))). *See also In re GMC Pick-Up Litig.*, 55 F.3d, at 807. "Where a coupon or rebate is not freely transferable on the open market, as is the case here, it has even less value." *True*, 749 F. Supp. 2d at 1075 (citing cases).

Coupons convey less value to their owners than their face value might suggest for several reasons. For almost all class members, there can be no secondary market in these gift cards; the settlement agreement prohibits resale except by licensed resellers or where contradicted by law. Settlement Agreement, § 2.21. Although there is a thriving secondary market in goods like gift cards, the gift cards will never enter it. *See* Stephanie Clifford, "Gift Cards With Bells and Whistles," N. Y. TIMES, at B1 (Dec. 10, 2010) (the leading gift card resale website sold about $10 million worth of them in 2010). Cash cannot expire, but the gift cards can. Settlement Agreement, § 6.1.2.2. Coupon redemption rates are famously low. *See* 28 U.S.C. § 1711, note § 2(a)(3)(A). The rule of thumb is that a redemption rate for a coupon without a secondary market is between 1% and 3%. *See generally* James Tharn & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 GEO. J. LEGAL ETHICS 1443 (2005). Even that low redemption rate may be an overestimate. *See, e.g.,* Final Report on Settlement Claims and Voucher Redemption, *Ford Explorer Cases,* J.C.C.P. Nos. 4266 & 4270 (Cal. Sup. Ct., Mar. 11, 2010) (only 148 coupon claimants out of a million-member class, creating a redemption rate less than one-fifth of 1%). It is difficult or impossible to anticipate every way in which these gift cards may be rendered inferior to cash: the Settlement Agreement incorporates Walmart.com's Gift Card Terms and Conditions (Settlement Agreement, § 2.21), but that website states that "Walmart may update these Terms and

1    Conditions at any time."

2         The other two prongs of the *Figueroa* triad are also in play here. Coupons which are not

3    redeemed cost defendants nothing. But coupons which are redeemed may simply represent a purchase

4    induced by the settlement. "In many cases, coupons are not punishment; they are … the economic

5    equivalent of a court-supervised promotional campaign."[2] *See* Christopher R. Leslie, "The Need To

6    Study Coupon Settlements in Class Action Litigation," 18 GEO. J. LEGAL ETHICS 1395, 1397 (2005).

7    Furthermore, in order to receive any benefit from the settlement, consumers must once again do business

8    with the same company which plaintiffs allege originally misbehaved. The coupon "'require[s] the

9    claimant to return to the Defendant to do business with him,' something at least some class members

10   likely would prefer not to do." *Synfuel Tech.*, 463 F.3d at 654 (quoting objectors in part).

11        It is unclear to what extent the coupons will encourage additional class member patronage and

12   repeat business, and it would be difficult or impossible for this Court to regularly monitor the website to

13   ensure that Walmart does not recoup some portion of the money they lose from the coupons simply by

14   raising its online prices. It is hard to say whether the discounts that these coupons create is a cost or a

15   benefit to the defendant – whether it is a loss-leader or a profit-maker – although one unambiguous

16   benefit that will go entirely to Walmart is that this settlement extinguishes class members' claims. In

17   short, this settlement agreement may place defendants in an enviable posture: if this settlement is

18   approved, they may be able to buy a court-approved marketing program that will extinguish expensive

19   litigation for a bargain-basement price.

20       **C.**    **As a Matter of Law, the Settlement's Fee Request Cannot Pass the Test of 28 U.S.C.**

21           **§ 1712 (a).**

22        If "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then

---

[2] Although it seemed possible earlier in this action that Walmart would accrue a substantial benefit
through this settlement by gaining valuable proprietary information about Netflix's customers, this
concern appears to have been assuaged. See Netflix's Opposition to Plaintiffs' Second Motion for
Preliminary Approval of Settlement with Walmart, July 29, 2011 (Dkt. No. 468); Supplemental Filing
Summarizing Use of Claimant Information in Notice Process Statement by Wal-Mart Stores, Inc.,
August 31, 2011 (Dkt. No. 487). If media reports suggesting that Walmart would profit from this
settlement by receiving a substantial portion of Netflix's proprietary information about class members are
ultimately correct (see, e.g., Graeme McMillan, "Why Walmart's Netflix Settlement Is Worthless (Twice
Over)," *available at* http://techland.time.com/2011/11/29/why-walmarts-netflix-settlement-is-worthless-
in-two-ways/), this would likely provide an additional ground for objection.

class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000).

Because this is a coupon settlement, attorneys' fees "shall be based on the value to class members of the coupons that are redeemed" rather than the theoretical value of the coupons available for redemption. 28 U.S.C. §1712(a). Such low-value settlements where "counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value" were a central legislative motivation of the Class Action Fairness Act. *Id.*, §1711, note 2(a)(3)(A). "The lodestar amount is particularly inappropriate where, as here, the benefit achieved for the class is small and the lodestar award large." *True*, 749 F. Supp. 2d at 1077 (*citing Create-A-Card, Inc. v. Intuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920 (N.D. Cal. Sept. 22, 2009)). Attorneys' fees should be based on a percentage of the recovery. "The contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains. This interest-alignment device is not perfect. . . . But [an] imperfect alignment of interests is better than a conflict of interests, which hourly fees may create." *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986). *See generally* Charles Silver, *Due Process And The Lodestar Method: You Can't Get There From Here*, 74 TULANE L. REV. 1809 (2000) (citing authorities that show a "broad consensus that percentage-based formulas harmonize the interests of agents and principals better than time-based formulas like the lodestar approach."). The percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). In contrast, judicial reliance on the lodestar will "create an unanticipated disincentive to early settlements, tempt lawyers to run up their hours, and compel district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.* Both public policy and the clear language of § 1712(a) require fees to be based on actual class recovery.

In this case, the total value of the settlement fund can be calculated by summing the value of all the coupons that the class actually uses with the cash that plaintiffs (both named and unnamed) and the class attorneys actually get. The dollar value of those benefits and that cash should be "treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." Manual for Complex Litigation (4th ed. 2008), § 21.71, p. 525.

The attorneys' fees may be compared to this total fund to determine whether the allocation between attorneys and the class is reasonable. *See id.* Because this is a coupon settlement, attorneys' fees "shall be based on the value to class members of the coupons that are redeemed" rather than the theoretical value of the coupons available for redemption. 28 U.S.C. §1712(a). Frank maintains, however, that the proposed settlement should be rejected outright, given the striking contrast between the ersatz relief available to the class and the fees that class counsel have secured for themselves.

In short, the attorneys' fees cannot currently be lawfully awarded, because class counsel has not informed the court of how much value the class has in fact received from the coupons. Indeed, this figure will necessarily remain indeterminate for some time. It is not so much that class counsel has failed the test of 28 U.S.C. §1712(a) by giving a bad answer to the question of what value the coupons "that are redeemed" have actually delivered to the class; instead, it looks as if class counsel ignored the law and never supplied anything like an answer at all. This violation of the Class Action Fairness Act is objectionable.

### D. Based on the Limited Information the Settling Parties Have Supplied, the Best Inference Is That Class Counsel Has Vastly Overpaid Itself and Vastly Overestimated the Coupons' Real Value.

Children may be forgiven for wanting their dessert before eating their vegetables, but class counsel's behavior in determining its own fee in the absence of an open and transparent determination of what the class will receive is more troubling. *Six Mexican Workers,* 904 F.2d 1301, 1311 (9th Cir. 1990) (appropriate benchmark for fees is 25% of recovery) and *Bluetooth* (same) illuminate a benchmark beyond which attorney-fee requests should not go without profound justification. There is no getting around the fact that an accurate determination of what class members will receive must precede the determination of class counsel's compensation. However, the unusual structure of this settlement has created several roadblocks that maximize coupon distribution over cash distribution and prevent any realistic calculation of what the class will receive. Until these roadblocks are eliminated, what the class will receive cannot be calculated; until that calculation takes place, attorneys' fees cannot be paid.

*The Coupon/Cash Roadblock.* Class members may choose whether they receive cash or a gift-card coupon. A class member who requests a gift card can submit a claim via e-mail, website, or regular mail; but, curiously, a class member who requests cash may only submit a claim via regular mail, and the

mailed claim for cash must include the claimant's Social Security number. Settlement Agreement, § 8.2.4. Why the settling parties have designed a scheme in which it is more expensive and cumbersome to request cash than to request a coupon is unclear; the Settlement Agreement specifies that cash requests are more cumbersome "in order to minimize fraud risks" (*id.*), but does not explain why coupon requests do not require the same level of security.[3] The settling parties have created a scheme in which one choice is substantially easier to make than another: they have loaded the dice so as to increase coupon claims and decrease cash claims. Although the settling parties' creation of a system for electronic claims processing for gift cards is commendable, the justification for restricting this system to gift card claimants remains a mystery. The issue of gift cards is relevant not just because class counsel has demanded cash payments for itself while engineering a coupon-payment settlement for its clients; it is relevant because, as noted above, attorneys' fees "shall be based on the value to class members of the coupons that are redeemed" rather than the theoretical value of the coupons available for redemption. 28 U.S.C. §1712(a). In other words, setting attorneys' fees before redemption takes place violates the law.

*The Administrative Cost/Mediation Roadblock.* This settlement also creates substantial uncertainty about what compensation to class members might ever be paid: the structure of the Settlement Agreement permits class counsel to seek arbitration, rather than the payment of cash or coupons that the Class Notice offers, if too many class members request cash compensation. Paying cash to class members is apparently encumbered by significant distributional costs, because the structure of the settlement requires the cost of mailing cash compensation to be borne by the portion of the fund designated for notice and administration. Settlement Agreement, § 6.1.2.3. If the mailing costs "become prohibitively expensive relative to the Gift Card component and would unduly diminish the per-claimant recovery," the parties are deemed to agree to mediation "to devise alternatives." *Id.* Indeed, the parties

---

[3] Obviously, many class action settlements distribute cash compensation without requiring class members to furnish a Social Security number. *See e.g.*, *In re Magsafe Apple Power Adapter Litig.*, No C 09-01911-JW, (N.D. Cal. 2012), *available at* https://www.adaptersettlement.com/default.aspx; *Kramer v. Autobytel Inc.*, No. 10-cv-2722-CW (N.D. Cal. 2012), *available at* http://www.textadclass.com/; *Weeks v. Kellogg Co.*, No. CV-09-08102 (MMM) (RZx) (C.D. Cal. 2011), *available at* http://www.cerealadvertisingsettlement.com/index; *Zeller v. E. & J. Gallo Winery, et al., and Constellation Brands, Inc., et al.,* No. BC432711 (Super. Ct. Cal. Los Angeles County 2012), *available at* http://www.frenchpinotnoirsettlement.com.

anticipate that the costs of notice and administration may overrun the funds they have set aside for them. Settlement Agreement, § 7.6. (It is worth noting here that, assuming there are 40 million claimants for benefits, each class member would therefore be entitled to thirty-five cents.[4]) The prospect of a mediated settlement with brand-new terms, because of insufficient resources to pay the bills, certainly will not improve the class's position; what is being planned for here is the possibility that, after class counsel and the named plaintiffs have been paid, the leftovers will be insufficient to compensate those whose circumstances have supposedly justified this action. This provision cannot possibly benefit the class: after class counsel has been paid, and if too many class members request cash compensation, then the "prohibitively expensive" costs of mailing might "unduly diminish" the average class member's recovery – thus plunging class members into mediation that will almost certainly further diminish their compensation. The provision's express warning that, in the event too many class members request cash compensation, the class members might not even receive what the Class Notice promises them is remarkable; that distressing possibility further underscores the moral and legal force of the Class Action Fairness Act's requirement that compensation to the attorneys must occur only after compensation to the class.

These two roadblocks prevent any accurate valuation of the settlement, and so those who must judge its fairness – formerly, class members; now, this Court – are left in unfamiliar territory without a map. Because of that failure, this settlement cannot be approved.

## IV.   The Contingent Arbitration Provision Creates Notice Problems for the Class.

As noted above, the Settlement Agreement contemplates reshuffling the deck and creating an entirely new deal for class members if the mailing costs for class members who request cash compensation "become prohibitively expensive relative to the Gift Card component and would unduly diminish the per-claimant recovery"; at that point, the parties are deemed to agree to mediation "to devise alternatives." Settlement Agreement, § 6.1.2.3. However, this mediation provision raises more questions

---

[4] It is of course impossible to say just how many claimants there will be. But if we accept the figures in Plaintiffs' Motion for Final Approval of Settlement, January 30, 2012 (Dkt. No. 566), at 5, what remains after we subtract attorneys' fees, attorneys' costs, notice and administration expenses, and named class member awards is roughly $14.14 million for the class. Dividing this figure by 40 million class members leaves us with a per capita quotient of just over 35¢.

than it answers. What rules, principles, or law will determine whether the costs of mailing are "prohibitively expensive" in such a circumstance, or whether those costs would "unduly diminish" recovery, or how much cash has to be claimed to trigger arbitration? Do either or both of the settling parties have unbridled discretion to seek arbitration, or is there some objective condition that must be met before arbitration can take place? If the compensation produced by the settlement is altered by binding arbitration, haven't the class members been subject to a bait-and-switch procedure, given that they are entitled to notice under Fed. R. Civ. Proc. 23(e)? If arbitration occurs, how can class members meaningfully consent to or be bound by a settlement which apparently gives them no notice of their substantive compensation at all? Or is it the case that, if the Settlement Agreement says that you might get something from arbitration, you've received sufficient notice? The Settlement Agreement is silent on these questions, which are far from abstract or theoretical – rather, they are at the center of this settlement's fairness, adequacy and reasonableness. The Class Notice is not just silent on these questions; it fails to inform the class that there is any possibility of arbitration at all.

## V.    This Court's Valuation of the Settlement Should Not Include the Costs of Notice and Administration, Because They Do Not Primarily Benefit the Class.

Class counsel argues that it is entitled to count the costs of claim administration and notice to the class as a benefit to the class. This is wrong. First, as a matter of law, post-settlement notice is carried out almost exclusively for the benefit of *defendants*, rather than the class, and thus cannot be double-counted as a class benefit; second, the theory that notice should be counted as a class benefit for purposes of evaluating the settlement would lead to absurd results that contradict the Class Action Fairness Act.

The consideration that defendants receive for settling a class action is a waiver of all claims by class members. But if an individual class member "later claims he did not receive adequate notice and therefore should not be bound by the settlement, he can litigate that issue on an individual basis when the settlement is raised as a bar to a lawsuit he has brought." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). *See also In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 396 (3d Cir. 2004) (countenancing "a collateral attack on the order approving the Settlement" for claims of inadequate notice); *Kealoha v. Castle,* 210 U.S. 149, 155 (1908) (holding that there can be no *res judicata* without notice). Defendants therefore have every incentive to ensure that classwide notice meets constitutional

requirements. This is far from a hypothetical concern: defendants have found themselves on the wrong end of repeat litigation when class members failed to receive constitutionally-adequate notice. *See, e.g., Besinga v. United States*, 923 F.2d 133, 137 (9th Cir. 1991) (reversing dismissal of plaintiff's case because no notice was given in prior class action). *Cf. Coppolino v. Total Call Intern., Inc.*, 588 F. Supp. 2d 594 (D. N.J. 2008) (holding that plaintiff's claim was not barred by *res judicata* when class notice in earlier settlement was constitutionally inadequate). Notice benefits defendants when it creates claim preclusion that would not otherwise exist. As such, the expense of class notice cannot simply be entered as a benefit on the class's side of the ledger.

Furthermore, if the Court adopted the view that notice benefited the class, the very act of settlement could be considered "consideration"—even if class members got nothing in exchange for waiving their rights—simply because those class members received a letter in the mail notifying them of the settlement. For example, imagine a settlement against a bank that provided only a token $100 *cy pres* award, but in which the defendant was entitled to deduct half the cost of notice from individual customers' accounts to pay for attorneys' fees. Such a settlement would normally be prohibited by 28 U.S.C. § 1713.[5] Because the very act of notice "substantially outweighs the monetary loss," if a court adopted the proposition that notice benefits the class generally, the skimming of all class members' accounts would be permissible. Because such a result would be flatly unjust and impossible to square with the plain import of the statute, this suggests that counting notice as a class benefit generally is not only insupportable and unfair, but also self-refuting.[6]

The commission that class counsel demands for administrative expenses is even more indefensible. As part of its share of the settlement, class counsel in effect demands a cut of the court-approved fees and expenses of the claims administrator, as well as a cut of the administrative and

---

[5] "The court may approve a proposed settlement under which any class member is obligated to pay sums to class counsel that would result in a net loss to the class member only if the court makes a written finding that nonmonetary benefits to the class member substantially outweigh the monetary loss."

[6] There is dictum to the contrary in *Staton,* 327 F.3d at 975, but that case cites no authority and provides no reasoning for the proposition. In the context of that opinion—which included notice as a class benefit and found the resultant attorneys' fee award impermissibly high—it appears that the Ninth Circuit was assuming that notice costs could be counted as a class benefit only for the sake of the argument. Moreover, any argument to the contrary would have to account for the fact that *Staton* appears to have been legislatively superseded by the enactment in 2005 of 28 U.S.C. § 1713.

1  maintenance fees associated with the settlement fund. Just as in the case of the notice expenses, the

2  money going to the claims administrator is money going to a third party, rather than the class, and should

3  not be considered part of the common fund for purposes of calculating the fee award. Any other result is

4  the economic equivalent of a kickback where class counsel gets money based on how much the

5  settlement administrator bills.

6      Such an arrangement creates a conflict of interest between the attorney and the class. Under the

7  current structure, every dollar the settlement administrator receives is a dollar the class will not receive.

8  If attorney fees are paid only on what the class receives, class counsel will have appropriate incentive to

9  ensure that settlement administration is efficient and to take steps to prevent overbilling or wasteful

10  expenditures. But if class counsel is given a commission based on the size of administrative expenses, it

11  would have no financial incentive to oversee the efforts of the administrator, creating a perverse system

12  of compensation that discourages assignment of resources to the class. *Cf. Wal-Mart Stores, Inc. v. Visa*

13  *U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (attorney fee calculations should use methods which align

14  the interests of attorney and client).

15      Class counsel may legitimately request a percentage of what the class receives: however, it should

16  not be rewarded for the amounts the defendant pays the post office and the settlement administrator any

17  more than it should be rewarded for the amounts the defendants pay defense counsel. In short, class

18  counsel should only be asking for a share of the money the class *actually* receives. The "key

19  consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*"

20  (emphasis in original). *In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10

21  (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.,* No. C 07-06452 WHA, 2009 WL

22  3073920, at * 3 (N.D. Cal. Sept. 22, 2009)). " '[N]umerous courts have concluded that the amount of the

23  benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee

24  charge should be assessed.' " *In re Prudential Ins. Co. America Sales Practices Litig.,* 148 F.3d 283, 338

25  (3d Cir. 1998) (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37). "In determining the appropriate

26  amount of attorneys' fees to be paid to class counsel, the principal consideration is the success achieved

27  by the plaintiffs under the terms of the settlement." *Schwartz v. Dallas Cowboys Football Club, Ltd.,* 157

28  F. Supp. 2d 561, 579 (E.D. Pa. 2001). In short, class counsel is entitled to request a share of the benefits

1  it brings to the class; its demand for a share of expenditures that benefit other parties in the action is

2  unreasonable.

3       This court would be within its discretion to exclude the costs of administration and notice from its

4  calculation of the value of the settlement. *See Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 595

5  n.69 (D.N.J. 2010), *appeal pending,* No. 10-3618(L) (3d Cir.) (court declines to include claims

6  administration expenses because, among other things, it "did not provide a direct benefit to the class");

7  *Schwartz,* 157 F. Supp. 2d 561. *See also Boone v. Philadelphia,* 668 F. Supp. 2d 693, 702, 715 (E.D. Pa.

8  2009) (deducting administrative expenses from the value of the settlement fund). This court should

9  follow the trend of those cases when calculating the value of the settlement.

10  **VI.    The Settling Parties Induced This Court to Preliminarily Approve the Settlement Through**

11  **Materially Inaccurate Statements to this Court About the Essential Terms of the**

12  **Agreement.**

13       The settling parties have failed to stand by the agreement which they originally presented to this

14  Court. In the settling parties' original Motion for Preliminary Approval of this settlement on July 15,

15  2011 (Dkt. No. 454), they repeatedly referred to the requirement under federal law that a court must

16  ensure that "nonmonetary provisions" in a settlement must result in "actual value to the class." *See id.* at

17  19 (the motion uses the phrase "actual value" no less than 4 times on that page); Fed. R. Civ. Proc. 23(h),

18  Advisory Committee Notes to 2003 Amendments to Rule 23. That motion then explained how a gift card

19  would bring "actual value to the class":

20

21       Significantly, the Gift Card is fully transferable. Courts have found that
22       the transferability of gift cards is important in determining that a
       settlement has actual value to the class. *See, e.g., Young v. Polo Retail,*
22       *LLC,* No. C-0204546-VRW, 2007 WL 951821, at *4 (N.D. Cal. Mar. 28,
       2007)("More compelling than the availability of alternative items like
23       Polo brand paint or perfume is the transferability of the gift cards; this
       enables class members to obtain cash – something all class members will
24       find useful."); *Lucas v. Kmart Corp.,* 234 F.R.D. 688, 692-93 (D. Colo.
       2006) (granting preliminary approval to class action settlement with
25       portion of settlement in gift cards redeemable at face value); *Palamara v.*
       *Kings Family Restaurants,* No. 07-cv-317, 2008 WL 1818453, at *1, *6
26       (W.D. Pa. Apr. 22, 2008) (granting final approval to a settlement that
27       involved vouchers with a retail value of $4.68).

28

1    In short, under the briefs filed with this Court, it is the "fully transferable" nature of the Gift Card

2    that "enables class members to obtain cash" and thus acquire "actual value." Two weeks ago (and long

3    after the Settlement Agreement was signed), the above paragraph was reproduced almost word-for-word

4    in Plaintiffs' Motion for Final Approval of Settlement (omitting only the now-immaterial *Lucas* citation),

5    reiterating the paragraph's promise, explanation, and operational definition of "transferability." Dkt. No.

6    566, at 10.

7    At some point after preliminary approval of this settlement, however, the settling parties changed

8    the deal that they had presented to the Court, so as to eliminate the "actual value" that this settlement's

9    Gift Cards had promised to the class – although they continued to communicate the previous

10   understanding as operational to this Court. *Id.* The Settlement Agreement now provides that the Gift Card

11   will be "fully transferable but may not be resold."[7] Settlement Agreement, § 6.1.2.3. That is, despite the

12   multiple depictions of full transferability made to this Court, class members can redeem the cards at

13   Walmart.com or give them away, but cannot sell them. "Where a coupon or rebate is not freely

14   transferable on the open market, as is the case here, it has even less value." *True*, 749 F. Supp. 2d at 1075

15   (citing cases). The upshot of this restriction is that a central aspect of the Gift Cards that the settling

16   parties conveyed to this Court as delivering "actual value" – *Young v. Polo Retail's* definition of

17   "transferability" – has been abandoned by the parties' subsequent Settlement Agreement. The Settlement

18   Agreement's qualification is reminiscent of Henry Ford's famously qualified promise that a Ford buyer

19   could have "any color he wants, so long as it is black," (HENRY FORD, MY LIFE AND WORK (1922), 72).

20   A gift card that is "fully transferable" but that "may not be resold" has been materially qualified

21   downward not only in transferability but in "actual value." Regrettably, plaintiffs' briefing has repeatedly

22   conveyed to this Court a materially false portrait of the value that class members will receive from this

23   settlement. This provides another reason that this settlement is objectionable.

24   **VII.    The Attorneys' Fees This Settlement Contemplates Are Excessive.**

25   If counsel "receive[s] a disproportionate distribution of the settlement," *Bluetooth*, 654 F.3d 935

26   (quoting *Hanlon*, 150 F.3d at 1021), it would be a "warning sign" that "class counsel have allowed

---

27   [7] More precisely, the card may not be resold unless the class member is a licensed reseller or applicable

28   law requires the contrary. *Id.*

pursuit of their own self-interests … to infect the negotiations." *Id.* at 947. A proportionate distribution is one in line with the Ninth Circuit's benchmark, which is that 25% of the fund should be "given in common fund cases." *See, e.g., id.; Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *Torrisi.*, 8 F.3d at 1376; *Powers v. Eichen,* 229 F.3d 1249, 1256-57 (9th Cir. 2000). Certainly, the Ninth Circuit's benchmark percentage-of-recovery approach has certain limitations (*e.g.,* the common fund should not include inestimable injunctive relief; *see Staton*, 327 F.3d at 973), and the benchmark may appropriately be adjusted because of special circumstances. *E.g., In re Wash. Pub. Power Supply Sys. Secs. Litig.,* 19 F.3d 1291 (9th Cir. 1994) (court reduced benchmark in megafund case); *Six (6) Mexican Workers,* 904 F.2d at 1311 (considering the length of litigation, degree of success obtained, and complexity of the issues, court ultimately decided to adhere to the benchmark). The strength and flexibility of this approach provides a superior method of aligning the interests of class counsel and class members.

The Settlement Agreement's proposed schedule of payments is, unfortunately, incompatible with the benchmark. Defendants will write a check for $27.25 million, of which class counsel will receive $8.5125 million for its fees and costs; the costs of notice and claims administration will swallow up roughly $4.55 million. Plaintiffs' Motion for Final Approval of Settlement (Dkt. No. 566), 5. This leaves roughly $14.19 million for named and unnamed class members. As noted above, the "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*" (emphasis in original). *In re HP Inkjet Printer Litig.,* No. 5:05-cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (quoting *Create-A-Card Inc., v. Intuit, Inc.,* No. C 07-06452 WHA, 2009 WL 3073920, at * 3 (N.D. Cal. Sept. 22, 2009)). The upshot of these figures is that class counsel has negotiated compensation for itself that goes far outside this Circuit's benchmark. Instead of compensation that respects the 25% benchmark, class counsel has asked for over 37% of the value of this settlement.[8] As a practical matter –

---

[8] By the *Inkjet* rule, we sum the dollars that go to the class members and to their counsel to determine the value of the settlement, but we do not include the payments for notice and claims administration because they do not signify "benefit *actually conferred.*" The value of the settlement therefore includes the $8.5125 million that goes to class counsel for its fees and costs as well as the roughly $14.19 million that the class will receive by the terms of the settlement. The percentage of the settlement benefits class counsel will receive – their payment for fees and costs, divided by the sum of the two figures immediately above – is almost exactly 37.5%.

because some of the benefits that might go to the class will never be received, given that people occasionally lose gift cards – it is necessarily true that the 37% figure will ultimately rise even higher.[9] Especially in the context at hand, in which the class will receive pennies on the dollar, class counsel's consumption of such a large portion of the value of this settlement is objectionable. *Cf.* "Class Counsel has requested for itself an uncontested cash award ... with only a modest discount from the claimed lodestar amount. In other words, the class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." *Sobel v. Hertz*, No. 3:06-CV-00545, 2011 U.S. Dist. LEXIS 68984, at *44 (D. Nev. Jun. 27, 2011)

**VIII.   This Court Should Apply The ALI Principles In Determining The Fairness Of This Settlement.**

Standards for reviewing settlements differ from circuit to circuit: the "current case law on the criteria for evaluating settlements is in disarray." *ALI Principles* § 3.05, cmt. a at 205. The Ninth Circuit has asked courts to follow an eight-factor test. *E.g.*, *Churchill Village v. General Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004). But the Ninth Circuit has also reversed settlement approvals without reference to the eight-factor test. *Molski,* 318 F.3d 937 (reversing settlement approval without reference to eight-factor test).

Some of the *Churchill Village* factors are not helpful in evaluating a settlement, not least because the cases give no guidance to how to weigh the various factors. One possible method of resolving this concern and rationalizing the law would be for courts to follow § 3.05 of the American Law Institute's *Principles of the Law of Aggregate Litigation*. The ALI *Principles* provide more than an indeterminate balancing test of multiple factors; rather, they suggest that courts should examine settlements to see if they pass several specific tests of fairness. Under § 3.05(a), there is an initial four-part test that all settlements must meet: the court must consider whether

> (1) the class representatives and class counsel have been and currently are adequately representing the class;

---

[9]   This is exactly the kind of practical problem that underscores why the value that the class actually receives – that is, "the value to class members of the coupons that are redeemed" –  must be calculated before attorneys' fees can be determined.

(2) the relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;

(3) class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; and

(4) the settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four requirements, a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case." *Id.* § 3.05(b).

A.    **The ALI Principles Are Consistent with *Churchill Village*.**

It is within this court's discretion to use the § 3.05 standards as a consistent complement to the *Churchill Village* eight-factor test — which also asks courts to examine the risks of the case and the reasonableness of the settlement fund in relation to those risks — and to *Molski v. Gleich*, which supplied more general standards of fairness. Ninth Circuit precedent on the question is compatible with the use of ALI's *Principles* § 3.05 in evaluating this settlement; furthermore, appropriate use of the *Principles* could rationalize the somewhat untethered *Churchill Village* factors, thus solving the problem of a multi-factor test that provides little guidance in distinguishing good settlements from bad ones. (*Cf.* the discussion of judicial fee-setting in *Nilsen v. York County,* 400 F.Supp.2d 266, 277 (D. Me. 2005) (a multi-factor approach "offers little predictability" to lawyers and judges. and its "highly subjective approach" "allows uncabined discretion").)

B.    **As a Matter of Policy, the Court Should Not Infer Settlement Approval from a Low Number of Objectors, Especially Because the Parties Have Artificially Reduced the Number of Objections.**

Class counsel has argued that class members who have not contacted this Court about the settlement support it; more precisely, it has argued that the absence of class reaction demonstrates that "at least 99.99999% of the class is in favor of the Settlement." Plaintiffs' Motion for Final Approval of Settlement (Dkt. No. 566), 13. This is an insupportable argument that has been refuted by multiple authorities.

Any given class action settlement, no matter how much it betrays the interests of the class, will produce only a small percentage of objectors. The predominating response will always be apathy,

because objectors—unless they can obtain *pro bono* counsel—must expend significant resources on an enterprise that will create little direct benefit for themselves. Another common response from non-lawyers will be the affirmative avoidance, whenever possible, of anything involving a courtroom. Class counsel may argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. This is wrong. Silence is simply *not* consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing In re Gen. Motors Pick-Up Litig.,* 55 F.3d at 789.). "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007).

Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir. 1981)); *cf. Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995) ("'[T]he silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement . . . .'"). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680–681 (7th Cir. 1987). "Acquiescence to a bad deal is something quite different than affirmative support." *In re Gen. Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) (reversing approval of settlement).

When class members have little at stake, the rate of response will be predictably low. As such, the

response from class members cannot be seen as something akin to an election or a public opinion poll. *See In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when low number of objectors in large class, when "those who did object did so quite vociferously"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529, 1532 (2004). It is typically not worth the average citizen's time or money to object: the slight likelihood that one additional objection will be decisive, when multiplied by the slight increase in an individual class member's payout that such an objection would produce, makes individually-funded objections a losing proposition.

The Court must act as a guardian for *all* class members—whether or not they have formally entered the case by registering an objection. "[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971). The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *In re Gen. Motors Pick-Up Litig.*, 55 F.3d at 812–13; *ALI Principles* § 3.05, *comment a* at 206.

Silence of absent class members will be all the more pronounced in cases like the one at hand, in which the settling parties have artificially reduced the number of objections in various ways. As discussed above, the class notice provided no mention of the potential for arbitration in this settlement. Because misleading notice is not informative, such notice is also inadequate. *Molski,* 318 F.3d at 952; *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 427 (D.D.C. 2005) ("Inaccurate notice is equivalent to no notice at all"). Similarly, the misleading offer in the Class Notice of a "Walmart gift card" is hard to square with the reality of a card that can only be used through Walmart.com.

Second, even if class members manage to inform themselves of the matters about which the Class Notice is silent, the process of objection and opting out is unnecessarily burdensome. The requirement that objectors print and mail multiple copies of their objection is both expensive and outdated in 2011. Other courts permit the relatively efficient (indeed, close to costless) method of transmitting objections by email; *see In re Motor Fuel Temperature Sales Practices Litig.*, No 2:07-md-01840-KHV-JPO, Order (Dkt. No. 3019), at 2 (D. Kan. Nov. 10, 2011) ("If Costco plans to proceed with email notification, it

must allow class members to opt out of the class and object to the settlement electronically"); Class Notice, *In re Classmates.com Consolidated Litig.*, No. 09-cv-0045-RAJ (W.D. Wash 2011), *available at* http://www.cmemailsettlement.com/docs/notice.pdf. Notably, the settlement administrator provides an email contact form on its own website for its own customers; for some reason, the settlement administrator never made this method of communication available to objectors, although those who request coupons (but not cash) are permitted to use relatively fast and cheap electronic methods.

Put together, these hurdles create some doubt as to whether the ultimate Settlement Agreement appropriately respects class members' Fed. R. Civ. P. 23(e)(5) right to object to the settlement. If they do not constitute an independent reason to reject the settlement in this case, at the very least they provide an added reason to discredit any argument that the lack of objectors in any way signals the class members' approval of the settlement.

## IX. This Objection Argues That the Class's Share Of The Settlement Is Too Small, Not That The Total Value Of The Settlement Is Insufficiently Large.

This settlement is impermissibly self-dealing. It should not stand as a matter of law. But it is worthwhile to distinguish this objection's arguments from the arguments it is *not* making.

This objection does not argue that the value of the settlement is too small. The argument here is not that the settlement should be of greater magnitude; rather, the argument is that a larger share of the settlement should have gone to the class, as opposed to the lawyers who are charged to represent them. Perhaps a single peppercorn to the class would be fair, but if the class attorneys have permitted too much money to be directed to themselves and too few resources to go the class, then the settlement is unfair on the grounds of self-dealing. "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton,* 327 F. 3d at 964; *accord Bluetooth,* 654 F.3d at 947. The nature of class counsel's fees is an inherent and inseparable part of the settlement, and any evaluation of the settlement's fairness must include it: "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness … The settlement must stand or fall in its entirety." *Bluetooth,* 654 F. 3d at 948 (emphasis, quotations, and citations omitted).

This objection also does not argue that the settlement is a product of collusion. However, demonstrating that a settlement lacks collusion does not thereby demonstrate that the settlement is flawless. Lack of collusion is *necessary* for settlement approval, but it is not *sufficient*. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth,* 654 F.3d at 947. An objector need not demonstrate collusion to demonstrate an unfair settlement; all it takes to make a settlement unfair is a defendant's indifference to class counsel's self-dealing. *Staton,* 327 F.3d at 964. *Bluetooth's* distinction between collusion and impermissible self-dealing is at the heart of this objection: when attorneys' fees are too large, this is evidence of self-dealing whether collusion is established or not.

## X.      This Objection Is Brought In Good Faith.

Objector Frank is an attorney and represents himself *pro se*. It is perhaps relevant to distinguish this objector's intentions from the agenda of those who are often styled "professional objectors." It is understood that "professional objectors" are for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n.150 (2003). This is not Frank's business model. While Frank has brought several objections to unfair class action settlements on behalf of himself and other clients, the majority of which have been successful, he refuses to engage in *quid pro quo* settlements and does not extort attorneys; he has never withdrawn an objection in exchange for payment, and has won millions of dollars for class members. *See, e.g.*, Ashby Jones, "A Litigator Fights Class-Action Suits," WALL ST. J. (Oct. 31, 2011); Rachel M. Zahorsky, "Unsettling Advocate," ABA J. (Apr. 2010); Allison Frankel, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010).

Nonetheless, it is Frank's experience, based on the conduct of class counsel in other cases, that some attorneys will falsely and unjustifiably accuse Frank of objecting in bad faith and seeking to extort class counsel. If this Court has any doubt whether his objection is brought in good faith, Frank is willing

to stipulate to an injunction prohibiting himself or any entities affiliated with him from accepting compensation in exchange for the settlement of this objection.

## CONCLUSION

This settlement violates one aspect of the law after another: the Class Action Fairness Act, Rule 23's guarantees of notice, this Circuit's benchmark, the requirement of accuracy in representation before this Court, and on and on. This Court should reject this settlement; in the alternative, it should reduce the compensation that class counsel receives to no more than 25% of the total value of the settlement that is actually redeemed by class members.

In the very unlikely event that class members were actually conferred the approximately $14.19 million that this settlement promises (which in any case cannot be determined before actual coupon redemption, as opposed just to coupon distribution), that would mean that class counsel's compensation under the law would be limited to roughly $4.73 million. Class counsel's current compensation scheme under the settlement agreement allows $8.5125 million for fees and costs, which is not so much excessive as it is exorbitant. As such, this court should delay any ruling on fees until it is given the required information on coupon redemption by the class.

Dated: February 14, 2012          Respectfully submitted,


                                   /s/ Theodore H. Frank
                                   Theodore H. Frank (SBN 196332)
                                   1718 M Street NW, No. 236
                                   Washington, DC 20036
                                   tedfrank@gmail.com
                                   (703) 203-3848

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I served true and correct copies upon these parties via first class mail at the addresses below, per the instructions of the Class Notice.

U.S. District Court for the Northern District of California
Courtroom 3
1301 Clay Street
Oakland, CA 94612

Lawrence DiNardo
Paula W. Render
Jones Day
77 West Wacker Drive
Chicago, IL  60601

Robert G. Abrams
Gregory L. Baker
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036-5304

Jonathan M. Jacobson
David H. Reichenberg
Wilson Sonsini Goodrich and Rosati
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY  10019

DATED this 14th day of February, 2012.

_(s) Theodore Frank_
Theodore Frank